EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Guillermo San Antonio Acha, en su capacidad oficial como Comisionado Electoral del Partido Popular Democrático<br><br>    Peticionario<br><br>        v.<br><br>Liza García Vélez, en su capacidad oficial como Presidenta de la Comisión Estatal de Elecciones; Aníbal Vega Borges, en su capacidad oficial como Comisionado Electoral del Partido Nuevo Progresista; Roberto I. Aponte Berríos, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño y José F. Córdova Iturregui, en su capacidad oficial como Comisionado Electoral del Partido del Pueblo Trabajador<br><br>    Recurridos<br><hr><br>Aníbal Vega Borges, en su capacidad oficial como Comisionado Electoral del Partido Nuevo Progresista<br><br>    Peticionario<br><br>        v.<br><br>Liza García Vélez, en su capacidad oficial como Presidenta de la Comisión Estatal de Elecciones; Guillermo San Antonio Acha, en su capacidad oficial como Comisionado Electoral del Partido Popular Democrático; Partido Independentista Puertorriqueño, por conducto de su Comisionado Electoral Sr. Roberto U. Aponte Berrios; Partido del Pueblo Trabajador por conducto de su Comisionado Electoral Dr. José F. Córdova Iturregui<br><br>    Recurridos | 2016 TSPR 227<br><br>196 DPR \_\_\_\_ |

Número del Caso: CT-2016-15

Fecha: 4 de noviembre de 2016

Abogados de la parte Peticionaria:

**Comisionado Electoral del PNP**
Lcda. María Elena Vázquez Graziani
Lcdo. Hamed G. Santaella Carlo
Lcdo. Alfonso A. Orona Amilivia

Abogados de la parte Recurrida:

**Comisionado Electoral del PPD**
Lcdo. Pedro Ortiz Alvarez
Lcdo. Guillermo San Antonio Acha
Lcdo. Jorge Martínez Luciano
Lcda. Alexis G. Rivera Medina

**Comisionado Electoral del PPT**
Lcda. Rosa M. Seguí Cordero

**Comisionado Electoral del PIP**
Lcdo. Luis E. Romero Nieves

**Comisión Estatal de Elecciones**
Lcdo. Manuel Izquierdo Encarnación
Lcdo. Héctor E. Pabón Vega

**Comisiona Especial:**
Lcda. Aileen Navas Auger

Materia: Sentencia con opiniones disidentes.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Guillermo San Antonio Acha, en su capacidad oficial como Comisionado Electoral del Partido Popular Democrático<br><br>Peticionario<br><br>v.<br><br>Liza García Vélez, en su capacidad oficial como Presidenta de la Comisión Estatal de Elecciones; Aníbal Vega Borges, en su capacidad oficial como Comisionado Electoral del Partido Nuevo Progresista; Roberto I. Aponte Berríos, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño y José F. Córdova Iturregui, en su capacidad oficial como Comisionado Electoral del Partido del Pueblo Trabajador<br><br>Recurridos | CT-2016-15 |  |
| Aníbal Vega Borges, en su capacidad oficial como Comisionado Electoral del Partido Nuevo Progresista<br><br>Peticionario<br><br>v.<br><br>Liza García Vélez, en su capacidad oficial como Presidenta de la Comisión Estatal de Elecciones; Guillermo San Antonio Acha, en su capacidad oficial como Comisionado Electoral del Partido Popular |  |  |

Democrático; Partido Independentista Puertorriqueño, por conducto de su Comisionado Electoral Sr. Roberto U. Aponte Berrios; Partido del Pueblo Trabajador por conducto de su Comisionado Electoral Dr. José F. Córdova Iturregui

Recurridos

SENTENCIA

En San Juan, Puerto Rico, a 4 de noviembre de 2016.

Tradicionalmente para las elecciones generales, electores activos de todas las ideologías y creencias políticas solicitan el ejercicio del voto por adelantado autorizado por la Ley Electoral, *infra*, por confrontar problemas de movilidad. Figure que un elector presenta a tiempo la solicitud correspondiente, firmada por un médico, quien certifica que en efecto tiene impedimentos de movilidad. El elector confía que no hay problemas con su solicitud porque nadie le ha dicho que los haya. Sin embargo, para su sorpresa, a días de las elecciones su solicitud de voto adelantado es automáticamente dejada sin efecto porque el Comisionado Electoral de un partido político impugna su petición y nunca le notifica. Peor aún, la Presidenta de la Comisión Estatal de Elecciones (CEE) toma la decisión de denegar esa solicitud y no notifica oportunamente a ese elector de manera que pueda

defender su derecho. Por ende, nadie le dio la oportunidad de defender su derecho en la CEE ni ante los tribunales.

Este cuadro se agrava aún más, cuando la CEE expresamente reconoce que notificó tardíamente a los electores al enviar su decisión por correo regular dos días más tarde. Esto, a pesar de que ese elector tan sólo cuenta con 24 horas para cuestionar esa decisión ante los tribunales. Es decir, primero no le avisaron de la impugnación y cuando al fin decidieron en la CEE, causaron que se enterara cuando ya era muy tarde para alegar nada o peor aún, al día de hoy no hay evidencia de que le hayan avisado correctamente.

Para el elector este escenario es una pesadilla, pero para los menos de 800 electores objeto de estos casos consolidados, de todas las ideologías y afiliaciones políticas, es una situación real. Eso es, precisamente, lo que le sucedió a estos electores, muchos de ellos personas de la tercera edad que confiaron en el ejercicio del mecanismo de voto adelantado que la Ley Electoral les da.

Quien crea que no hay nada malo con este escenario estará a favor de confirmar a ciegas el dictamen de la Presidenta de la CEE. En cambio, quien crea que este tortuoso proceso adolece de garantías básicas para la protección del derecho al voto, tales como la ausencia de una notificación efectiva de una decisión que le es adversa, entonces estará a favor de revisar la determinación de la presidenta de la CEE y validar las

3

solicitudes de votos en controversia. La desconfianza y la sombra que se arrojaría sería si este Tribunal valida ese nebuloso proceso y, en consecuencia, le hubiésemos brindado preeminencia a la burocracia, a las omisiones de la CEE y a los intereses partidistas, por encima del derecho al voto que protege la Constitución y la Ley Electoral.

I

En el presente caso se impugna la determinación de la Presidenta de la CEE con relación a cientos de electores **debidamente registrados** que cumplimentaron el proceso para solicitar el voto adelantado por razón de tener alguna condición de movilidad que les impide acudir a su centro de votación el día de las elecciones generales. Ante la inminencia del proceso electoral, y estando en peligro la posibilidad de que cientos de electores puedan ejercer su derecho fundamental al voto, le corresponde a este Tribunal finiquitar la controversia sin mayor dilación.

Los hechos del caso ante nos surgen como consecuencia del proceso para solicitar el voto adelantado de aquellos electores que padecen de algún impedimento que les obstaculiza acudir a sus colegios electorales para ejercer su derecho al voto. Ante las discrepancias que surgieron como parte del proceso, se presentaron una serie de apelaciones ante la CEE con relación a 788 de estas solicitudes, las cuales quedaron sometidas ante ese organismo desde el 21 de septiembre de 2016, 3, 4, y 5 de

4

octubre de 2016. A pesar de la celeridad con la que se debió atender la controversia, no fue hasta el 26 de octubre de 2016 que la CEE emitió su determinación con relación a estos electores mediante *Resolución Enmendada.*[1] Es decir, la CEE emitió su determinación a tan sólo 72 horas de que comenzara el voto adelantado de acuerdo con la *Ley Electoral del Estado Libre Asociado de Puerto Rico*, Ley Núm. 78-2011, según enmendada, 16 LPRA sec. 4179(m) (Ley Electoral).[2]

**De los hechos ante nos, no existe afirmación ni constancia alguna con relación a si los electores afectados por esta determinación fueron notificados oportunamente de la *Resolución Enmendada* o de cualquier otra.**[3] Lo que sí es incuestionable es que de la propia *Resolución Enmendada* se desprende que el "trámite administrativo para conformar los expedientes de estos casos en la Oficina de la Secretaría de la CEE ha sido complejo y azaroso".[4] Lo azaroso se torna en peligroso, cuando la *Resolución Enmendada* revela que "al momento de evaluar los expedientes con las solicitudes de estos

---

[1]*Véase, Resolución Enmendada* de la CEE, CEE-RS-16-83.

[2]Nótese que el Art. 9.039 de la Ley Electoral, dispone que el proceso de voto adelantado tiene que comenzar 10 días previos a las elecciones generales y terminar, por lo menos, un día antes de la elección. 16 LPRA sec. 4179(m).

[3]*Véase*, la Certificación emitida por el Secretario de la CEE el 31 de octubre de 2016, Anejo 1 de la comparecencia del Comisionado del PNP.

[4]*Véase, Resolución Enmendada de la CEE,* pág. 1.

electores se continúan recibiendo documentos y Apelaciones de diferentes electores que solicitan a la Comisión que les autorice a votar mediante esta forma".[5] Sin embargo, la *Resolución Enmendada* adolece de información detallada en torno a cuáles electores se les observó las garantías del debido proceso de ley, si alguno, y a cuáles no; al punto que la resolución impugnada no dispone detalladamente cuáles son las partes afectadas. Más bien, la *Resolución Enmendada* se limita a ordenarle al Secretario de la Comisión, que en la etapa posterior a la adjudicación notifique la misma. Como cuestión de hecho, el Secretario de la CEE certifica la notificación con un lenguaje distinto al ordenado por la Presidenta de la CEE. Mientras, la Presidenta de la CEE ordena de forma genérica la notificación, sin incluir detalladamente las partes afectadas, el Secretario de la CEE se limita a certificar que notificó a "partes interesadas".[6]

A pesar de ello, tanto el Comisionado del Partido Popular Democrático (Comisionado del PPD) como el Comisionado del Partido Nuevo Progresista (Comisionado del PNP) acudieron al día siguiente ante el Tribunal de Primera Instancia para revisar los procesos ante la CEE. Los recursos fueron consolidados por el Tribunal de Primera Instancia por solicitud y anuencia de las partes.

---

[5] Íd.

[6] Íd., pág. 35.

6

Paralelamente al procedimiento ante el foro primario, el Comisionado del PNP solicitó la certificación intrajurisdiccional del recurso instado ante el Tribunal de Primera Instancia. Debido al interés apremiante, este Tribunal atendió la petición ese mismo día y declaró con lugar la certificación solicitada. Asimismo, como medida preventiva para que se prosiguiera con el derecho al voto de estos electores, ordenamos que se depositaran en un sobre individual los votos de aquellos ciudadanos y ciudadanas que forman parte de la controversia a dilucidarse.

Posteriormente, denegamos una solicitud de desestimación del recurso presentado. Finalmente, y conforme a lo ordenado, la Comisionada Especial emitió el *Informe de la Comisionada Especial*.

Con el beneficio de la comparecencia de las partes, procedemos a atender el recurso ante nos.

II

A.

Recordemos que una de las piedras angulares del sistema democrático es el derecho al voto de sus ciudadanos y ciudadanas. Éste es de tal envergadura que está consagrado en la Constitución de Puerto Rico, Art. II, Sec. 2, Const. del ELA, LPRA Tomo 1. Mediante el ejercicio del derecho al voto se expresa y afianza la voluntad del pueblo, por lo que éste debe ser desplegado libre de toda coacción y las leyes deben garantizarlo con

supremacía. *Véanse*, Guadalupe v. C.E.E., 165 DPR 106 (2005); P.P.D. v. Administrador Gen. de Elecciones, 111 DPR 199 (1981). Conforme a ello, resulta un mandato insoslayable de este Tribunal la adjudicación de todas estas controversias con la premura necesaria, a la vez que se custodia que se cumpla con las garantías mínimas del debido proceso de ley. Por tanto, es nuestro deber promulgar que no se coarte este derecho fundamental en contra de los electores e impedir que estos reclamos escapen la adjudicación final de este foro. Siendo el derecho al sufragio electoral un derecho fundamental, éste goza de preeminencia, por lo que en su contra no proceden escollos de clase alguna. P.S.P., P.P.D., P.I.P. v. Romero Barceló, 110 DPR 248, 296-97, (1980)(*Per Curiam*). La Ley Electoral así lo reconoce cuando expresamente dispone que no se podrá rechazar, cancelar, invalidar o anular el registro de un elector o privarlo de su derecho al voto mediante reglamento, orden, resolución, interpretación o de cualquier otra forma. Art. 6.006 de la Ley Electoral, 16 LPRA sec. 4066.

Una de las faenas principales de este Tribunal es interpretar las disposiciones aplicables a las situaciones particulares que se traen ante nuestra atención. *Véanse*, Brau, Linares v. ELA et als., 190 DPR 315 (2014); IFCO Recycling v. Aut. Desp. Sólidos, 184 DPR 712 (2012). De esta forma, no hemos vacilado en armonizar las disposiciones de la ley o de estatutos involucrados al

8

resolver las controversias, para obtener un resultado sensato, lógico y razonable. Ríos Martínez v. Comisión Local de Elecciones de Villalba, Precinto 065, res. 24 de agosto de 2016, 2016 TSPR 188 (2016), 196 DPR ____ (2016).

En este contexto, resulta importante resaltar que la encomienda delegada a este Tribunal es ser el "de última instancia en Puerto Rico". Art. V. Sec. 3, Const. del ELA, LPRA Tomo 1. Es por ello que la revisión de los organismos administrativos no puede escapar ni atentar contra el mandato constitucional de velar por la legalidad de las acciones de diversas entidades. *Véanse*, Ríos Martínez v. Comisión Local de Elecciones de Villalba, Precinto 065, *supra*, citando a Junta Dir. Portofino v. P.D.C.M., 173 DPR 455 (2008).

Tal obligación cobra mayor relevancia cuando estamos ante un derecho fundamental como lo es el voto, para el cual debe prevalecer aquella interpretación que lo favorezca. Como es sabido, todo proceso está cobijado por unas protecciones de índole constitucional, una de las cuales es el debido proceso de ley. Éste se manifiesta en dos vertientes: la sustantiva y la procesal. Rivera Santiago v. Srio. Hacienda, 119 DPR 265, 273 (1987).

El debido proceso de ley comprende el "derecho de toda persona a tener un proceso justo y con todas las garantías que ofrece la ley, tanto en el ámbito judicial como en el administrativo". Aut. Puertos v. HEO, 186 DPR 417, 428 (2012); Marrero Caratini v. Rodríguez Rodríguez,

138 DPR 215, 220 (1995); *véase*, además, Sec. 7. Art. II de la Const. del ELA, LPRA Tomo 1. Mediante éste, se protege que no se intervenga con los derechos de las personas sin antes brindar a las partes la oportunidad **básica** de ser escuchados y defenderse. <u>U. Ind. Emp. A.E.P. v. A.E.P.</u>, 146 DPR 611, 617 (1998). Exige que ante la privación de un derecho, la parte afectada tenga acceso a un proceso que sea cónsono con los principios de justicia e imparcialidad. <u>Rivera Rodríguez & Co. v. Lee Stowell</u>, 133 DPR 881, 887-88 (1993).

Como hemos expuesto, la característica medular del debido proceso de ley es que el procedimiento debe ser **justo**. A su vez, la normativa jurídica ha identificado otros de sus componentes básicos como lo son la notificación adecuada y la oportunidad de ser escuchado y de defenderse. <u>U. Ind. Emp. A.E.P. v. A.E.P.</u>, *supra*, pág. 616.

Con relación a la notificación adecuada a la parte afectada, ésta es necesaria para que la parte pueda enterarse de la decisión final que se ha tomado en su contra y ejercer cualquier derecho que entienda que proceda. *Véanse*, <u>Plan de Salud Unión v. Seaboard Co.</u>, 182 DPR 714 (2011); <u>Dávila Pollock *et als*. v. RF Mortgage</u>, 182 DPR 86 (2011). Esta falta de notificación repercute en que la decisión notificada carece de efecto para las partes, es decir, las personas cuyo derecho y obligaciones pueden verse afectados por la acción o inacción de la agencia.

Lugo Rodríguez v. J.P., 150 DPR 29, 43 (2000). El que las partes sean debidamente notificadas requiere que en la notificación que se emita se especifique aquellas a las cuales se les notificó para que se pueda ejercer efectivamente el derecho a revisión judicial conferido en ley. Íd., págs. 46-47. Obviamente, es parte la persona contra quien se dirige la acción, y aquel cuyos derechos y obligaciones pueden verse afectados adversamente por la acción o inacción de la agencia. JP Plaza Santa Isabel v. Cordero Badillo, 177 DPR 177, 188 (2009); Ocean View v. Reina del Mar, 161 DPR 545 (2004). En fin, todo aquel que puede demostrar que la decisión acarrea un efecto adverso o menoscaba su derecho es una parte que debe ser identificada y debidamente notificada. JP Plaza Santa Isabel v. Cordero Badillo, *supra*, pág. 190.

La interrogante de quiénes son parte en determinado proceso, aunque puede ser una labor compleja, no resulta serlo cuando se trata del menoscabo de los derechos de las personas. Por ello, ciertamente en los casos electorales resulta innegable que el elector que pretende ejercer su derecho al voto es la parte con mayor interés, por lo que procede que sea debidamente identificado y notificado de los procesos concernientes. Adjudicarle un efecto a la decisión no notificada a una parte trastocaría el andamiaje procesal y socavaría los cimientos del debido proceso de ley.

11

Igualmente, al analizar si un procedimiento cumple con los requisitos constitucionales del debido proceso de ley se examina el interés que puede resultar afectado por la actuación oficial; el riesgo de una determinación errónea debido al proceso utilizado y el valor probable de garantías adicionales o distintas. *Véase*, U. Ind. Emp. A.E.P. v. A.E.P., *supra*, pág. 616.

Estas garantías son indispensables para salvaguardar el debido proceso de ley de los electores que confrontan cuestionamientos y objeciones que puedan desembocar en una limitación de su ejercicio del derecho al voto. *Véanse*, Mundo Ríos v. CEE *et al.,* 187 DPR 200 (2012) (*Per Curiam*); Suárez Cáceres v. Com. Estatal Elecciones, 176 DPR 31 (2009).

B.

La Ley Electoral promueve el uso de términos cortos para que los asuntos electorales sean debidamente atendidos **hasta que sean finalmente adjudicados por los foros judiciales**. *Véase*, Frente Unido Independentista v. C.E.E., 126 DPR 309, 318 (1990). La razón para que estos procesos sean atendidos prontamente es salvaguardar los derechos de cualquier elector o agrupación de electores y vindicar los derechos que entienda que el organismo electoral ha violado. Íd. En fin, el objetivo real es atender los reclamos de los electores, evitando la dilación y demora innecesaria que entorpezca el proceso electoral y evitar que se promueva incertidumbre. Íd. Tan

es así que la Ley Electoral incorpora la *Declaración de Derechos y Prerrogativas de los Electores* a los fines de, entre otras, reconocer la capacidad de los electores para iniciar o promover cualesquiera acciones legales en defensa de su derecho a emitir su voto. Art. 6.001 de la Ley Electoral, 16 LPRA sec. 4061.

En este análisis, no podemos perder de perspectiva que el propósito del voto adelantado es hacer viable el derecho al sufragio universal de aquellos electores que no pueden estar en sus colegios electorales en la fecha de determinadas elecciones. Sección 1.2 del *Reglamento de Voto Ausente y Voto Adelantado de Primarias 2016 y Elecciones Generales 2016* aprobado el 25 de mayo de 2006 (Reglamento).[7] Por tanto, en el balance de intereses, el derecho del elector a no verse imposibilitado de ejercer su derecho al voto prevalece sobre cualquier otro y no está sujeto a la imposición de trabas innecesarias.

Es esta norma jurídica la que nos debe guiar en la adjudicación de los méritos del recurso instado.

### III

En el caso ante nuestra consideración no existe controversia alguna en torno a que el proceso ha sido uno "complejo y azaroso",[8] plagado de incertidumbre y que la

---

[7]Para conocer el Reglamento, véase http://ceepur.org/es-pr/Secretaria/Documents/ REGLAMENTO%20PARA%20EL%20VOTO%20AUSENTE%20Y%20ADELANTADO%2 0ELECCIONES%202016.pdf. (Accesado por última vez el 4 de noviembre de 2016).

[8]*Véase, Resolución Enmendada* de la CEE.

13

notificación no se hizo conforme a derecho. Sin embargo, a pesar de la envergadura del reclamo, y el hecho de que para principios del mes de octubre se culminó con el proceso de reuniones, la CEE dilató su decisión para emitirla a horas del comienzo del voto adelantado. Como si no fuera poco, tampoco veló porque se notificara oportunamente a los electores afectados de su determinación. Su indiferencia es de tal grado que, durante su testimonio ante la Comisionada Especial, el Secretario de la CEE, el Sr. Walter Vélez Martínez, **"desconoce"** si los electores fueron debidamente notificados.[9] De hecho, de la *Resolución Enmendada* no se puede constatar si, en efecto, se cumplió con ello. Más aún, de ésta no se desprende quiénes son las partes notificadas por el dictamen emitido a los fines de que éstas advengan en conocimiento de cómo ha sido afectado su derecho o puedan instar la acción correspondiente. La certificación genérica de la *Resolución Enmendada* suscrita por el Secretario de la CEE impide saber o constatar si en efecto se cumplió con los requisitos jurisprudencialmente avalados para que la notificación sea efectiva.

Sin embargo, mediante la Certificación emitida por el Secretario de la CEE, en virtud de la solicitud del Comisionado del PNP, la propia CEE reconoció que la referida *Resolución Enmendada* **no** fue notificada **oportunamente** de manera que los electores pudiesen ejercer

---

[9]*Véase, Informe de la Comisionada Especial*, pág. 6.

14

su derecho de revisión judicial ante el Tribunal de Primera Instancia dentro del término de 24 horas que provee la Ley Electoral. *Véase*, Art. 4.001 de la Ley Electoral, 16 LPRA sec. 4031. Ello pues, esta notificación fue realizada **tardíamente** el 28 y 29 de octubre de 2016 mediante **correo postal.** Tal notificación de la *Resolución Enmendada* dos días posteriores a su emisión, y enviada por correo postal, indiscutiblemente coartó el derecho de los electores a instar un recurso de revisión judicial y a defender su derecho individual.

De hecho, adviértase que los electores no tan sólo no fueron notificados oportunamente de la decisión de la CEE, sino que, desde un inicio nadie les notificó que su solicitud de voto adelantado, ya revisada a nivel de la Comisión Local, estaba siendo impugnada ante la CEE. Los electores afectados **nunca** estuvieron en **posición real** de cuestionar las determinaciones adversas que le impedían votar por adelantado. El que la Ley Electoral, *supra*, guarde silencio sobre notificar a los electores cuando los Comisionados Locales apelan la determinación de la Comisión Local a la CEE, no derrota que, como cuestión de derecho, este estatuto está sujeto a los postulados elementales del debido proceso de ley. Adviértase que, al momento de apelar, la autorización a ejercer el derecho al voto por adelantado queda **sin efecto** hasta que eventualmente la CEE lleve a cabo un procedimiento

15

adjudicativo y emita su dictamen al respecto. *Véase*, Art. 5.005 de la Ley Electoral, 16 LPRA sec. 4045.

Cuando se toma una determinación que incide sobre los escenarios en los que un elector emitirá su voto, las nociones **básicas** del debido proceso de ley exigen que se notifique adecuadamente para que tenga la oportunidad de ser escuchado. No es persuasivo el argumento de que la notificación en ese momento no es necesaria por estar ante un procedimiento administrativo interno en el que las Comisiones Locales son sólo sucursales de la CEE. Primero, los dictámenes de esos organismos no son meras recomendaciones, pues tienen efectos legales sobre los electores. Segundo, como se indicó, una vez son apeladas, por disposición de ley, quedan sin efecto. A fin de cuentas, la CEE no debe ser un banco con sucursales de los intereses de los partidos políticos, sino que debe ser facilitador y depositario de la voluntad de **todos** los electores registrados.

En atención a lo anterior, estamos ante una determinación de la CEE que afecta el derecho de cientos de electores, sin que se cumpliera con el debido proceso de ley al emitir la *Resolución Enmendada*. Empero, la CEE asume el argumento acomodaticio de desligarse de ese reclamo. Al así actuar, olvida que le compete a ese organismo el llamado y la responsabilidad de llevar a cabo y supervisar los procesos electorales, con el fin de que se cumplan los requisitos de ley en un ambiente de

16

absoluta pureza e imparcialidad. Ciertamente, su proceder en el caso ante nuestra consideración no puede ser avalado o escapar la revisión de este Tribunal. Es nuestro deber velar porque el acceso a un derecho fundamental, como lo es el derecho al voto, no quede relegado al arbitrio o deficiencia de cualquier organismo adjudicativo. Mucho menos, permitiremos que el proceso coarte el derecho de apelar a un ciudadano por razones fuera de su control, o peor aún, que las acciones administrativas socaven y le impidan ejercer su derecho constitucional a la expresión mediante la ejecución de su derecho al voto. *Véase,* <u>Ríos Martínez v. Comisión Local de Elecciones de Villalba, Precinto 065</u>, *supra*.

Ante ese cuadro preocupante, el debate que se suscita es si pasamos por alto la crasa violación al debido proceso de ley de los electores afectados ante la interrogante de si, en efecto, se cumplió con el proceso garantizando a éstos, al menos, advenir en conocimiento de la denegatoria de su reclamo al voto adelantado. En cualquier otra circunstancia ordinaria, se podrían tomar medidas para rectificar cualquier incumplimiento con el requisito de notificación. Sin embargo, hoy estamos a horas de que culmine el proceso del voto adelantado y a pocos días de las elecciones generales. Esto, en gran medida imposibilita una serie de remedios de cara a los intereses constitucionales que se pueden ver *afectados*. Con esa realidad en contemplación, no debemos abandonar

17

el firme compromiso de este Tribunal en la defensa del derecho constitucional al voto. El tracto procesal dilatorio e injustificado de la CEE no puede ir en detrimento del derecho fundamental al voto de los electores afectados.

En consecuencia, este Tribunal está obligado a evitar que la *Resolución Enmendada* impugnada de estos casos consolidados tenga el efecto de obstaculizar el ejercicio del voto de los electores que solicitaron el voto adelantado objeto del presente recurso.[10] Por consiguiente, se validan todas las peticiones de voto adelantado que estuvieron ante la consideración de la CEE en el caso de epígrafe. Proceder de forma contraria, resultaría en un ejercicio en contravención a los más elementales principios de la democracia. Nuestro sistema democrático nos impide correr el riesgo de una determinación errónea que trunque los derechos de los ciudadanos, en esta ocasión, uno de los de más alta preeminencia en la democracia como lo es el derecho al voto. Al así proceder, cumplimos con el objetivo principal de atender los reclamos de los electores de cara a un proceso electoral inminente. Con este dictamen, fortalecemos la democracia y garantizamos el pleno ejercicio del derecho al sufragio a

---

[10]La CEE validó un sinnúmero de solicitudes de voto adelantado, por lo que dejarlas sin efecto coartaría también el derecho de estos electores a ejercer su voto adelantado por razón de problemas de movilidad. Por tanto, una decisión de este Tribunal tampoco puede perjudicar a estos electores debido al trámite administrativo del que fueron objeto las solicitudes en el caso ante nuestra consideración.

18

estos electores, según reconocido en el ordenamiento electoral de Puerto Rico.

IV

Conforme a todo lo anterior, se validan todas las solicitudes de voto adelantado que están ante la consideración de este Tribunal. En consecuencia, se ordena a la Comisión Estatal de Elecciones que proceda a contabilizar los votos objeto del remedio provisional previamente otorgado por este Tribunal y continúe con el proceso de votación de los solicitantes autorizados preliminarmente y objeto de este dictamen para su eventual contabilización de los mismos conforme a derecho.

Notifíquese **inmediatamente** por teléfono, correo electrónico y por la vía ordinaria.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión Disidente. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión Disidente. El Juez Asociado señor Colón Pérez emitió una Opinión Disidente. El Juez Asociado señor Feliberti Cintrón disiente, se une a la Opinión Disidente emitida por la Jueza Presidenta Oronoz Rodríguez y hace constar la siguiente expresión:

> "El Juez Asociado señor Feliberti Cintrón respetuosamente disiente de la determinación tomada por una mayoría de este Tribunal y se reafirma en su posición original de que procedía desestimar el recurso de revisión presentado ante el Tribunal de Primera Instancia por no haberse perfeccionado conforme a Derecho. Consecuentemente, este Tribunal debió anular el auto del recurso de certificación intrajurisdiccional de epígrafe, según fuera

expedido el viernes, 28 de octubre de 2016. Véase el ***Voto Particular Disidente*** emitido el lunes, 31 de octubre de 2016 por el Juez Asociado señor Feliberti Cintrón, al que se unieron la Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Colón Pérez, 2016 TSPR 219, 196 DPR ____ (2016)."


                        Juan Ernesto Dávila Rivera
                      Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Aníbal Vega Borges, en su capacidad oficial como Comisionado Electoral del Partido Nuevo Progresista<br><br>Peticionario<br><br>v.<br><br>Liza García Vélez, en su capacidad oficial como Presidenta de la Comisión Estatal de Elecciones; Guillermo San Antonio Acha, en su capacidad oficial como Comisionado Electoral del Partido Popular Democrático; Partido Independentista Puertorriqueño, (PIP), por conducto de su Comisionado Electoral, Sr. Roberto I. Aponte Berríos; Partido del Pueblo Trabajador, (PPT), por conducto de su Comisionado Electoral Dr. José F. Córdova Iturregui<br><br>Recurridos | CT-2016-15 | Certificación Intrajurisdiccional |

Opinión disidente emitida por la Jueza Presidenta Oronoz Rodríguez a la cual se une el Juez Asociado señor Feliberti Cintrón

En San Juan, Puerto Rico, a 4 de noviembre de 2016.

Time will one day heal the wound to that confidence that will be inflicted by today's decision. One thing, however, is certain. Although we may never know with complete certainty the identity of the winner of this year's [...] election, the identity of the loser is perfectly clear. **It is the Nation's confidence in the judge as an impartial guardian of the rule of law.** (Justice John Paul Stevens dissenting opinion in Bush v. Gore, 531 U.S. 98, 129 (2000)(énfasis suplido)

En este caso coinciden importantes derechos que requieren de un análisis concienzudo y riguroso. Coincido en que el valor de la participación ciudadana durante un evento electoral es un elemento esencial de una democracia robusta y saludable. Sin embargo, la integridad del proceso en sí, que facilita esa participación, también es un elemento indispensable en un sistema de gobierno democrático, ya que cualquier sombra que se arroje sobre la pureza del proceso, indudablemente lacera la confianza requerida para preservar la esencia misma del sistema democrático.

Un pueblo que no confía en que el resultado electoral es fiel a la voluntad de aquellos y aquellas que serán representados, se ven marginados, no sólo por el proceso electoral en sí mismo, sino por su gobierno. La verdadera prueba de un sistema democrático auténtico consiste en la legitimación del mandato mayoritario. De manera que un proceso no maculado imprime en aquellos cuyas aspiraciones no prevalecieron en las urnas un sentir de trato justo y, ulteriormente, una apreciación por las aspiraciones comunes y el respeto por los derechos de todas y todos los gobernados. La destrucción de la confianza debida al proceso representa la ruptura del pacto social tan necesario para una sana convivencia y la supremacía de la ley.

En este caso la Comisión Estatal de Elecciones (CEE) inició un proceso donde al menos 10,000 puertorriqueños y puertorriqueñas tendrían acceso a emitir su voto de manera adelantada por razón de impedimento de naturaleza tal que

limita su movilidad. De estos, unas 788 solicitudes resultaron cuestionadas ante la CEE. Por ende, el caso certificado por este Tribunal Supremo consistía, en esencia, en adjudicar la corrección de la determinación de la CEE, que en su evaluación de situaciones específicas denegó unas solicitudes que contenían defectos tales como: ausencia de firma del elector o información esencial requerida por el formulario para el voto adelantado o formularios que de su faz arrojaban dudas sobre su legitimidad por situaciones tales como decenas de solicitudes certificadas por un mismo médico, todas suscritas en igual fecha.

Según detallo a continuación, disiento del curso trazado por una mayoría de este Tribunal, primero, por ser evidente que carecemos de jurisdicción para atender el recurso presentado. Segundo, porque aun asumiendo que este Tribunal goza de jurisdicción, nos encontramos ante un caso cuya principal, mas no única controversia, se reduce a determinar qué es un médico de cabecera o de tratamiento en el contexto de una solicitud de voto adelantado por problemas de movilidad. Ahora bien, a fin de evitar atender el problema medular identificado en la resolución recurrida, en la Sentencia que suscribe una mayoría se desarrolló un planteamiento amparado en el debido proceso de ley que no sólo no es correcto como cuestión de derecho sustantivo, sino que ni siquiera fue presentado o elaborado por el Comisionado Electoral del PNP. Las bases para sostener que la Resolución de la CEE debe dejarse sin efecto son inexistentes. De

entrada, una mayoría de este Tribunal descansa en alegaciones no sustentadas por el expediente ante nuestra consideración o por la prueba recogida por la Comisionada Especial nombrada por este Tribunal, cuyo informe hoy una mayoría sencillamente descarta. Segundo, se basa en un requisito de notificación que la ley ni la reglamentación aplicable exige. Al proceder así, este Tribunal le ata las manos a la CEE para depurar las solicitudes cuestionadas, muchas de las cuales carecen del rigor necesario para ser aceptadas.

Este Tribunal está llamado a proteger la primacía de la ley que en este caso se reduce a los mecanismos diseñados para garantizar la integridad de los procesos electorales en aras de evitar que el ejercicio del sufragio se convierta en una farsa donde se distorsione el ejercicio válido de la mayoría de los electores. Lo contrario sería un grave peligro para las instituciones democráticas. En atención a los hechos específicos del caso ante nuestra consideración, los cuales una mayoría ignora por completo, disiento.

I.

De entrada, cabe destacar que este Tribunal no tiene jurisdicción para evaluar los méritos del recurso. El 27 de octubre de 2016, el Lcdo. Aníbal Vega Borges, Comisionado Electoral del Partido Nuevo Progresista (Comisionado Electoral del PNP), presentó ante el Tribunal de Primera Instancia un *Urgente Recurso de Revisión Electoral*, Caso

Civil Núm. SJ2016CV00290.[11] Solicitó la revisión de la *Resolución Enmendada CEE-RS-16-83 de 26 de octubre de 2016 sobre Solicitudes Voto Adelantado de Electores con Impedimento (encamados)* emitida por la Presidenta de la Comisión Estatal de Elecciones, la Lcda. Liza M. García Vélez (CEE), y notificada el 27 de octubre de 2016 a las 9:07 p.m.

Asimismo, el 28 de octubre de 2016, presentó ante este foro un *Recurso de Certificación Intrajurisdiccional* y una *Moción Urgente en Auxilio de Jurisdicción*. Nos solicitó que certificáramos el caso y lo consolidáramos con el caso Guillermo San Antonio Acha v. CEE y otros, SJ2016CV00289, por impugnarse en ambos la misma resolución emitida por la CEE. Luego de que el foro primario consolidara ambos casos, emitimos una Resolución y certificamos dicho asunto.

El 29 de octubre de 2016, el Lcdo. Guillermo San Antonio Acha, Comisionado Electoral del Partido Popular Democrático (Comisionado Electoral del PPD), presentó ante este Tribunal una *Moción Urgente de Desestimación por Falta de Jurisdicción del Tribunal y, en la alternativa, solicitud de orden aclaratoria sobre consolidación*. En síntesis, alegó que carecíamos de jurisdicción para resolver la controversia en cuestión porque el Comisionado Electoral del PNP incumplió con el término de 24 horas que establece el Art. 4.001 de la

---

[11] Incluyó como demandados a la Lcda. Liza García Vélez, en su capacidad oficial como Presidenta de la Comisión Estatal de Elecciones; Lcdo. Guillermo San Antonio Acha, en su capacidad oficial como Comisionado Electoral del Partido Popular Democrático, Lcdo. Roberto I. Aponte Berríos, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño y al Dr. José F. Córdova Iturregui, en su capacidad oficial como Comisionado Electoral del Partido Pueblo Trabajador.

Ley Electoral, 16 LPRA sec. 4031, para notificar un recurso de revisión. Señaló que la CEE notificó la Resolución Enmendada que se pretende revisar el 26 de octubre de 2016 a las 9:07 p.m. y que el Comisionado Electoral del PNP presentó su recurso de revisión oportunamente, el 27 de octubre de 2016 a las 12:57 p.m. Sin embargo, indicó que este último notificó su recurso a la CEE fuera del término aplicable y que el PPD no fue notificado.[12]

Por su parte, el Comisionado Electoral del PNP presentó una *Moción en Oposición a Desestimación y Acreditando Notificación del Comisionado Electoral del PNP*. Alegó que el Comisionado Electoral del PPD se sometió voluntariamente a la jurisdicción en el foro primario. Asimismo, sostuvo que el término de 24 horas para presentar el recurso comenzó a transcurrir el 27 de octubre de 2016 a las 9:07 p.m. porque, según las Reglas de Procedimiento Civil, 32 LPRA Ap. V, no contaba "el día en que se realiza el acto, evento o incumplimiento después del cual el término fijado empieza a transcurrir". Regla 68.1 de Procedimiento Civil, supra.

El Art. 4.001 de la Ley Electoral, 16 LPRA sec. 4031, provee, sin ambages, que la parte que interese revisar un dictamen de la CEE tendrá un término de 24 horas para presentar el recurso de revisión y notificarle a la CEE y a

---

[12] El 30 de octubre de 2016, el Dr. José Córdova Iturregui, Comisionado Electoral del Partido del Pueblo Trabajador (Comisionado Electoral del PPT), también presentó una *Moción de Desestimación*. Alegó que el Comisionado Electoral del PNP le notificó tardíamente el recurso de revisión electoral que presentó ante el foro primario y la *Moción urgente en auxilio de jurisdicción* presentada ante este Tribunal.

las partes afectadas.[13] Lo anterior es un requisito estatutario para perfeccionar el recurso de revisión. Por tanto, su incumplimiento priva de jurisdicción al tribunal.

En su oposición a la desestimación solicitada, el Comisionado Electoral del PNP **aceptó** que no notificó su escrito a la CEE o a las demás partes dentro del término de 24 horas exigido por el estatuto, sino el 28 de octubre de 2016, entre 9:30 a.m. a 10:00 a.m.

Ante tal admisión, la falta de jurisdicción resulta patente y el curso legal obligado era la desestimación. "[L]os entes adjudicativos tienen que ser celosos guardianes de su jurisdicción y **no poseen discreción para asumirla en aquellas circunstancias en que no la tienen**". Rivera Marcucci v. Suiza Dairy, 2016 TSPR 172, 8, 196 DPR ___ (2016)(énfasis suplido).

Sin embargo, varios miembros de este Tribunal denegaron la desestimación solicitada por entender que el término para recurrir de una determinación de la CEE es de naturaleza jurisdiccional mas no así la notificación exigida para la CEE y las demás partes afectadas. Con tal bifurcación, concluyó que el plazo para notificar el recurso de revisión es de cumplimiento estricto y consideró que el foro primario prorrogó mediante orden el término para cumplir con el mismo, **aun cuando el Comisionado Electoral del PNP no le solicitó**

---

[13] En particular, el Art. 4.001 dispone que: "[d]entro de los treinta (30) días anteriores a una elección el término para presentar el escrito de revisión será de veinticuatro (24) horas. La parte promovente tendrá la responsabilidad de notificar dentro de dicho término copia del escrito de revisión a la Comisión y a cualquier otra parte afectada". 16 LPRA sec. 4031.

**dicha prórroga** al foro de instancia **y tampoco levantó tal planteamiento de derecho ante este Tribunal.**[14]

En estas circunstancias, la orden del tribunal de instancia, ni en su texto expreso o implícito, pretendía prorrogar término alguno, mucho menos para el perfeccionamiento de un recurso electoral. De otro lado, aun si para fines de la argumentación infiriéramos tal intención en la orden del tribunal, tampoco hubiera podido conceder la prórroga pues es "norma trillada" en nuestro ordenamiento procesal que se requiere justa causa para que un tribunal pueda, en el ejercicio de su discreción, prorrogar un término de estricto cumplimiento. <u>Rosario Mercado v. ELA</u>, 189 DPR 561, 563 esc. 1 (2013). Si el Comisionado Electoral del PNP ni siquiera solicitó la prórroga en cuestión, evidentemente tampoco proveyó la justa causa que este Tribunal atribuyó sin argumento alguno de la parte que incumplió con lo requerido por la ley.

Es preciso señalar que los miembros de este Tribunal que en este caso determinaron que el juez de instancia prorrogó *motu proprio* el término para perfeccionar la revisión judicial de una determinación de la CEE, han suscrito expresiones como estas: "[l]a parte que actúa tardíamente debe hacer constar las circunstancias específicas que ameriten reconocerse como justa causa para prorrogar un término de cumplimiento estricto. Si no lo hace, **los tribunales 'carece[n] de discreción para prorrogar el término**

---

[14] El Comisionado Electoral del PNP argumentó que conforme a las Reglas de Procedimiento Civil el plazo de 24 horas comenzaba a discurrir pasadas 24 horas desde la notificación de la decisión de la CEE.

y, por ende, acoger el recurso ante su consideración'". Soto Pino v. Uno Radio Group, 189 DPR 84, 92 (2013). De manera que un tribunal no puede concluir que existe justa causa para el cumplimiento de un requisito de ley que le confiere jurisdicción en el abstracto, ausente de alegación o prueba que justifique tal curso de acción.[15]

II

En vista de que una mayoría de este Tribunal asumió jurisdicción cuando no la tiene,[16] entendemos que es necesario exponer los hechos que dieron inicio a esta controversia, ya que en la Sentencia emitida no se incluyen ni se discuten. Según mencionado previamente, el Comisionado Electoral del PNP solicitó la revisión de una Resolución Enmendada emitida por la CEE. Mediante ésta, la CEE consolidó 19 apelaciones relacionadas a 788 electores que solicitaron, al amparo del Art. 9.039(m) de la Ley Electoral, 16 LPRA sec. 4179, su derecho a ejercer el voto adelantado en el domicilio por padecer de condiciones

---

[15] Finalmente, huelga comentar que recientemente este Tribunal, en un escenario muy similar, declaró no ha lugar un recurso de *certiorari* presentado por el Partido Popular Democrático en el caso Luis A. Rodríguez Aponte (Comisionado Electoral) y otros v. Comisión Local de Elecciones de Las Marías Precinto 034, CC-2016-1017. Esto, pues, de forma **unánime** consideramos que el peticionario había incumplido con el Reglamento de este Tribunal al no certificar dentro de las 24 horas de presentar su escrito que notificó su recurso a las demás partes vía fax o personalmente y por teléfono. Véase, Regla 22 (E)(3-5) del Reglamento del Tribunal Supremo, 4 LPRA Ap. XXI(B). A pesar de que en este caso el Comisionado Electoral del PNP incumplió con un requisito análogo, una mayoría de este Tribunal dejó pasar el incumplimiento al declarar no ha lugar la moción de desestimación presentada por falta de jurisdicción. Fue así que inició esta crónica de inconsistencia e intrusión judicial.

[16] Ello, a pesar de que reiteradamente hemos expresado que la falta de jurisdicción no puede ser subsanada, ni el tribunal puede arrogarse la jurisdicción que no tiene. Aun cuando las partes no lo planteen, un tribunal viene obligado a velar por su jurisdicción. Ponce Fed. Bank v. Chubb Life Ins. Co., 155 DPR 309, 332 (2001); Rodríguez v. Zegarra, 150 DPR 649 (2000); Lagares v. E.L.A., 144 DPR 601 (1997); Vázquez v. A.R.P.E., 128 DPR 513 (1991); Sociedad de Gananciales v. Autoridad de Fuentes Fluviales, 108 DPR 644 (1979).

médicas que afectan su movilidad y les impiden asistir a su colegio de votación. Tras evaluar los recursos, la CEE denegó una gran cantidad de solicitudes porque: (1) no contenían la firma del elector; (2) el doctor que certificó la condición no era el médico de cabecera o tratamiento del elector o no tenía su licencia médica vigente, y (3) los electores no tenían problemas de movilidad, entre otras.

En su recurso, el Comisionado Electoral del PNP alegó que se violó el debido proceso de ley de estos electores toda vez que <u>no fueron notificados de la apelación presentada por las Comisiones Locales ante la CEE</u>. Además, señaló que la CEE erró: (1) al definir qué es un médico de cabecera o de tratamiento; (2) al cuestionar la validez de las licencias de los médicos y si éstos tenían "good standing"; (3) al denegar solicitudes porque el mismo médico certificó demasiadas, y (4) al examinar si la movilidad física de varios electores es de tal naturaleza que le impide acudir al centro de votación.[17]

Una vez este Tribunal certificó este asunto, nombramos a la Hon. Aileen Navas Auger, jueza que presidía el caso consolidado en el foro primario, como comisionada especial y le ordenamos a celebrar vistas evidenciarias y a presentar un informe con sus determinaciones de hecho y conclusiones de derecho el 1 de noviembre de 2016, a las 3:00 p.m. Asimismo, dispusimos que las partes tendrían

---

[17] Nótese que el Comisionado Electoral del PNP no menciona ninguna violación del debido proceso de ley relacionada a la notificación de la Resolución Enmendada de la CEE.

hasta el miércoles, 2 de noviembre de 2016, a las 3:00 p.m. para presentar sus alegatos.

Por último, ordenamos a la CEE a iniciar el recogido de los votos de las personas cuyas solicitudes fueron denegadas, los cuales deberían colocar en un sobre de objeción conforme a lo dispuesto en el *Manual de Procedimiento para el Voto Adelantado en el Colegio de Fácil Acceso en el Domicilio para las Elecciones Generales 2016* de 11 de agosto de 2016.

Oportunamente, la Comisionada Especial nos rindió su Informe luego de celebrar dos vistas en las que recibió prueba testifical y documental.[18] De las determinaciones de hechos incluidas en el Informe surgen los siguientes testimonios:

(1) **Sr. Walter Vélez Martínez, Secretario de la CEE**- Testificó a los fines de autenticar y certificar copia del expediente administrativo correspondiente a las apelaciones objeto de la Resolución Enmendada. Sin embargo, al ser confrontado con la copia, éste no pudo certificar que la copia mostrada fuese copia fiel y exacta del expediente administrativo, por lo cual no fue admitida. Por otro lado, a preguntas de la representación legal del Comisionado Electoral del PNP, éste expresó que desconocía si las apelaciones a nivel administrativo fueron notificadas a los electores.[19] Señaló que el que presenta la

---

[18] Informa la Comisionada Especial que las partes llegaron a unos acuerdos parciales que pusieron fin a las controversias sobre el precinto 027 de Arecibo y el precinto 049 de Sabana Grande. Además, el Comisionado Electoral del PNP desistió de sus reclamaciones en cuanto a las solicitudes de la Sra. María Reyes Reyes y el Sr. David Helfeld Hoffman, ambos electores del Municipio de Jayuya. En consecuencia, el Comisionado del PNP solicitó la revisión de las denegaciones de las solicitudes de los electores de los siguientes precintos: 089 de las Piedras (97 electores); 090 de las Piedras (1 elector); 057 de Jayuya (57 electores); 056 de Jayuya (65 electores), 015 de Dorado (45 electores) y 054 de Utuado (51 electores). Por su parte, el Comisionado del PPD cuestionó la aprobación de las solicitudes presentadas en los siguientes precintos: 066 de Orocovis, 069 de Aibonito y 040 de Añasco.
[19] Contrario a lo que alega una mayoría de este Tribunal, el Secretario de la CEE no mencionada nada sobre la notificación de la Resolución Enmendada de la CEE.

apelación es el que tiene el deber de hacer la notificación.

(2) **Sra. Michelle Coira Burgos, Comisionada Local del PPD en Orocovis**- Testificó que, como parte de sus funciones, realizó una investigación sobre las solicitudes de los votos de encamados del PNP. Expresó que visitó varias residencias, entre ellas la de la Sra. Blanca Ortíz Ortíz y que allí observó que la persona no estaba encamada y advino en conocimiento que no le habían visitado. Además, explicó que conocía a la señora Ortíz Ortíz porque es participante del programa de Asistencia Social Familiar en el cual ella trabaja. Se reafirmó que la señora Ortíz Ortíz puede caminar sin dificultad.

(3) **Sra. Elba Rivera Torres, Comisionada del PPD de la Comisión Local de Aibonito-** Como parte de sus funciones evalúa transacciones electorales, tales como la solicitud de voto encamado. El 19 de septiembre de 2016, fecha de cierre del registro electoral, asistió a una reunión de los Comisionados Locales en la Junta de Inscripción Permanente (JIP). En esa ocasión, objetó 50 solicitudes de voto a domicilio en las cuales el Dr. Francisco Fontánez Rivera había certificado la condición de inmovilidad. Hizo constar la objeción en el Acta de Incidencias y fue citada para audiencia ante la CEE. Declaró que objetó el voto a domicilio de Carmen Ana Borelli, Ana Colón Borelli y Carlos Vegilla Colón porque conocía que dichos electores se movilizaron a votar en las primarias el 5 de junio de 2016 a la Escuela Francisco Degetau, unidad 8, la cual ubica al lado de la residencia de éstos. "Expresó que Carlos Vegilla está en silla de ruedas, pero lo movilizan. Reiteró que le consta que no está encamado. Testificó además que la Sra. Carmen Ana Borelli tiene una condición neurológica y, aunque reconoció que camina con dificultad, puede desplazarse".[20]

(4) **Dr. Carlos Heredia**- médico generalista con licencia número 014360 y con oficina privada en Morovis. Certificó 83 solicitudes que corresponden al Precinto 040 de Añasco. Testificó que "a petición de funcionarios del Partido Nuevo Progresista de la Comisión Local del pueblo de Añasco, visitó electores con el propósito de cumplimentar la certificación médica que requiere la 'Solicitud para votar en el colegio de fácil acceso en el domicilio por impedimento de movilidad (Encamados)' correspondiente a las elecciones generales de 2016. Indicó que en algunos casos visitó los

---

[20] Informe de la Comisionada Especial, pág. 18.

hogares en más de una ocasión, porque en la primera visita la persona solicitante no se encontraba en el hogar. Desconoce la razón para ello".[21] Señaló que sus servicios fueron gratuitos y que no conocía a los electores que iba a visitar con anterioridad a ello, sino que se personó a sus hogares con una lista facilitada por los funcionarios del PNP de Añasco. Explicó que "el procedimiento consistió en una visita al hogar del elector, acompañado de una enfermera, a la cual no pudo identificar por su nombre en el testimonio, pues no le conocía previamente. Indicó que la enfermera era del pueblo, provista por los funcionarios que le acompañaron a las visitas. Declaró que examinó a los pacientes y determinó que no podían por sus propios medios llegar hasta él o tenían problemas de movilidad".[22] Admitió que no todos estaban encamados, ya que algunos estaban en silla de ruedas o necesitaban ayuda para caminar. En esos casos, cumplimentó la parte de la solicitud correspondiente a la "Certificación Médica". Testificó además, que hubo electores que visitó que se negaron a que se les certificara. En dichos casos, no se llenó el formulario. Admitió que no tiene una relación médico-paciente con todos los electores a los cuales les cumplimentó el formulario e indicó que, de sus visitas, no todos podían interactuar con él. En el contrainterrogatorio admitió que recordó pacientes con Alzheimer.

De otra parte, la Comisionada Especial expuso que 34 de las solicitudes certificadas por el doctor Heredia adolecen de defectos de forma, ya que no fueron firmadas por el elector y no se especificó las razones para ello.[23]

---

[21] Íd., pág. 6.
[22] Íd., págs. 6-7.
[23] En particular, las solicitudes de los electores Luis Méndez González, Humberto Esteves Rodríguez, Claudio Rivera Orsini, Rosaura Rosado Gutiérrez, Ana Vélez Rivera, Juan Soto Ruiz, María González González, Adriano García Ramírez, Luis Figueroa Vázquez, Gladys Calderón Quiñonez, Demencia Crespo Rodríguez, Sotero Morales Vélez, María Carrero Valentín, Eladia Colón Balaguer, Iluminada Sánchez Ramos y Ana Santiago Rivera no contienen la firma de cada uno de ellos, pero sí la de un testigo. Sin embargo, el espacio para indicar "Razón para no firmar el solicitante" está en blanco. Asimismo, las presentadas por los electores Wilfredo Mercado Montalvo, Hilario Feliciano Cruz, Rosa García Rodríguez, Wilson Rivera Ruiz, Giovanna Rosario Soto, Mercedes Santana Serrano, Christian Morales Almodóvar, Mildred Muñiz Rodríguez, Carmen Rivera García, Leonor Salerna Cabán, Heidi González Sánchez, José Santiago Almodóvar, Monserrate Portugue Echevarría, Amelia Rosario Soto, José López De Jesús, María Reyes Concepción y Esmeralda Echevarría Echevarría tampoco contenían la firma del elector y la firma del testigo era ininteligible. Además, nuevamente el espacio para indicar "Razón para no firmar el solicitante" está en

(5) **Dr. Dennis Rivera González**– médico generalista con licencia número 12404. Certificó 78 electores del Precinto 54 de Utuado. Tiene práctica médica en Utuado y reside en dicho municipio. Testificó que al momento de suscribir las certificaciones médicas de dicho precinto estaba autorizado a ejercer la medicina en Puerto Rico. Admitió que no todas las personas que certificó habían sido sus pacientes previo a la certificación, pero que algunas de éstas sí. A preguntas del representante legal del Comisionado Electoral del PIP expresó que, para él, un médico de cabecera es cualquier médico que visita a un paciente y que no tiene que existir una relación previa médico-paciente. No obra en evidencia las solicitudes de voto encamado certificadas por él.

(6) **Dr. Jorge Colón Morales**– es médico de profesión y trabaja en la Corporación del Fondo del Seguro del Estado (CFSE) en Bayamón. Además trabaja parcialmente en oficina privada. Certificó 42 solicitudes para el municipio de Orocovis, precinto 066. "[T]estificó que el 17 de septiembre de 2016 visitó pacientes que estaban solicitando el voto encamado, con el propósito de cumplimentar la Certificación Médica que exige la solicitud. Narró que a solicitud de funcionarios de la Comisión Local del PNP, se dirigió al pueblo de Corozal y allí se encontró con la Dra. Ana María Faget y Dra. Dalmarys Moreno Montesino.[24] Una vez se encontraron con los funcionarios del PNP, siguieron la "ruta" designada por éstos para visitar pacientes en tres pueblos: Comerío, Barranquitas y Orocovis. Declaró que su visita a Orocovis duró entre dos a tres horas y examinó alrededor de 50 pacientes. Indicó que le tomó de 2-3 minutos verificar la condición de cada paciente y certificar la solicitud de voto encamado. Testificó que esa gestión no conlleva mucho tiempo porque el médico tiene un "ojo clínico" que de observar al paciente puede hacer dicha determinación. Declaró además que el tiempo que demoró en movilizarse entre paciente y paciente fue de 5 a 7 minutos".[25]

"Al preguntársele si conocía a la Sra. Blanca Ortíz Ortíz, respondió en la negativa. Admitió que los electores que visitó en Orocovis, para efectos de cumplimentar la solicitud de voto

---

blanco. La solicitud correspondiente al elector Rafael Vélez Vélez no tiene la firma de él, pero está marcada una "X". Contiene la firma de un testigo, pero en el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

[24] La Dra. Dalmarys Moreno Montesino certificó 26 solicitudes para el municipio de Orocovis, precinto 066.

[25] Informe de la Comisionada Especial, págs. 13-14

encamado, fueron visitas de un solo contacto. Además indicó que su propósito era certificar el formulario de solicitud. Finalmente admitió que no era médico de cabecera, ni tratamiento de dichos electores".[26]

(7) **Dra. Ana María Faget**- médico de profesión y trabaja para la CFSE hace 7 años en Bayamón. "Trabajó como médico primario privado, anteriormente. Expresó que en la actualidad también practica la medicina privadamente, en visitas al hogar, familiares y personas que conoce. Algunas de éstas, gratuitamente y otras recibe remuneración. En las ocasiones que recibe remuneración, la recibe en efectivo. No acepta planes médicos. La práctica privada la ejerce fuera de sus horas laborables. Su horario de trabajo en la CFSE es de 8:00-4:30 p.m., de lunes a viernes. (...) [E]xpuso que ha participado de clínicas gratuitas como servicio a la comunidad, pero solo recuerda una ocasión en el pueblo de Vega Baja. Confrontada con la Orden Administrativa 16-03 de la CFSE, admitió que de ese documento surge que todo empleado profesional que requiere de una licencia para el ejercicio de la profesión y que desee practicar dicha profesión privadamente, requiere de una dispensa de la CFSE. Sin embargo, se reafirmó en que ella no requería dispensa para practicar la medicina privadamente; sino de una notificación. Se le cuestionó si había hecho alguna notificación para el año 2016, y respondió en la afirmativa. En cuanto al 2015, indicó que no recordaba".[27]

En relación a las solicitudes de voto encamado para el municipio de Orocovis, testificó que la Asociación de Servidores Públicos del PNP le solicitó sus servicios gratuitos para certificar las solicitudes de votos de encamados. "Narró que el 17 de septiembre de 2016, visitó el pueblo de Orocovis y que en otras ocasiones había certificado a pacientes de Corozal y Naranjito. Indicó que dichas gestiones las hizo junto a la Dra. Dalmaris Moreno y el Dr. Colón Morales. Testificó que salió de su hogar en el área metropolitana y se encontró con los doctores Moreno y Colón Morales en el dispensario de Corozal. Allí se encontraron con un funcionario del PNP, al cual siguieron en su carro. Llegaron a una residencia y fueron todos a ver un paciente, al cual evaluaron. Luego, se desplazaron al Comité del Alcalde de Orocovis y se reunieron con otros funcionarios del PNP, quienes tenían una lista de electores a visitar

---

[26] Íd., pág. 14.
[27] Íd., pág. 14

y cada médico siguió una ruta, guiada por los funcionarios del PNP. En su caso, testificó que llegaba al hogar del elector y mediante la observación lo evaluaba. Expresó que la mayoría de los pacientes, con una observación es suficiente para determinar si tienen un problema de movilidad. Por ejemplo, indicó que si la persona está en una silla de ruedas, si tiene falta de masa muscular en sus extremidades o si utiliza un andador es indicio de que la persona tiene problemas de movilidad. En relación al formulario, no supo decir quién había cumplimentado la parte superior del mismo que corresponde al nombre y firma del elector."[28] Al ser confrontada con la solicitud del elector Héctor Ortíz Díaz y preguntársele si conocía la razón por la cual indicaba que no podía firmar por estar "encamado (daño cerebral)", ésta "respondió que a ella no le correspondía cumplimentar dicha parte, que sólo se limitaba a la parte de Certificación Médica, sobre problemas de movilidad. Indicó además, que esa parte la llena el elector o la persona que firma como testigo. Añadió que en ocasiones, las personas que llenan la solicitud no tienen conocimientos médicos. La doctora Faget no es médico de tratamiento de los electores a los cuales le certificó la solicitud de voto encamado. No pudo precisar si alguno de éstos había sido su paciente con anterioridad a esa fecha, y negó que los hubiese visto después".[29]

La Comisionada incluyó como una determinación de hecho que tres médicos [doctora Faget, doctora Moreno Montesino y doctor Colón Morales] certificaron 103 solicitudes en Orocovis el 17 de septiembre de 2016 y que tanto la doctora Faget como el doctor Colón testificaron que el recorrido duró aproximadamente dos horas. Además, menciona que, a pesar de que la doctora Faget testificó que solo fue el 17 de septiembre de 2016 a Orocovis a certificar electores, de los documentos estipulados surge que certificó a los siguientes electores el 18 de septiembre de 2016: Esmérida Rivera Rivas, Juana Rodríguez Alvarado, José de Jesús Avilés, Pablo Rojas Rivera,

---

[28] Íd., pág. 15.
[29] Íd., págs. 15-16.

Margarita Avilés López, José Hernández Rojas y Orlando Velázquez Domínguez. Además, de las 35 certificaciones estipuladas que fueron expedidas por la doctora Faget para el precinto 066 de Orocovis, surge que varias de ellas adolecen de defectos de forma, pues no tienen la firma del elector, ni marca, pero sí tienen la firma de un testigo. Sin embargo, en el espacio para indicar "Razón para no firmar el solicitante", se indicó que "no puede escribir", "edad" (vejez) casi no ve o "encamado" (daño cerebral).[30] En otras, la firma del testigo era ininteligible.[31]

Por otro lado, de las certificaciones expedidas por el Dr. Francisco Fontánez Rivera para el precinto 069 de Aibonito, surge que dos de ellas contienen defectos.[32]

Finalmente, la Comisionada señaló que, en cuanto a los Precintos 057 de Jayuya, 089 de Las Piedras, 015 de Dorado y 090 de Las Piedras, se admitió evidencia por parte del Comisionado Especial del PNP a los fines de identificar a los electores afectados, pero no se presentó prueba adicional.[33]

---

[30] Éstas corresponden a los electores Juana Rodríguez Alvarado, Nixolina Santiago Santiago, Petronila Alvarado Ortiz, Casilda López Miranda, Francisca Hernández Díaz, Ada Colón Meléndez, Benito Ortolaza Collazo, Héctor Ortiz Díaz

[31] En particular, las de los siguientes electores: Esmérida Rivera Rivas (no se indicó la razón para no firmar el solicitante), María López Rodríguez (se indicó que no puede escribir), Arcadia Meléndez Ortiz (en el espacio para indicar "Razón para no firmar el solicitante", surge: (CVA)), Gloria Torres Ramírez (la firma ininteligible del testigo se encontraba en el espacio de la firma del solicitante y en el espacio para indicar "Razón para no firmar el solicitante", surge: "incapacitada para firmar").

[32] La correspondiente a la electora Carmen Ana Borelli Aponte no tiene la firma del elector, ni marca, la firma del testigo es ininteligible y el espacio para indicar "Razón para no firmar el solicitante" está en blanco. Asimismo, la solicitud de la Sra. Rosa Cartagena Rodríguez, en la parte que firma el elector hay una marca de "X", tiene la firma de un testigo, pero el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

[33] La Comisionada Especial señaló que, con relación a los Apéndices I-IV del Comisionado del PNP, estaba "limitada a realizar determinaciones de hechos adicionales, ya que la parte interesada solicitó la admisibilidad limitada a la identidad de los electores.

En cumplimiento con nuestra orden, la Comisionada Especial también incluyó varias conclusiones de derecho.[34] En síntesis, luego de realizar un análisis puntual, concluyó que el médico de cabecera o de tratamiento que debe certificar la solicitud de voto adelantado encamado al amparo del Art. 9.039(m) de la Ley Electoral, supra, es aquel que le provee atención médica al elector con algún tipo de habitualidad. Expresó que "[n]o es posible concluir, y el testimonio de los médicos no lo probó, que un médico pueda ser considerado de cabecera por el simple hecho de intervenir con un paciente en una única ocasión para un único fin".[35]

Al amparo de lo anterior, y evaluada la prueba desfilada, determinó que los doctores Heredia, Colón y Faget no eran médicos de cabecera o tratamiento de los electores cuyas solicitudes certificaron. Además, no le mereció credibilidad el testimonio de los médicos en cuanto "a la cantidad de electores que visitaron en dos horas para poder entrar al hogar, observar, preguntar, evaluar y emitir una certificación; sobre todo cuando no tenían el historial previo de estos pacientes y ni les conocían".[36] Igualmente, mencionó que se estipularon varias solicitudes de Orocovis que contienen defectos de forma. Por tanto, recomendó que se revocara la Resolución

Ello ante la objeción a la admisibilidad total de las demás partes". Informe de la Comisionada Especial, pág. 19.

[34] La Comisionada Especial aclaró que "las revisiones parciales presentadas por los Comisionados del PNP y del PPD se circunscribieron a cuestionar solo algunos aspectos de la *Resolución Enmendada* emitida por la Presidenta de la CEE el 26 de octubre de 2016. En otras palabras, la *Resolución Enmendada* contiene conclusiones que se sostienen, algunas, como cuestión de derecho por no haber sido impugnadas y, otras, por no haberse aportado la prueba necesaria para revocar las mismas". Íd., pág. 28.

[35] Íd., pág. 30.

[36] Íd., pág. 31

Enmendada en cuanto al caso de Orocovis.[37]

Con relación a las solicitudes del Precinto 054 de Utuado certificadas por el doctor Rivera González, expresó que:

> La última certificación, de 21 de septiembre de 2016 disponía que el Dr. Rivera González cumplió con los requisitos de registro de licencia y educación médica continua para el trienio 2016-2019, a tenor con lo dispuesto en la Ley núm. 139-2008 y la Ley núm. 11 de 23 de junio de 1976, según enmendadas. Además, expresamente indicó que dicha certificación era válida hasta el 27 de febrero de 2019. Conforme al término del trienio 2016-2019, dicha certificación comenzaba del 27 de febrero de 2016 y su duración se extendía al 27 de febrero de 2019. No surge de la prueba presentada que al Dr. Rivera González se le haya suspendido o revocado su licencia. Conforme el Art. 7 de la Ley Núm. 139-2008, la Junta de Licenciamiento y Disciplina Médica de Puerto Rico puede tomar las siguientes acciones en torno a las licencias: denegar, suspender, cancelar o revocar cualquier licencia y para emitir una orden fijando a un médico un período de prueba por un tiempo determinado.[38]

Sobre este particular la Comisionada Especial determinó que la prueba presentada para establecer que el doctor Rivera González no tenía una licencia vigente para ejercer la medicina no fue clara, por lo que recomendó revocar la determinación de la CEE en cuanto al Precinto 054 de Utuado.

En cuanto al Precinto 069 de Aibonito, a pesar de que el Comisionado Electoral del PPD impugnó 49 solicitudes aprobadas en la Resolución Enmendada, sólo presentó prueba de tres casos: Ana Isabel Colón Borelli, Carlos Veguilla Colón y Carmen Ana Borelli Aponte. La Comisionada señaló

---

[37] En cuanto a las solicitudes correspondientes al precinto 040 de Añasco certificadas por el doctor Heredia, la CEE las denegó por considerar que el médico no era de cabecera o tratamiento de los electores. Íd., pág. 29.
[38] Íd., pág. 32

que, en cuanto a esos tres electores, hubo prueba directa de que no están encamados, por lo que recomienda que se revoque la determinación de la CEE en cuanto a estos tres electores.[39]

Con respecto al formulario sobre solicitud de voto adelantado por problemas de movilidad aprobado por la CEE, determinó que "su cumplimentación es una cuestión de estricto derecho ya que de no llenar adecuadamente los espacios provistos con la información requerida se incumple con la Ley Electoral, según enmendada, *supra,* y el elector no es aquel que identificó el legislador como elegible para el voto por adelantado".[40] Por consiguiente, recomienda que se revoquen las solicitudes aprobadas por la CEE en su Resolución Enmendada que no cumplieron estrictamente con los requisitos reglamentarios.

En síntesis, la Comisionada emitió las siguientes recomendaciones:

- Sobre los precintos **089 y 090 de Las Piedras** (90 electores), **057 de Jayuya** (57 electores), **015 de Dorado** no se presentó prueba alguna por la cual se deba revocar la determinación de la CEE, por tanto se recomienda se confirme y se deniegue el recurso de revisión en cuanto a esa alegación.
- En cuanto al **Precinto 054 de Utuado**, se recomienda se acoja el recurso de revisión y se revoque la determinación de la CEE. La prueba presentada para establecer que el Dr. Dennis González no estaba autorizado a ejercer la medicina no estuvo clara.
- Se recomienda revocar la Resolución en cuanto al **Precinto 066 de Orocovis**, por no ser los médicos certificantes, médicos de cabecera o tratamiento.
- En relación al **Precinto 069 de Aibonito** se recomienda se revoque sólo en cuanto a los electores Carmen Ana Borelli, Ana Colón Borelli, Carlos Vegilla Colón y Rosa Cartagena Rodríguez.
- En cuanto los planteamientos sobre falta de notificación del procedimiento administrativo ante la

---

[39] Las solicitudes restantes certificadas por el Dr. Francisco Fontánez no fueron impugnadas con prueba.
[40] Informe de la Comisionada Especial, págs. 32-33.

CEE y violación del debido proceso de ley, durante el procedimiento administrativo que llevó a la Presidenta de la CEE a emitir su *Resolución Enmendada,* no se presentó prueba sobre el particular. Aunque se intentó, por medio de la declaración del Sr. Walter Vélez Martínez, Secretario de la Comisión, éste no pudo afirmar ni negar el hecho de la notificación a los electores; ya que de su declaración, ello no corresponde a la CEE, sino a la Comisión Local.
- Por último, en vista de que los comparecientes llegaron a unos acuerdos parciales mediante los cuales desistieron de sus reclamaciones en cuanto a los precintos 027 de Arecibo y 049 de Sabana Grande, recomienda que se dicte Sentencia de conformidad.

Oportunamente, las partes presentaron sus respectivos alegatos. En su alegato, el Comisionado Electoral del PNP reitera los planteamientos presentados en su *Recurso de Certificación Intrajurisdiccional.* Sostiene que una lectura de la Ley Electoral y la intención legislativa de garantizar el voto a las personas encamadas exigen que la CEE se limite a verificar que el elector cumpla con una certificación médica. Además, señala que se violó el debido proceso de ley de los electores al no ser notificados de las apelaciones instadas por los comisionados locales y que la CEE incurrió en incuria. Finalmente, cuestiona las determinaciones de hechos y de derecho de la Comisionada Especial.

Por otro lado, los Comisionados Electorales del PPD, el PIP y el PPT presentaron conjuntamente un alegato. Plantean que conceder el remedio que solicita el Comisionado Electoral del PNP permitiría el fraude electoral. Además, reiteran el planteamiento jurisdiccional presentado anteriormente. Por otro lado, acogen las recomendaciones de hechos y de derecho de la Comisionada Especial y sostienen que se debe dar gran

deferencia a ésta y a la CEE. Aseguran que el procedimiento cumplió con las garantías del debido proceso de ley y lo establecido en la Ley Electoral y el *Manual*. Finalmente, concluyen que el Comisionado Electoral del PNP no presentó prueba suficiente para refutar las conclusiones de la CEE.

En su alegato, la Presidenta de la Comisión Estatal de Elecciones argumenta que las determinaciones de su Resolución fueron razonables y deben sostenerse. Plantea, en esencia, que la prueba presentada ante la Comisionada Especial demostró que los médicos que atendieron muchas de las solicitudes que revocó no tenían una relación médico-paciente con los electores. Desde su perspectiva, los requisitos establecidos para conceder el voto adelantado a personas encamadas, entre ellos la certificación del médico de cabecera o tratamiento del elector, son válidos y están comprendidos dentro de las facultades de la Asamblea Legislativa y la Comisión Estatal de Elecciones. Estos requisitos, a su juicio, incluyen su interpretación de que un médico de cabecera o tratamiento es solo aquel con una relación médico-paciente con el elector. Por esta razón, solicita que la resolución recurrida sea confirmada.

## III

Evaluados los alegatos de las partes, una mayoría de este Tribunal valida todas las solicitudes de voto adelantado que están ante nuestra consideración. Concluye que la CEE violó el debido proceso de ley de los electores al notificar tardíamente la Resolución Enmendada. Señala

que la notificación se realizó el 28 y 29 de octubre de 2016, es decir, dos días después de su emisión y por correo postal, lo que, según la mayoría "indiscutiblemente coartó el derecho de los electores a instar un recurso de revisión judicial y a defender su derecho individual".[41] No tiene razón. Veamos.

A.

La sección 7 del Artículo II de la Constitución de Puerto Rico establece que "[n]inguna persona será privada de su libertad o propiedad sin un debido proceso de ley". La jurisprudencia federal y estatal ha reconocido que el debido proceso de ley tiene dos vertientes: la sustantiva y la procesal. Mientras que la sustantiva examina la justicia intrínseca de la norma, la procesal procura el "derecho de toda persona a tener un proceso justo y con todas las garantías que ofrece la ley, tanto en el ámbito judicial como en el administrativo". Marrero Caratini v. Rodríguez Rodríguez, 138 DPR 215, 220 (1995). Mediante esta doctrina se examina si el ciudadano gozó de un procedimiento justo e imparcial antes de que su derecho de propiedad o de libertad fuese afectado por el Estado.

Para ser acreedor de las garantías del debido proceso de ley primero hay que determinar si, en efecto, hay un interés propietario o libertario constitucionalmente protegido afectado negativamente por una actuación gubernamental. Serrano Vélez v. ELA, 154 DPR 418, 437 (2001). Una vez reconocido, corresponde establecer cuáles son las garantías que el Estado debe satisfacer. Al

---

[41] Sentencia, pág. 14.

resolver estos casos, hemos expresado que la naturaleza del debido proceso es "circunstancial y pragmática". Domínguez Talavera v. Tribunal Superior, 102 DPR 423, 428 (1974). Así, las garantías procesales que el Estado debe reconocer dependen del tipo de procedimiento y de los intereses afectados.

Este Tribunal ha reconocido una serie de requisitos que el Estado debe satisfacer en todo procedimiento adversativo para cumplir con las exigencias del debido proceso de ley: (1) una notificación adecuada del proceso; (2) un proceso ante un juez imparcial; (3) una oportunidad razonable de ser oído; (4) el derecho a contrainterrogar testigos y examinar evidencia presentada en su contra; (5) tener asistencia de abogado, y (6) que la decisión se base en el récord. Rivera Rodríguez & Co. v. Lee Stowell, 133 DPR 881, 889 (1993). Sobre el primer requisito, hemos expresado que la "notificación adecuada brinda a las partes la oportunidad de advenir en conocimiento real de la decisión tomada, a la vez que otorga a las personas cuyos derechos pudieran verse transgredidos una mayor oportunidad de determinar si ejercen o no los remedios disponibles por ley". Picorelli López v. Depto. De Hacienda, 179 DPR 720, 737 (2010). Como parte de esta notificación adecuada es necesario advertir sobre los remedios que tiene disponible la parte, entre ellos, "el trámite administrativo que deb[e] proseguir". Olivo v. Srio. de Hacienda, 164 DPR 165, 178 (2005).

Valga aclarar que cuando hablamos de debido proceso de ley aludimos a la vertiente constitucional de dicho

derecho. Es decir, existen una serie de garantías otorgadas por leyes, por ejemplo, las Reglas de Procedimiento Civil o la Ley de Procedimiento Administrativo Uniforme (LPAU), que exceden las garantías constitucionales reconocidas en la cláusula del debido proceso de ley. Así, en el ámbito civil se ha reconocido un derecho estatutario a apelar las determinaciones judiciales y a ser notificado de esa apelación. Por otro lado, en el ámbito administrativo el derecho a apelar ante un tribunal adquiere una dimensión constitucional, pues hemos expresado que "el derecho a cuestionar la determinación de una agencia mediante revisión judicial es parte del debido proceso de ley protegido por la Constitución de Puerto Rico". Rocío Fonte v. F & R Construction, S.E., 2016 TSPR 194, 196 DPR ____ (2016). Por tanto, hemos concluido que "la falta de notificación adecuada del recurso de revisión de una decisión administrativa puede afectar la jurisdicción del Tribunal de Apelaciones". Mun. de San Juan v. Jta. Planificación, 189 DPR 895, 903 (2013).

En síntesis, el debido proceso de ley incluye el **derecho a apelar ante un tribunal** una determinación administrativa **y a ser notificado** de ese derecho. Sin embargo, nuestro ordenamiento no exige **que se notifique a la otra parte la apelación instada ante un foro administrativo.**

Vale la pena destacar que el objetivo de la adjudicación administrativa es proveer un sistema justo, práctico y flexible. Y es que, el debido proceso de ley

ofrece protección contra la arbitrariedad administrativa, pero **no es molde rígido** que prive la flexibilidad de los procedimientos administrativos. Henríquez v. Consejo Educación Superior, 120 DPR 194, 202 (1987)(énfasis suplido). Por otro lado, comete un error este Tribunal cuando confunde las exigencias mínimas del debido proceso de ley en su vertiente constitucional y las garantías adicionales que establece la Asamblea Legislativa en leyes como las Reglas de Procedimiento Civil o la Ley de Procedimiento Administrativo Uniforme (LPAU). Véase, por ejemplo, Colón Torres v. A.A.A., 143 DPR 119, 124 esc. 4 (1977); véase también José Julián Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con Estados Unidos, Ed. Temis S. A. pág. 608 (2009) ("En rigor, cuando se habla de los requisitos del debido proceso se alude a las pautas procesales que la entidad pública debe reconocer a las personas, independientemente de si por ley o reglamento esas pautas se reconocen"). Por lo tanto, en ausencia de requisitos estatutarios, el Tribunal debe asegurarse que en efecto el procedimiento fue injusto porque se afectaron algunas de las pautas mínimas que requiere nuestro ordenamiento constitucional.

Según expuesto previamente, lo que el derecho constitucional exige es una notificación adecuada que le permita a una parte advenir en conocimiento de una **decisión** tomada por la agencia y los remedios que tiene disponible por ley para cuestionarla.

B

En lo pertinente, una mayoría de este Tribunal señala que la notificación "tardía" de la *Resolución Enmendada* "coartó el derecho de los electores a instar un recurso de revisión judicial y a defender su derecho individual" toda vez que el término provisto para solicitar la revisión del dictamen ya había transcurrido para cuando éstos fueron notificados.[42] En este caso, la Presidenta de la CEE notificó a los electores su denegatoria a ciertas solicitudes de voto adelantado y advirtió los remedios que tenían disponible las partes para revisar esa determinación, es decir, acudir al Tribunal de Primera Instancia, según los términos establecidos en el Art. 4.001 de la Ley Electoral, e impugnar las determinaciones de la CEE. 16 LPRA sec. 4031. Tan es así, que el Comisionado Electoral del PNP recurrió ante el Tribunal de Primera Instancia de la determinación que le fuera notificada y además tuvo la oportunidad de presentar prueba a su favor. Es decir, no se vieron afectados sus derechos y no se impidió que procurara los remedios que tenía a su disposición, cumpliéndose así con las garantías mínimas que exige el debido proceso de ley.

Sin embargo, lo que en efecto resuelve la Sentencia emitida es que viola el debido proceso de ley que la decisión tomada sea **notificada dos o tres días después.** Esto, a pesar de que la Ley Electoral **no establece un término para notificar** la determinación. Además, no logro comprender como el término para revisar la determinación de la CEE transcurrió antes de que le notificaran a los

---

[42] Sentencia, pág. 14.

electores, pues es harto conocido que los términos para solicitar la revisión de un dictamen no comienzan a decursar hasta que la determinación le sea notificada a la parte afectada.[43] Caro Ortiz v. Cardona Rivera, 158 DPR 592, 599-600 (2003). Véase también R. Hernández Colón, Práctica Jurídica de Puerto Rico, Derecho Procesal Civil, 5ta ed., Pubs. LexisNexis de Puerto Rico, Inc., 2010, pág. 193. De hecho, la propia Ley Electoral reconoce este principio fundamental al establecer que la parte adversamente afectada podrá presentar su escrito de revisión dentro de las veinticuatro (24) horas **"siguientes a la notificación de la misma"**. Art. 4.001, 16 LPRA sec. 4031. (Énfasis suplido). Por tanto, como la notificación no fue tardía y el término para acudir en revisión judicial comenzó a transcurrir una vez los electores fueron notificados, debemos concluir que el debido proceso de ley de los electores no fue de ninguna manera afectado.[44]

---

[43] Así, en Caro Ortiz v. Cardona Rivera, 158 DPR 592, 599-600 (2003), este Tribunal expresó "que hasta que no se notifica adecuadamente a las partes una *resolución, orden o sentencia*, ésta no surte efecto y los distintos términos que de ella dimanan no comienzan a transcurrir". (Énfasis en original).

[44] Una mayoría de este Tribunal también concluye que se violó el debido proceso de ley porque no se les notificó a los electores las apelaciones instadas por los comisionados locales. En primer lugar, vemos que la Sección 2.2 del *Reglamento para el Voto Ausente y Adelantado Primarias 2016 y Elecciones Generales 2016* no exige que el comisionado local notifique a los electores del recurso de apelación instado ante la Presidenta de la CEE. Tampoco lo exige la Ley Electoral. Ante la ausencia de un requisito por ley debemos examinar si en efecto el debido proceso de ley requiere la notificación de este tipo de apelación. Entendemos que la jurisprudencia relacionada a la notificación adecuada y la oportunidad de ser oído de ninguna manera exigen que se le notifique a la otra parte la apelación instada ante un foro administrativo. Requerir esto atentaría contra el diseño del procedimiento administrativo, el cual "persigue (...) acelerar la adjudicación". Ríos Colón v. F.S.E., 139 DPR 167, 183 (1995). En ese sentido, "[s]i se permiten estos mecanismos, el procedimiento **administrativo** -lejos de ser **rápido**, sencillo y sin formalismos- corre el riesgo de convertirse en una copia del procedimiento judicial". Id.

Cabe mencionar que este Tribunal expresó que "[e]xigirles a las agencias que notifiquen sus resoluciones dentro de rígidos límites de tiempo sería prácticamente imposible". O.E.G. v. Román, 159 DPR 401, 420 (2003). Curiosamente, en esta ocasión el Tribunal es quien añade una rigidez fatal al trámite administrativo, pues resuelve que notificar dos o tres días después de emitir un dictamen afectó el debido proceso de ley de los electores, a pesar de que éstos podían cuestionar la determinación y salvaguardar sus derechos.[45] Al invalidar las solicitudes por un fundamento tan jurídicamente escueto este Tribunal trastoca el andamiaje procesal y socava los cimientos del debido proceso de ley.


IV

Expuesto lo anterior, no hay duda de que una mayoría de este Tribunal se escuda detrás de un análisis distorsionado del derecho, para evitar atender el asunto que realmente se trajo ante nuestra consideración. A saber, qué es un médico de cabecera o de tratamiento en el contexto de una solicitud de voto adelantado por problemas de movilidad al amparo del Art. 19.039 de la Ley Electoral, supra. Ante las determinaciones de hecho y de derecho incluidas en el Informe sometido ante este Tribunal por la Comisionada Especial, me veo imposibilitada de ignorar una controversia que arroja duda

---

[45] Resulta importante destacar que la alegación de que se notificó dos o tres días después, no es más que eso: una alegación. Ello pues nunca se pasó prueba sobre ello.

sobre la pureza del proceso electoral. En consecuencia, procedo a exponer el derecho aplicable a este asunto.

A.

Es norma reiterada que nuestro derecho administrativo se fundamenta en una actitud de gran deferencia por parte de los tribunales a los organismos administrativos. Vélez Rodríguez v. ARPE, 167 DPR 684, 693 (2006). En el caso particular de la CEE, este Tribunal ha expresado que "[e]l tribunal debe, en aquellos casos en que la determinación dependa principal o exclusivamente de una cuestión de derecho electoral especializado, guardar la usual deferencia al organismo administrativo". Mundo Ríos v. CEE, 187 DPR 200, 207 (2012); Granados v. Rodríguez Estrada I, 124 DPR 1, 20 (1989).

Sin embargo, también hemos señalado que cuando una parte recurre al Tribunal de Primera Instancia para la revisión de una determinación, resolución u orden de la CEE, ese foro "celebrará una vista en su fondo, recibirá evidencia y formulará las determinaciones de hecho y conclusiones de derecho que correspondan". 16 LPRA sec. 4031. Por lo tanto, el foro primario revisa mediante un juicio de novo las decisiones de la CEE. Suárez Cáceres v. Com. Estatal Elecciones, 176 DPR 31, 64-65 (2009). En este "juicio puede producirse nueva prueba documental y testifical, lo que implica que todos los extremos pertinentes y relativos a los planteamientos estarán abiertos a la consideración del tribunal revisor como si se plantearan por primera vez". Íd. Por consiguiente, el tribunal no tiene que darle deferencia a la evaluación de

la prueba realizada por la CEE. PAC v. PIP, 169 DPR 775, 791-92 (2006).

B

Una de las garantías fundamentales y emblemáticas de nuestro ordenamiento democrático es el derecho al voto. A esos efectos, nuestra Constitución dispone que "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Art. II, Sec. 2, Const. ELA, 1 LPRA Art. II, Sec. 2. Anteriormente, hemos reconocido el derecho al voto como "la más preciada de las prerrogativas del pueblo, porque es a través del voto que el pueblo ejerce su poder soberano y expresa su voluntad". Ramírez de Ferrer v. Mari Bras, 144 DPR 141, 176 (1997), citando a P.P.D. v. Admor. Gen. De Elecciones, 111 DPR 199, 207 (1981).

A su vez, la propia Constitución delega en la Asamblea Legislativa la facultad de "dispon[er] por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas". Art. VI, Sec. 4, Const. ELA, 1 LPRA. Según el Diario de Sesiones de la Asamblea Constituyente, nuestros constituyentes concibieron esta facultad legislativa con gran amplitud. De ahí que expresaran lo siguiente:

> "Será objeto de reglamentación por ley todo lo concerniente al proceso electoral y al proceso de inscripción de electores en los registros electorales, así como todo lo relativo a los partidos políticos. Las disposiciones de esta constitución no deben entenderse en el sentido

de limitar o menoscabar tal facultad. Otra cosa sería hacer imposible la aprobación de leyes electorales por el poder legislativo. Amplia ha de ser también--sin limitaciones que la harían imposible de ejercitar--la facultad de la Asamblea Legislativa en cuanto a lo concerniente al proceso de inscripción de electores en los registros electorales, a la formación de tales registros, y a los medios para que en ellos sean inscritos los electores legales, así como para que de ellos sean eliminados los electores sin capacidad legal o que no reúnan los requisitos señalados por esta constitución [o] la ley. Amplia ha de ser asimismo la facultad de la Asamblea Legislativa para regular todo lo concerniente a la manera en que se han de depositar y contar los votos en las elecciones y la forma de practicar el escrutinio de tales votos. Y amplia ha de ser la facultad legislativa para reglamentar todos los detalles concernientes al ejercicio del voto y al mecanismo e instrumentación de dicho ejercicio." Diario de Sesiones de la Asamblea Constituyente de Puerto Rico, pág. 2621 (ed. 1961).

Tenemos, pues, el valor del derecho al voto de cada ciudadano, por un lado, y la amplia facultad de la Asamblea Legislativa para regular y viabilizar el ejercicio concreto de ese derecho, por el otro. A esos efectos, hemos expresado que "la Asamblea Legislativa tiene **la facultad y la obligación** de aprobar aquella reglamentación que salvaguarde el derecho al voto y que propenda a la realización de un proceso electoral justo, ordenado, libre de fraude, honesto, íntegro y democrático". PNP v. De Castro Font II, 172 DPR 883, 894 (2007) (énfasis suplido). En aras de conciliar ambos aspectos de nuestro ordenamiento democrático -el derecho al voto y la integridad del proceso electoral- hemos establecido escrutinios judiciales distintos según el efecto que la actuación gubernamental tenga sobre el derecho al voto. Así, este Tribunal ha expresado que las

limitaciones, requisitos u obstáculos que se establezcan a la capacidad como tal que tiene una persona para votar están sujetas a un escrutinio estricto. Ramírez de Ferrer v. Mari Bras, supra, pág. 176 (ley requería ciudadanía estadounidense para poder votar); Angleró v. Barreto Pérez, 110 DPR 84, 92 (1980) (ley requería que se registraran 153 días antes de las elecciones). Bajo este escrutinio, solo prevalecerán aquellas limitaciones que "constituyan un medio necesario para la consecución de un interés público apremiante". Ramírez de Ferrer v. Mari Bras, supra, pág. 76.

Sin embargo, cuando la acción o norma cuestionada no constituye una limitación al propio ejercicio del derecho al voto, sino una prerrogativa legislativa sobre cómo y cuándo se ejercerá dicho derecho, el escrutinio aplicable es menos riguroso. A esos efectos, hemos dicho que, en cuanto al proceso electoral se refiere, "el Estado puede implantar requisitos razonables, pero 'de tal forma que no impongan al elector condiciones de difícil cumplimiento o exigencias que menoscaben su derecho al voto o desalienten su ejercicio'". Rivera v. Gobernador, 121 DPR 558 (1988), citando a PPD v. Admor. Gen. de Elecciones, 111 DPR 199, 242 (1981). Por tanto, cuando la ley no tiene el efecto de impedir o gravar sustancialmente el ejercicio del derecho al voto, el escrutinio pertinente es el llamado análisis tradicional o racional. PSP, PPD, PIP v. Romero Barceló, 110 DPR 248, 261 (1980). Bajo este, la ley no debe ser invalidada "a menos que sea claramente arbitraria y no pueda establecerse nexo racional alguno entre la misma y

un interés legítimo del Estado". Íd., citando a Zachry International v. Tribunal Superior, 104 DPR 267, 277 (1975).

C

A tono con lo anterior, la Asamblea Legislativa aprobó el Código Electoral de Puerto Rico para el Siglo XXI, Ley Núm. 78-2011, 16 LPRA sec. 4001, según enmendada (Ley Electoral). En lo pertinente al caso de autos, la Ley Núm. 239-2014, enmendó el Art. 9.039 de la Ley Electoral, 16 LPRA sec. 4179(m), para establecer que los votos de las personas con impedimentos de movilidad (encamados) que cualifiquen como electores de Fácil Acceso en el Domicilio se trataran como votos adelantados. En específico, la disposición en cuestión dispone lo siguiente:

> Para los casos que soliciten el voto adelantado por la causal de algún tipo de **condición médica** que le impida asistir a su colegio de votación, la Comisión proveerá un formulario para que **el médico de cabecera o de tratamiento del elector certifique**: que el elector presenta un problema de movilidad física que sea de tal naturaleza que le impida acudir a su centro de votación.

> La Comisión será responsable de reglamentar la manera en que se establecerá el procedimiento a seguir para garantizar el voto de las personas con impedimento de movilidad (encamados). En este procedimiento se trabajará la votación como voto adelantado bajo la supervisión de la Junta Administrativa del Voto Ausente (JAVA) y coordinado por la Junta de Inscripción Permanente (JIP). Id. (énfasis suplido)

Por su parte, el *Manual de Procedimientos para el Voto Adelantado en el Colegio de Fácil Acceso en el Domicilio para las Elecciones Generales 2016 (11 de agosto de 2016)*, exige que la solicitud de una persona encamada para votar en el colegio de fácil acceso en el domicilio

esté "certificada por **su médico de cabecera o médico de tratamiento**". (énfasis suplido) Íd. pág. 3. Así también, el Manual establece como requisito que dicha solicitud esté "firmada por el elector". Íd. La única excepción a este requisito aplicará en el caso de electores con impedimentos para firmar, leer o escribir, en cuyo caso deberán "hacer una marca y alguna persona autorizada por [estos] certificará este hecho con su firma como testigo en el espacio que a estos fines provee la solicitud". Íd.

Lo primordial al momento de examinar y aplicar una ley es interpretar su texto. Esto, pues, "cuando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa". Romero Barcelo v. E.L.A., 169 DPR 460, 476-77 (2006); véase también Brau v. ELA, 190 DPR 315, 338 (2014). A su vez, es imprescindible procurar que la interpretación que así se derive de la ley conserve cierta lógica y razonabilidad, pues los tribunales también debemos evitar que la pura aplicación mecánica de la ley acarree graves injusticias.

La disposición de la Ley Electoral que está en controversia requiere que el formulario de un Voto de Fácil Acceso en el Domicilio por razón de inmovilidad lo certifique "el médico de cabecera o de tratamiento del elector". 16 LPRA sec. 4179(m). Al interpretar esta disposición, es de utilidad la regla hermenéutica denominada *expressio unius est exclusio alterius.* Según dicha regla, "la mención específica de una persona o cosa implica la exclusión de otras personas o cosas". R.E.

Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, San Juan, Pubs. J.T.S., 1987, pág. 345. Dicha norma parte de la renuencia de los tribunales a imputarle actos inútiles o fútiles a la Asamblea Legislativa. <u>Flamboyán Gardens v. Junta de Planificación</u>, 104 DPR 254, 262 (1975).

En este caso, sería difícil ignorar la especificidad provista al tipo de médico que certificaría la condición de inmovilidad del elector, ya que el legislador no dispuso que fuera cualquier médico, sino el médico de **cabecera** o de **tratamiento** <u>del elector</u>. Así, al mencionar específicamente que se trataría del médico de **cabecera** o **tratamiento** <u>del elector</u>, el legislador excluyó a otros médicos de la facultad de certificar el referido formulario.[46] En ese sentido, resultan ilustrativas otras acciones legislativas en las que, a diferencia del caso ante nos, el legislador ha requerido certificaciones médicas con expresiones genéricas. Estas, por ejemplo, se reducen a un "certificado médico"[47] o una certificación expedida por "**un** médico especialista debidamente autorizado para ejercer tal profesión".[48] Tomando eso en cuenta, resulta forzoso hacer la distinción pertinente ante la caracterización hecha por el legislador en el artículo 9.039(m) de la Ley Electoral.

---

[46] Recuérdese, además, que el manual de la CEE dispone que la solicitud de estos electores debía certificarse por "<u>su</u> médico de cabecera o médico de tratamiento". *Manual de procedimientos para el voto adelantado en el Colegio de Fácil Acceso a Domicilio para las Elecciones Generales de 2016 (11 de agosto de 2016)*, pág. 3.

[47] *Ley para la Administración de los Recursos Humanos en el Servicio Público*, Ley Núm. 184-2004, 3 LPRA sec. 1466 (en el contexto de ausencias al trabajo y licencias por enfermedad).

[48] *Ley de Vehículos y Tránsito de Puerto Rico*, Ley Núm. 22-2000, 9 LPRA sec. 5023(b)(en el contexto de las solicitudes de personas con impedimento de rótulos removibles para estacionar).

Para sustentar esta posición, es también pertinente determinar el significado particular de las palabras en la ley. Al incurrir en esta tarea, el Código Civil impone el deber al juzgador de atribuirle a las palabras su significado más "corriente y usual". 31 LPRA sec. 15. Los términos técnicos, por su parte, deben ser interpretados según los interpretan "los peritos o maestros" en la materia en cuestión. 31 LPRA sec. 16.

En otras ocasiones, hemos recurrido al diccionario para determinar el alcance de una disposición legal. Véase e.g. García v. Aljoma, 162 DPR 572 (2004); Pueblo v. Arandes de Celis, 120 DPR 530 (1988); Negrón Soto v. Gobernador, 110 DPR 664 (1981). Esto, pues consideramos el diccionario como una "fuente confiable para determinar el significado de una palabra, presumiendo que el legislador lo conoce". Vázquez Negrón v. ELA, 109 DPR 19, 24 esc. 3 (1979). Algunos incluso han expresado que el diccionario es "la fuente más confiable para determinar el significado de una palabra". R.E. Bernier y J.A. Cuevas Segarra, op.cit., pág. 250.

La Real Academia Española define *médico de cabecera* como aquel que "asiste **habitualmente** a una persona o a una familia". Real Academia Española, Diccionario de la Lengua Española (énfasis suplido).[49] Así también, define *tratamiento* como un "conjunto de medios que se emplean

---

[49]Disponible                                                              en: http://dle.rae.es/?id=Ol43qKz%7COl6Jp7U#/?id=Ol43qKz|Ol6Jp7U    (última visita 2 de noviembre de 2016). Una definición similar proveían diccionarios más antiguos, como el Diccionario de la Lengua Castellana, según el cual *médico de cabecera* era aquel que "asist[ía] **especialmente** á [sic] el enfermo". J. Ibarra, Diccionario de la Lengua Castellana, Impresor de Cámara de S.M. y de la Real Academia, 1783, pág. 628 (énfasis suplido).

para curar o aliviar una enfermedad". Íd.[50] Por otro lado, los diccionarios especializados definen *médico de cabecera* como quien "asiste **especialmente** y de **continuo** al enfermo". Diccionario Terminológico de Ciencias Médicas, Salvat Editores, 1984, pág. 682 (énfasis suplido).[51]

De estas definiciones concluimos que el artículo 9.039(m) de la Ley Electoral estableció como requisito que quien certificara el problema de movilidad fuera un médico con algún historial previo con el elector, ya fuera porque es su médico habitual o es el médico que atiende al elector específicamente en cuanto a la condición o enfermedad que le causa su inmovilidad. Esta conclusión es reforzada por la aplicación de la discutida norma hermenéutica (*expressio unius est exclusio alterius*) al referido artículo y el análisis comparativo de otras leyes que a su vez meramente requieren certificaciones médicas sin especificar que se trata de un médico de cabecera o tratamiento.

Bajo el entendido de que "[a]l interpretar y aplicar un estatuto hay que hacerlo teniendo presente el propósito social que lo inspiró", Vázquez v. A.R.Pe., 128 DPR 513, 523 (1991), es propicio añadir que el historial de las

---

[50] Disponible en: http://dle.rae.es/?id=aWzrvDX#/?id=aWzrvDX (última visita 2 de noviembre de 2016).
[51] En el contexto de beneficios del Seguro Social, a nivel federal se define *treating source* como: "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who **has, or has had, an ongoing treatment relationship with you**". 20 C.F.R. sec. 404.1502 (énfasis suplido). Véase, e.g., McTaggart v. Astrue, 342 F.Appx. 373, 374-75 (10th Cir. 2009); Barker v. Shalala, 40 F.3d 789 (6th Cir. 1994)("The *treating physician* doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.").

disposiciones legales aplicables al voto de personas encamadas confirma nuestra conclusión. Al hacer este análisis, solemos recurrir a "la exposición de motivos [de la ley en cuestión], la política pública del tiempo, los informes de las comisiones legislativas y el diario de sesiones, entre otros". Pepsi-Cola v. Mun. Cidra, 186 DPR 713, 737-38 (2012).

La génesis de la controversia actual se extiende al proceso electoral de 2004, donde por primera vez la CEE estableció un procedimiento especial para el voto de electores con impedimentos de movilidad o encamados. Originalmente, el procedimiento para que estos electores votaran se incorporó mediante resoluciones de la CEE, hasta que en el 2012 se adoptó una enmienda al *Código Electoral para el Siglo XXI* que dispuso el Voto de Fácil Acceso a Domicilio como un tipo de voto ausente. Art. 9.039, Ley Núm. 135-2012; véase también Resolución CEE-RS-12-103; Resolución CEE-RS-04-67. El proceso para votar de esta manera, al ser equiparado a un voto ausente, se reducía a cumplimentar un formulario enviado por correo que sería verificado y aprobado por la Comisión Local. En ese sentido, no existía una cualificación o certificación médica del elector que solicitaba el voto adelantado por problemas de movilidad.

Este procedimiento suscitó serias controversias en las Elecciones de 2012, al punto de que varios sectores políticos hicieron alegaciones de que múltiples votos de personas encamadas se habían emitido de manera

fraudulenta.[52] Las posturas encontradas sobre la conveniencia del procedimiento hasta entonces contemplado para el voto de las personas encamadas están reflejadas en el historial legislativo de las enmiendas al artículo 9.039 mediante la Ley 239-2014. El Informe de la Comisión de Gobierno, Eficacia Gubernamental e Innovación Económica señala, por ejemplo, que durante "[los comicios electorales [de 2012] surgieron controversias vinculadas . . . al Artículo 9.039 del Código Electoral de Puerto Rico". 17ma Asamblea Legislativa, *Informe recomendando la aprobación del P. del S. 1254, con enmiendas (10 de noviembre de 2014)*, pág. 10. Según el informe, estas controversias "provocaron que este innovador sistema de votar se viera empañado por denuncias de malos manejos de papeletas enviadas a electores que nunca pidieron votar bajo ese sistema". Íd. pág. 11 De ahí que el informe concluyera que las enmiendas al artículo 9.039 pretendían "devolv[er] la confianza pública en nuestro sistema electoral". Íd.[53]

Por su parte, la Exposición de Motivos de la Ley Núm. 239-2014 reitera que las enmiendas realizadas al Código Electoral de Puerto Rico para el Siglo XXI, entre ellas

---

[52] Alegato de los Comisionados Electorales del PPD, el PIP y el PPT, págs. 12-13.

[53] Del Diario de Sesiones de la Cámara de Representantes también se desprenden preocupaciones similares. Véase 17ma Asamblea Legislativa, Diario de Sesiones de la Cámara de Representantes, 13 de noviembre de 2014, pág. 23 (donde el representante Torres Yordán expresó lo siguiente: "Señor Presidente, tengo que felicitar a los compañeros porque restablecen que el voto encamado, que el voto encamado realmente quien va a votar es el encamado, no el que recibe la papeleta. Porque todos sabemos que ese día antes de la elección van esos tres, cuatro funcionarios a visitar a ese elector que está encamado, que puede ver que sí, que está encamado y que sí va ejercer su derecho al voto libre y voluntariamente. Que no va a ser que le van a enviar una papeleta por correo y sabrá Dios quién coja esa papeleta y cómo va a votar. Yo creo que al reestablecer esta función le damos sinceridad y honestidad al proceso, y eso es bueno, señor Presidente y demás compañeros").

las enmiendas al artículo 9.039, procuran "[establecer] **controles y medidas de seguridad** que garanticen el voto independiente y secreto de todos los electores en las diferentes clasificaciones de voto adelantado o ausente, en especial, sobre la atención de los grupos de electores más vulnerables, como son los encamados, los hospitalizados y aquellas personas con discapacidades". Exposición de Motivos, Ley Núm. 239-2014. Así también, expresa como propósito medular de las enmiendas "proveer la mayor garantía, transparencia y pureza legal en los procesos electorales". Id.

De este trasfondo nos parece que el texto claro de la ley estuvo a su vez motivado por el interés del legislador de promover un procedimiento electoral altamente confiable y que garantizara y protegiera la seriedad de este proceso democrático. El juicio sobre la conveniencia o deseabilidad de dicha norma no nos corresponde cuando el legislador actúa de forma clara y, a su vez, dentro de sus facultades constitucionales. Desde esta perspectiva, no albergamos duda de que lo que el legislador quiso fue otorgarle un rigor a las solicitudes de voto de personas encamadas del que antes carecía. El rigor fue tal que el formulario del elector con problemas de movilidad tenía que estar certificado por el médico de cabecera o tratamiento del elector.

Expuesto el derecho aplicable, pasemos a atender la controversia ante nuestra consideración.

V

El Comisionado Electoral del PNP sostiene que una lectura armoniosa de la Ley Electoral y la intención legislativa de garantizar el voto a las personas encamadas exigen que la CEE se limite a verificar que el elector cumpla con una certificación médica. Consideramos que dicha lectura no se sostiene a base del lenguaje específico que provee la Ley Electoral, su historial legislativo y la reglamentación aplicable, según expuesta previamente.

Además, arguye que interpretar médico de cabecera o tratamiento de manera tan específica sería inconstitucional, pues obstaculizaría el derecho al voto de los encamados. Tampoco le asiste la razón. Veamos.

En primer lugar, no estamos ante una ley que grava o impide sustancialmente el ejercicio del derecho al voto. Todo lo contrario. "[L]a Asamblea Legislativa, para **viabilizar el voto** de aquellas personas que debido a diversas razones no pueden comparecer al colegio electoral en que están inscritos. . . fijó el procedimiento y voto de electores ausentes". PSP v. CEE, 110 DPR 400, 419 (1980) (énfasis suplido). Al establecer un sistema de voto ausente y voto adelantado, la Asamblea Legislativa cumple con su obligación de salvaguardar el derecho al voto de todo ciudadano. Véase PNP v. De Castro Font II, 172 DPR 883, 894 (2007). Recientemente, se añadió el voto de las personas con impedimentos de movilidad (encamados) a la lista de personas que pueden votar por adelantado. No obstante, para garantizar la integridad del proceso electoral y conforme a la amplia facultad constitucional

conferida, se establecieron una serie de requisitos para evitar la comisión de fraude en las elecciones.

Ante un ataque constitucional, estos requisitos no están sujetos a un escrutinio estricto propio de una ley que limite o grave sustancialmente el derecho al voto de las personas.[54] No estamos ante una ley que obstaculice el ejercicio del derecho en sí mismo. Véanse, por ejemplo, Ramírez de Ferrer v. Mari Bras, supra, pág. 176; Angleró v. Barreto Pérez, 110 DPR 84, 92 (1980). Más bien, el Artículo 9.039(m) de la Ley Electoral, supra, viabiliza que los encamados puedan ejercer su derecho al voto y asegura la pureza del proceso electoral. PSP, PPD, PIP v. Romero Barceló, supra, pág. 261 ("obedece al propósito primordial de hacerle posible al mayor número de electores debidamente inscritos el que efectivamente hagan uso de su derecho al voto, al mismo tiempo que provee mecanismos para asegurar la integridad del proceso electoral".). Así, al examinar la constitucionalidad de estos requisitos aplica un escrutinio tradicional o racional. PSP, PPD, PIP v. Romero Barceló, supra, pág. 261. Requerir que el médico de cabecera o de tratamiento del elector certifique que la persona que solicita votar por adelantado padece de una condición médica que causa un impedimento de movilidad no es arbitrario y está racionalmente relacionado con un interés legítimo del Estado: garantizar un proceso electoral justo, ordenado, libre de fraude, honesto e

---

[54] Sin embargo, "aun sujet[os] a un estricto escrutinio judicial", debemos concluir que los requisitos establecidos constituyen los mecanismos menos onerosos para la consecución de un interés público apremiante, la integridad del proceso electoral. PSP v. CEE, 110 DPR 400, 440 (1980)

íntegro.[55] Ahora bien, no podemos negar que en la mayoría de las ocasiones la única forma de votar de las personas encamadas es el voto por adelantado establecido por ley. Por esta razón, los requisitos establecidos deberán ser examinados "de tal forma que no impongan al elector condiciones de difícil cumplimiento o exigencias que menoscaben su derecho al voto o desalienten su ejercicio". Rivera v. Gobernador, supra, pág. 564, citando a PPD v. Admor. Gen. de Elecciones, supra, pág. 242. Ante una controversia relacionada al voto ausente de los confinados sostuvimos que "[e]l prisma adjudicativo judicial tiene que ser más amplio, a la par que riguroso, en atención a [las] realidades peculiares y a las restricciones que estas imponen". Rivera v. Gobernador, supra, pág. 564. Considerando lo fundamental que es el voto en nuestro ordenamiento democrático, no podemos aplicar mecánicamente los escrutinios judiciales sin considerar si, en efecto, la Asamblea Legislativa está cumpliendo con su facultad y obligación de garantizar el sufragio universal y salvaguardar la integridad del proceso electoral.[56] Somos del criterio que, evaluando los distintos valores constitucionales implicados, la Asamblea Legislativa ejerció válidamente sus facultades al requerir que el certificado médico sea del médico de cabecera o de

---

[55] El requisito de una certificación médica también se ha sostenido en otras jurisdicciones. Véanse, por ejemplo, McDonald v. Bd. Of Election Comm'rs of Chicago, 394 U.S. 802, 803-04 (1969), Whalen v. Heimann, 373 F. Supp. 353, 357 (D. Conn. 1974); Qualkinbush v. Skubisz, 357 Ill. App. 3d 594, 619 (2004).

[56] Para una discusión sobre el deber del Estado de reconocer y concretizar, en la medida que sea posible, el derecho al sufragio véase García v. Aljoma, 162 DPR 572, 580-82 (2004). Por otro lado, en PNP v. Tribunal Electoral, 105 DPR 288, 289 (1976) validamos extender el término dispuesto por ley para radicar los sobres con los votos por adelantado en consideración al mandato constitucional de la sección 2 de la Carta de Derechos y de las circunstancias del caso.

tratamiento del elector. En estas situaciones es previsible y esperado que un elector con una condición médica que limite su movilidad sea asistido en el curso ordinario de su tratamiento o enfermedad por profesionales de la salud para atender sus condiciones de cuidado.

VI

Habiendo concluido que la certificación requerida por el Art. 9.039 de la Ley Electoral, supra, a los electores que solicitan votar adelantado por un impedimento de movilidad es constitucional, procedemos a evaluar las conclusiones de hecho y de derecho que surgen del Informe de la Comisionada Especial con relación a los precintos en controversia.[57]

En cuanto a la controversia de derecho relativa a qué es un médico de cabecera, coincidimos con el análisis expuesto por la Comisionada Especial. Como hemos adelantado, no tenemos duda de que el legislador quiso decir exactamente lo que el texto de la ley indica, que el médico de cabecera o tratamiento de la persona encamada o con impedimento es la que certifica su condición por haber tenido un contacto previo con la persona. Esto es, que es un médico con alguna familiaridad con el elector impedido, su paciente.

En atención a lo anterior, considero, al igual que la Comisionada Especial, que los testimonios vertidos por los

---

[57] Según mencionado previamente, las partes llegaron a unos acuerdos parciales que pusieron fin a las controversias sobre el precinto 027 de Arecibo y el precinto 049 de Sabana Grande. Además, el Comisionado Electoral del PNP desistió de sus reclamaciones en cuanto a las solicitudes de la Sra. María Reyes Reyes y el Sr. David Helfeld Hoffman, ambos electores del Municipio de Jayuya. Por tanto, lo determinado por la CEE con relación a esos precintos y electores no son objeto de esta controversia.

doctores Carlos Heredia, Jorge Colón Morales, Ana María Faget y Dalmarys Moreno Montesino, resumidos en el acápite I de esta Opinión, demostraron que las certificaciones realizadas por éstos no cumplen con la Ley.[58] Una mayoría de este Tribunal da por buenas estas certificaciones. Sin embargo, el proceso descrito por éstos testigos al realizar las certificaciones -a saber, la existencia de una ruta designada por comisionados locales del PNP- en lugar de proteger y reafirmar la confianza debida al proceso electoral, siembra sospecha y levanta inquietudes en cuanto a un requisito cuyo fin era enteramente lo opuesto, transmitir transparencia a través de un proceso marcado con mayor rigor. Sus testimonios demuestran la razón por la cual la Asamblea Legislativa entendió necesario modificar el proceso aplicable al voto adelantado en controversia.

Ante el esquema descrito, me parece lamentable que una mayoría de este Tribunal tergiverse los hechos y el derecho para validar cientos de votos que no se emitieron conforme a ley. Ignorar esta situación, amparado en un requerimiento inexistente del debido proceso de ley, hace un pobre servicio a nuestra democracia. Más aún cuando sobre 9,000 puertorriqueños y puertorriqueñas completaron correctamente los requerimientos dispuestos para el voto adelantado por impedimento.

---

[58] Considero que las conclusiones restantes de la Comisionada Especial se ajustaron a la prueba que tanto el Comisionado Electoral del PNP y el PPD presentaron u omitieron presentar para sostener sus respectivos recursos de revisión de la CEE. Por lo anterior, asumiendo que este Tribunal tuviera jurisdicción para atender la controversia, acogería todas las recomendaciones de la Comisionada Especial.

La CEE es la entidad facultada en ley para salvaguardar la integridad de los procesos electorales. Si bien el derecho al voto es fundamental, los requisitos que lo viabilizan son esenciales para que la voluntad del electorado y la integridad de los procesos sea suprema. Conforme a la ley y la reglamentación vigente, la CEE notificó su resolución a todas las partes involucradas. <u>No existe prueba admitida al récord que rebata tal presunción</u>. De manera que, en este caso, sin rigor alguno, se asumió jurisdicción sobre un caso en el que el Comisionado Electoral del PNP no notificó su recurso de revisión conforme a la Ley Electoral. Sin embargo, se descartó la Resolución de la CEE alegando que no se notificó al elector, argumento que es traído, por primera vez, y mediante prueba de referencia, en el alegato presentado ante este Tribunal. No hay duda de que este Tribunal excedió su facultad para alcanzar el fin promovido: que las solicitudes de voto adelantado --altamente cuestionables-- correspondientes a los listados provistos por los Comisionados Locales del PNP, no sean objeto de escrutinio por el personal de la CEE.

Por entender que una mayoría de este tribunal distorsiona el récord administrativo, añade prueba que nunca se presentó ante la Comisionada, llega a conclusiones que no se sustentan en derecho y evalúa esta controversia de forma acomodaticia para llegar a un fin particular, disiento.

Maite D. Oronoz Rodríguez
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Aníbal Vega Borges, en su capacidad oficial como Comisionado Electoral del Partido Nuevo Progresista<br><br>Peticionario<br><br>v.<br><br>Liza García Vélez, en su capacidad oficial como Presidenta de la Comisión Estatal de Elecciones, Guillermo San Antonio Acha, en su capacidad oficial como Comisionado Electoral del Partido Popular Democrático; Partido Independentista Puertorriqueño, (PIP); por conducto de su Comisionado Electoral Sr. Roberto I. Aponte Berríos; Partido del Pueblo Trabajador, (PPT), por conducto de su Comisionado Electoral Dr. José F. Córdova Iturregui<br><br>Recurridos | **Núm.** CT-2016-15 | Certificación Intrajurisdiccional |

"She seems to be more than one person. A dual personality? Sybil and Peggy, totally different form each other." Flora Rheta Schreiber, *Sybil: The Classic True Story of a Woman Possessed by Sixteen Personalities*.

Opinión Disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 4 de noviembre de 2016

Es al final de cada cuatrienio, cuando estamos inmersos en el proceso electoral, que se sienten con mayor

intensidad, los efectos nocivos del flujo de la marea. Es en estos momentos cuando se hace evidente la veracidad de la admonición de don Ramón de Campoamor: "nada es verdad ni mentira, todo es según el color del cristal con que se mira". Nuevamente, una exigua mayoría del Tribunal, "a sólo una horas de comenzar el evento que cada cuatrienio marca nuestro renovado compromiso democrático, … arroja sombras sobre su legitimidad." *Mundo Ríos v. CEE*, 187 DPR 200, 213 (2012) (Rodríguez Rodríguez, Op. disidente). Véase además, *Rivera Guerra v. C.E.E.*, 187 DPR 229 (2012).

I

La controversia ante nuestra consideración se suscitó durante el proceso de evaluación de un sinnúmero de solicitudes de voto adelantado de electores con impedimentos de movilidad para las elecciones generales a celebrarse el martes, 8 de noviembre de 2016. Véase Artículo 9.039 (m) de la *Ley electoral del Estado Libre Asociado de Puerto Rico*, 16 LPRA sec. 4179 (m); *Reglamento de voto ausente y voto adelantado de primarias 2016 y elecciones generales 2016* de 25 de mayo de 2016; *Manual de procedimiento para el voto adelantado en el Colegio de Fácil Acceso en el Domicilio para las elecciones generales* de 11 de agosto de 2016. En esencia, en diversas Comisiones Locales de Elecciones se impugnó la aprobación de cientos de solicitudes, aduciendo incumplimiento con diversas disposiciones legales aplicables. Consecuentemente, los Comisionados Locales del Partido Popular Democrático, el Partido Nuevo Progresista y

el Partido Independentista Puertorriqueño presentaron diecinueve (19) apelaciones ante la Comisión Estatal de Elecciones (Comisión). Véase *Informe de la Comisionada Especial* de 1 de noviembre de 2016, pág. 2.

El 26 de octubre de 2016, a las 9:07 p.m., la Lcda. Liza M. García Vélez, Presidenta de la Comisión, notificó la *Resolución Emendada CEE-RS-16-83* (*Resolución Enmendada*) mediante la cual dispuso de las referidas apelaciones concernientes a 788 electores. Inconforme con la determinación, el Comisionado Electoral del Partido Popular Democrático, Lcdo. Guillermo San Antonio Acha (Comisionado Electoral del P.P.D.) presentó, el 27 de octubre de 2016 a las 11:51 a.m., un recurso de revisión judicial ante el Tribunal de Primera Instancia. Posteriormente, el Comisionado Electoral del Partido Nuevo Progresista, Lcdo. Aníbal Vega Borges (en adelante, Comisionado Electoral del P.N.P o peticionario) presentó, por su parte, un recurso de revisión judicial ante el foro primario el 27 de octubre de 2016 a las 12:57 p.m.[59]

Ahora bien, el 28 de octubre de 2016, el Comisionado Electoral del P.N.P presentó ante este Foro los escritos titulados *Moción Urgente en Auxilio de Jurisdicción* y *Recurso de Certificación Intrajurisdiccional*. Mediante *Resolución*, notificada el mismo día, una mayoría de este Tribunal declaró *con lugar* ambas peticiones. A esos efectos,

---

[59] Posteriormente, el 28 de octubre de 2016, la Hon. Aileen Navas Auger, Juez Superior, ordenó la consolidación de ambos recursos.

se ordenó la celebración de vistas evidenciarias, a celebrarse durante los días 29 y 30 de octubre de 2016; se designó a la Hon. Aileen Navas Aguer, Juez Superior, como comisionada especial a cargo de las vistas, y se ordenó a las partes a presentar sus alegatos el 3 de noviembre de 2016.

El 29 de octubre de 2016, el Comisionado Electoral del P.P.D. solicitó, ante este Tribunal, la desestimación del recurso presentado por el Comisionado Electoral del P.N.P. mediante escrito intitulado *Moción urgente de desestimación por falta de jurisdicción del Tribunal y, en la alternativa, solicitud de orden aclaratoria sobre consolidación*.

En lo pertinente, el Comisionado Electoral del P.P.D. señaló que el Comisionado Electoral del P.N.P notificó el recurso de revisión judicial a la Comisión el 28 de octubre de 2016 a las 9:57 a.m. Arguyó que, al así proceder, la notificación se realizó transcurridas las veinticuatro (24) horas que el Artículo 4.001 de la *Ley electoral*, 16 LPRA sec. 4031, dispone para hacerlo. Razonó que el recurso de revisión judicial nunca se perfeccionó, por lo que los tribunales carecen de jurisdicción para atenderlo.

Por su parte, el Comisionado Electoral del P.N.P. se opuso a la moción de desestimación. En esencia, adujo dos fundamentos para plantear que la notificación se realizó de forma oportuna. En primer lugar, el Comisionado Electoral del P.N.P. resaltó que "las partes se sometieron voluntariamente a la jurisdicción del tribunal

independientemente haya habido error o no en la notificación de las partes". *Moción en oposición a desestimación y acreditando notificación del comisionado electoral del PNP*, pág. 6. Por otro lado, arguyó que, por virtud del Artículo 2.004 de la *Ley electoral*, los términos del Artículo 4.001 se computaban de conformidad con las Reglas de Procedimiento Civil. A esos efectos, razonó que, conforme a la Regla 68.1 de Procedimiento Civil, 32 LPRA Ap. V R. 68.1, el término para la presentación y notificación del recurso de revisión en cuestión comenzó a discurrir el día después al que se notificó la *Resolución Enmendada*. Así, sostuvo que tenía hasta el 28 de octubre de 2016, en horas de la noche, para presentar y notificar el recurso de revisión.

El 31 de octubre de 2016, una mayoría de este Tribunal consideró que los planteamientos de índole jurisdiccional presentado por el Comisionado Electoral del P.P.D. no tenían mérito. Por ello, declaró *no ha lugar* la moción de desestimación. A excepción del Juez Asociado señor Estrella Martínez, los demás componentes de la mayoría suscribieron unas expresiones emitidas por el Juez Asociado señor Martínez Torres. En éstas, concluyó que el término de veinticuatro (24) horas provisto por el Artículo 4.001 de la *Ley electoral* es de carácter jurisdiccional para efectos de la presentación del recurso de revisión. Empero, se razonó que el término se clasifica como de cumplimiento estricto con relación a la notificación del recurso. Es decir, fue el Artículo 4.001 es un término bifronte que se desdobla a

conveniencia. Asimismo, la mayoría consideró que el Tribunal de Primera Instancia, *motu proprio*, prorrogó el término para notificar el referido recurso mediante una orden. Véase *Orden del Juez Superior Ángel R. Pagán Ocasio* de 27 de octubre de 2016, SJ2016CV00290.[60]

Posteriormente, el 2 de noviembre de 2016, el Comisionado Electoral del Partido del Pueblo Trabajador (Comisionado Electoral del P.P.T.) compareció ante este Tribunal mediante una *Moción de desestimación por falta de jurisdicción y en solicitud de reconsideración*. En lo pertinente, planteó que el Comisionado Electoral del P.N.P. le notificó tardíamente la presentación del recurso de revisión judicial, a saber, el 28 de octubre de 2016 a las 9:34 a.m.

Por último, destaco que, el 3 de noviembre de 2016, el Comisionado Electoral del P.P.D. presentó una *Moción de reconsideración* en la que planteó, nuevamente, el asunto de falta de jurisdicción por incumplimiento del Comisionado Electoral del P.P.D. con la notificación del recurso de

---

[60] Cabe destacar que la Jueza Presidenta Oronoz Rodríguez emitió unas expresiones en las que señaló que, el incumplimiento con los requisitos estatutarios que dispone el Artículo 4.001 de la *Ley* priva de jurisdicción al Tribunal para entender en el asunto. Por otro lado, el Juez Asociado señor Feliberti Cintrón emitió un Voto Particular Disidente, al que se unió la Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Colón Pérez. En éste, el Juez Asociado no categorizó el referido término como uno jurisdiccional. No obstante, asumiendo que éste fuese uno de cumplimiento estricto, reconoció que el Comisionado Electoral del P.N.P. notificó el recurso de revisión judicial transcurridas las veinticuatro (24) horas correspondientes y no adujo justa causa para así hacerlo.

revisión judicial dentro del término dispuesto por el Artículo 4.001 de la *Ley electoral*.

Conforme adelanté, por entender que una mayoría de este Tribunal se abrogó la jurisdicción que estimó pertinente para atender un caso que no fue perfeccionado conforme a la legislación aplicable, preciso expresarme, nuevamente, en torno a este particular.

II

El Artículo 4.001 de la *Ley electoral del Estado Libre Asociado de Puerto Rico*, 16 LPRA sec. 4031, regula lo concerniente a la presentación y notificación de recursos de revisión judicial respecto a decisiones de la Comisión en torno a controversias electorales. En particular, el referido artículo dispone que:

> Dentro de los treinta (30) días anteriores a una elección el término para presentar el escrito de revisión será de veinticuatro (24) horas. **La parte promovente tendrá la responsabilidad de notificar dentro de dicho término copia del escrito de revisión a la Comisión y a cualquier otra parte afectada.** El tribunal deberá resolver dicha revisión dentro de un término no mayor de cinco (5) días, contado a partir de la presentación del caso. 16 LPRA sec. 4031 (énfasis suplido).

Según se desprende de la precitada disposición, si la presentación del escrito se efectúa dentro de los treinta (30) días anteriores a una elección, la parte promovente tendrá la responsabilidad de notificar la presentación del recurso a las otras partes afectadas dentro del mismo

término que tiene para presentar el escrito, a saber, veinticuatro (24) horas.

El requisito de notificación de escritos de revisión judicial a las otras partes en un pleito persigue el noble propósito de asegurar que éstas puedan litigar vigorosamente su causa y, en consecuencia, que el tribunal goce de un expediente claro y completo para resolver la controversia ante su consideración. Por estas razones, el requisito de notificación está revestido de un carácter imperativo. Véase *Soto Pino v. Uno Radio Group*, 189 DPR 84, 90 (2013). Éste coloca a la parte contraria en conocimiento del recurso de revisión, sin lo cual se frustraría su derecho al debido proceso de ley en su vertiente procesal.[61]

Los términos para efectuar la notificación de la presentación de un recurso de revisión pueden ser de naturaleza jurisdiccional o de cumplimiento estricto. Por un lado, los requisitos de cumplimiento estricto pueden eximirse o prorrogarse por causa justificada oportunamente invocada por la parte que incumplió con el término.[62] Véase *Jorge E. Martínez, Inc. v. Abijoe Realty Corp.*, 151 DPR 1, 7

---

[61] Cabe recordar que, hemos identificado, como componentes básicos del debido proceso de ley, elementos básicos procesales como lo son una notificación adecuada y la oportunidad de ser escuchado y de defenderse. *U. Ind. Emp. A.E.P. v. A.E.P.*, 146 DPR 611, 616 (1998).

[62] Ahora bien, cabe señalar que un tribunal no puede, sin más, eximir o prorrogar el cumplimiento de estos requisitos. Para esto, se requiere que la parte que solicita la prórroga, o actúa fuera de término, aduzca justa causa para ello. Si ésta no lo hace, el tribunal *carece de discreción* para prorrogar el término y acoger el recurso ante su consideración. *Soto Pino v. Uno Radio Group*, 189 DPR 84, 92 (2013); *Arriaga v. FSE*, 145 DPR 122, 131 (1998); *Bco. Popular v. Mun. de Aguadilla*, 144 DPR 651, 657 (1997).

(2000); *Soto Pino*, 189 DPR en la pág. 92. En contraste, los términos jurisdiccionales son fatales, improrrogables e insubsanables; por lo tanto, no son susceptibles de extenderse. Véase *Insular Highway v. A.I.I. Co.*, 174 DPR 793, 806-807 (2008); *Jorge E. Martínez*, 151 DPR en la pág. 7. Véase, además, Ivette Ramos Buonomo, *Derecho Procesal Civil*, 71 Rev. Jur. UPR 515, 516 (2002) ("Por término jurisdiccional se entiende que el plazo establecido discurre inexorablemente sin que se admita excusa alguna para su incumplimiento".). Debido al carácter fatal del término jurisdiccional, un tribunal carece de jurisdicción para considerar un escrito de revisión si la parte promovente incumple con presentarlo y notificarlo a las partes dentro del término. Véase *De Jesús Viñas v. González Lugo*, 170 DPR 499, 507-08 (2007).

Para auscultar si un término particular es de naturaleza jurisdiccional o de cumplimiento estricto, debemos ceñirnos a una hermenéutica rigurosa. Acorde con ésta, en primer lugar, es menester analizar el texto de la ley, divorciado de consideraciones exógenas. Recordemos que el Artículo 14 del Código Civil de Puerto Rico establece guías para la interpretación legislativa, a saber: "[c]uando la ley es clara [y] libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". 31 LPRA sec. 14. Así, pues, cuando el lenguaje del legislador es claro e inequívoco, el texto de la ley es la expresión por excelencia de la intención legislativa.

*Spyder Media, Inc. v. Mun. de San Juan*, 194 DPR 547, 555 (2016); *Báez v. ELA*, 179 DPR 231, 245 (2010).

Ahora bien, no debemos confundir el análisis textualista con uno miope. Al analizar la disposición legal en controversia, ésta nunca debe interpretarse de manera aislada; al contrario, al estudiar la disposición particular hay que considerar todo su contexto de manera integral para llegar a una conclusión que guarde coherencia con el propósito de la ley en la cual está incluida. *Spyder Media, Inc.*, 194 DPR en la pág. 555-56; *Mun. San Juan v. Banco Gub. Fomento*, 140 DPR 874, 884 (1996). No obstante, en ocasiones la ley puede resultar ambigua o guardar silencio sobre alguna interrogante. Ante una ambigüedad o silencio en el texto, los tribunales deben asegurar el cumplimiento de la intención legislativa. *Spyder Media, Inc.*, 194 DPR en la pág. 556; *Rivera Figueroa v. AAA*, 177 DPR 345, 363 (2009).

En lo que nos concierne, hemos considerado que cuando el texto de la ley guarda silencio sobre un requisito de notificación, o sobre el término para notificar, es improcedente atribuirle un carácter jurisdiccional a éste. En el caso de *Lagares v. ELA*, 144 DPR 601 (1997), razonamos que ya que la Regla 47 de las Reglas de Procedimiento Civil de 1979, 32 L.P.R.A. Ap. III R. 47, nada disponía sobre el requisito de notificación al instar una moción de reconsideración, por lo que era improcedente darle carácter jurisdiccional a un requisito no dispuesto en la ley. *Id.* en la pág. 617. De igual manera, en *Sucn. Salvador Jiménez v.*

*Pérez*, 153 DPR 527 (2001), resolvimos que la Regla 43.3 de las Reglas de 1979 nada disponía sobre el requisito de notificación al presentar una moción solicitando determinaciones de hecho adicionales; por lo tanto, procedía revestirle de carácter de cumplimiento estricto y no jurisdiccional. *Id.* en la pág. 531-34. Finalmente, en *Junta de Directores v. Ramos*, 157 DPR 818 (2002), concluimos que si bien el Artículo 35.8 de la *Ley de Cooperativas* requería la notificación del recurso de revisión de una determinación de la Junta de Directores, éste no especificaba que tenía que ser dentro del término para presentar el recurso. Por lo tanto, consideramos prudente categorizar este término como uno de cumplimiento estricto. *Id.* en la pág. 823. Es meritorio puntualizar que en todos los casos citados existía ambigüedad sobre la existencia del requisito de notificación o sobre el término para éste dispuesto.

Por otro lado, en las instancias donde se establece claramente un requisito de notificación —como en la controversia ante nosotros— hemos interpretado el requisito como uno jurisdiccional. Esto ha sido así, ya que hemos identificado la intención clara de la ley, de la cual se desprende el carácter obligatorio del término y de su cumplimiento. Así, en *González Santos v. Bourns*, 125 DPR 48 (1989), resolvimos que la notificación del escrito de apelación del Tribunal de Distrito al Tribunal Superior era uno de índole jurisdiccional porque la Regla 53.2 de las Reglas de Procedimiento Civil de 1979 expresamente disponía

que "el apelante notificará la presentación del escrito de apelación a todas las partes . . . dentro del término para apelar". *Id.* en la pág. 63; *Lagares*, 144 DPR en la pág. 616.

De igual manera, en *Méndez v. Corp. Urb. Quintas de San Luis*, 127 DPR 635 (1991), llegamos a la conclusión que el requisito de notificación del recurso de revisión judicial de una determinación administrativa, acorde con la Ley Núm. 170 de 12 de agosto de 1988, conocida como la *Ley de procedimiento administrativo uniforme*, era de naturaleza jurisdiccional. Esto, a razón del texto de la ley, que reza: "[l]a parte notificará la presentación de la solicitud de revisión a la agencia y a todas las partes dentro del término para solicitar dicha revisión". 3 LPRA sec. 2172. En ese entonces, razonamos que el lenguaje de la disposición recogía "la intención clara del legislador de que el recurso de revisión se perfeccione dentro del término de treinta (30) días. Es un fuerte indicador de que. . . estamos propiamente ante un requisito de carácter jurisdiccional". *Méndez*, 127 DPR en la pág. 637. Añadimos que, "[c]oncluir lo contrario desvirtuaría uno de los propósitos cardinales de la nueva ley". *Id.*

Específicamente, en el contexto del Derecho Electoral, hemos dispuesto que el término de diez (10) días para acudir en revisión judicial de una determinación de la Comisión Estatal de Elecciones es uno jurisdiccional, aunque la ley no lo dispone así expresamente. Véase *Frente Unido Independentista v. CEE*, 126 DPR 309, 319 (1991). Este

razonamiento fue posteriormente discutido en *López Rosas v. CEE*, 161 DPR 527 (2004), donde identificamos que "el propósito de la referida ley en el establecimiento de términos cortos para recurrir al Tribunal de una determinación de la C.E.E., es lograr la tramitación pronta de los asuntos electorales". *Id.*, en la nota 5. Por ende, queda de manifiesto que la Asamblea Legislativa, al disponer términos cortos para tramitar las controversias electorales, avaló la "diligencia en la presentación de los reclamos de los electores, de manera que se eviten dilaciones y demoras innecesarias que entorpezcan el proceso electoral y promuevan la incertidumbre de derechos". *Frente Unido Independentista*, 126 DPR en la pág. 318. Asimismo, muy recientemente, en referencia al Art. 4001 que nos ocupa, este Tribunal señaló que

> [a]sí pues, por su importancia y el impacto al derecho al sufragio, las decisiones de la CEE deben ser presentadas y resueltas con suma celeridad. Es por ello que el [Art. 4001] establece términos cortos, en ocasiones de una (1) hora, para que el foro primario resuelva las apelaciones provenientes de la CEE. *Ríos Martínez v. Comisión Local de Elecciones de Villalba*, 196 DPR ___, 2016 TSPR 188, en la pág. 14 (2016).

En consideración a todo lo anterior, con tal de asegurar el propósito de la tramitación expedita consagrado en la *Ley electoral*, estamos obligados a emplear una interpretación restrictiva de los términos aplicables para presentar y notificar los recursos de revisión judicial.

Según hicimos constar, el texto del Artículo 4.001 de la *Ley electoral* nada dispone sobre la clasificación del

término único para presentar y notificar el recurso de revisión. No obstante, se desprende de éste, que ambos actos gozan del mismo término, entiéndase, veinticuatro (24) horas. Por tanto, considerando la naturaleza de las controversias electorales, el término exiguo que dispone la *Ley* para presentar recursos de revisión judicial, y la citada jurisprudencia electoral, sabemos que el término para presentar y notificar el recurso de revisión judicial es de naturaleza jurisdiccional.[63] No hay razón para llegar a una conclusión contraria en este caso. Permitir que un recurso de revisión electoral se notifique tardíamente desvirtuaría el propósito de los términos cortos dispuestos en la *Ley electoral*.

Por último, resalto que el término de veinticuatro (24) horas para presentar y notificar recursos de revisión cuando surgen dentro de los treinta (30) días antes de una elección provee también para que el foro de instancia resuelva el caso dentro de cinco (5) días a partir de la presentación. No resulta difícil imaginar que la notificación tardía del recurso a las partes afectadas pueda impedir que se cumpla con ese término estatutario para resolver el caso y que, en consecuencia, se "[entorpezca] el proceso electoral y

---

[63] Aunque *Frente Unido Independentista* habla específicamente del término de diez (10) días para acudir en revisión como jurisdiccional, sería absurdo concluir que el término de veinticuatro (24) horas para acudir en revisión cuando quedan menos de treinta (30) días para las elecciones no es jurisdiccional. Como bien sabemos, debemos evitar alcanzar resultados absurdos al interpretar la ley. *Ríos Martínez*, 2016 TSPR 188 en la pág. 3.

[promueva] la incertidumbre de derechos". *Frente Unido Independentista*, 126 DPR en la pág. 318.

III

Tanto el Comisionado Electoral del P.P.D. en su *Moción urgente de desestimación* y su *Moción de reconsideración*, como el Comisionado Electoral del P.P.T. en su *Moción de desestimación* plantearon, esencialmente, lo mismo. A saber, que el Comisionado Electoral de P.N.P. notificó tardíamente -el 28 de octubre de 2016- la presentación del recurso de revisión judicial. Les asiste la razón.

Surge del expediente que la Presidenta de la Comisión emitió la *Resolución Enmendada*, objeto del presente litigio, el 26 de octubre de 2016 a las 9:07 p.m. Así, pues, conforme al texto indubitado del Artículo 4.001 de la *Ley electoral*, las partes interesadas en acudir en revisión judicial, en ocasión de estar a un periodo de treinta (30) días de las elecciones generales, tenían veinticuatro (24) horas para presentar y notificar el recurso en cuestión. Así, pues, en este caso este término vencía el 27 de octubre de 2016 a las 9:07 p.m.

Según adelantamos, el Comisionado Electoral de P.N.P. adujo diversos fundamentos con tal de convencer a este Tribunal de que notificó el referido recurso oportunamente. En efecto, logró persuadir a una mayoría de este Foro. No obstante, estoy imposibilitada de ignorar el hecho -no controvertido- que el recurso de revisión judicial se notificó, tanto a la Comisión como al Partido del Pueblo

Trabajador, el 28 de octubre de 2016 en horas de la mañana. Entiéndase, vencido el término jurisdiccional único para la presentación y notificación del recurso, según dispone el Artículo 4.001 de la *Ley electoral*.

Considero que este Tribunal ha sido enfático al disponer, en numerosas ocasiones, que el perfeccionamiento de los recursos apelativos debe observarse de manera rigurosa. Véase *García Ramis v. Serrallés Ramis*, 171 DPR 250, 253 (2007); *Arriaga Rivera v. F.S.E.*, 145 DPR 122 (1998). Asimismo, es norma arraigada el que no puede quedar al arbitrio de los abogados qué disposiciones reglamentarias deben acatar y cuándo. *Pellot v. Avon*, 160 DPR 124, 134 (2003). En este caso, el incumplimiento con los requisitos estatutarios que regulan el perfeccionamiento del recurso de revisión al amparo del referido Artículo es patente.

Por otro lado, la mayoría, mediante discusión serpentina, concluye que la *Resolución Enmendada* de la Comisión fue notificada tardíamente a los electores –a saber, dos días posteriores a su emisión y enviada por correo postal– el desenlace lógico, en todo caso, sería diametralmente opuesto a la conclusión que llega la mayoría. Me explico.

En primer lugar, recordemos que la falta de jurisdicción "incide directamente sobre el poder mismo [del tribunal] para adjudicar una controversia". *S.L.G. Szendrey Ramos v. F. Castillo*, 169 DPR 873, 883 (2007). Véase, además, *Souffront v. A.A.A.*, 164 DPR 663, 674 (2005);

*Carattini v. Collazo Syst. Analysis, Inc.*, 158 DPR 345 (2003). Por ello, la falta de jurisdicción es un asunto que puede atender el tribunal a *motu proprio*, pues, "no se tiene discreción para asumir jurisdicción allí donde no la hay". *Souffront*, 164 DPR en la pág. 674. Sin duda, cuando se promueve un pleito que no está maduro debemos aplicar este principio. Véase *Córdova y otros v. Cámara Representantes*, 171 D.P.R. 789 (2007); José A. Cuevas Segarra, *Tratado de Derecho Procesal Civil* 176, Tomo I (2da ed. 2011).

Como bien expone la opinión mayoritaria, y como hemos repetido en numerosas ocasiones, "la notificación de una decisión final es un requisito del debido procedimiento de ley con el que se debe cumplir de modo tal que el ciudadano afectado pueda enterarse de la decisión final que se ha tomado en su contra". *Río Const. Corp. v. Mun. de Caguas*, 155 DPR 394, 405 (2001). Véase, además, *Reliable v. ELA*, 195 DPR ___, 2016 TSPR 140, en la pág. 7 ("La notificación adecuada es uno de los preceptos del debido proceso de ley en su modalidad procesal".). El deber de notificar a las partes no es una formalidad cualquiera, sino que tiene efectos sobre los procedimientos posteriores al dictamen final de un proceso adjudicativo porque incide directamente sobre el derecho de una parte a cuestionar el dictamen emitido. Véase *Dávila Pollock v. R.F. Mortgage*, 182 DPR 86, 94 (2011).

En atención a lo anterior, hemos determinado, en cuanto a pleitos judiciales, que el término para acudir en alzada,

tanto de una resolución interlocutoria como de una sentencia final, no comienza a transcurrir si el tribunal deja de notificar el dictamen a alguna de las partes. Véase *Rosario et al. v. Hosp. Gen. Menonita*, 155 DPR 49, 58 (2001). Igualmente, en caso de una notificación defectuosa del dictamen final a cualquiera de las partes, el término no comienza a transcurrir para ninguna de las partes. Véase *Medio Mundo, Inc. v. Rivera*, 154 DPR 315, 330 (2001). Lo mismo hemos determinado en el ámbito del Derecho Administrativo. Véase *Hosp. Dr. Domínguez, Inc. v. Ryder*, 161 DPR 341, 347 (2004). Ciertamente, mientras el término no comience a discurrir para que las partes acudan en revisión, ninguna puede presentar un recurso de revisión; al así hacerlo, estaría presentando un recurso prematuro. Un recurso prematuro, como uno tardío, adolece del insubsanable defecto de privar de jurisdicción al tribunal al cual se recurre. Véase *Juliá Padró v. Epifanio Vidal, S.E.*, 153 DPR 357, 365 (2001). La presentación de un recurso prematuro carece de eficacia y no produce efecto jurídico alguno, pues no hay autoridad judicial para acogerlo. *Id*. en la pág. 366.

En concreto, una mayoría de este Tribunal considera que la Comisión no notificó la *Resolución Emendada* oportunamente a los electores.[64] Para fundamentar su postura, hacen alusión

---

[64] Debo señalar que la notificación de las decisiones de la Comisión referentes a las solicitudes de voto adelantado en el Colegio de Fácil Acceso en el Domicilio -que se hayan apelado de las Comisiones Locales- está particularmente regulado por el *Manual de procedimiento para el voto adelantado en el Colegio de Fácil Acceso en el Domicilio para las elecciones generales 2016* de 10 de agosto de 2016. Específicamente, el Inciso H dispone que

a dos documentos que figuran en el expediente. En primer lugar, subrayan que la *Resolución Emendada* dispuso que "[e]l trámite para conformar los expedientes de estos casos en la Oficina de Secretaría ha sido complejo y azaroso". *Resolución Emendada*, pág. 1. De otra parte, hacen referencia a una *Certificación* que presentó -posterior a las vistas evidenciarias- el Comisionado Electoral del P.N.P. *Alegato del Comisionado Electoral del Partido Nuevo Progresista, Lcdo. Aníbal Vega Borges*, anejo 1. De ésta, aparenta desprenderse que la notificación a los electores se realizó vía correo postal los días 28 y 29 de octubre de 2016.

En el caso que nos ocupa, si no se notificó la determinación de la Comisión a los electores afectados hasta dos días después de la emisión, pues, precisamente dos días después comenzaba a transcurrir el término para acudir en revisión judicial. No podemos partir de la fecha en que se notificó la *Resolución Enmendada* a los Comisionados como fecha hábil para acudir al foro de instancia, por cuanto faltaba notificar a las otras partes interesadas. Por lo tanto, todo recurso de revisión judicial que se instó entre esos dos días —como el recurso que nos ocupa— era prematuro

---

"[l]a Comisión notificará al elector y a la Comisión Local la decisión". *Manual*, pág. 6. Evidentemente, la disposición no contiene término alguno para realizar la notificación. A esos efectos, considero que las expresiones de la mayoría en torno a la notificación 'inoportuna' por parte de la Comisión a los electores, se atendió sin el rigor necesario. Así, de volverse a suscitar una controversia respecto a este particular, tendremos que aclarar una norma dictada al margen de las controversias puntuales que plantearon las partes ante nuestra consideración.

y el Tribunal de Primera Instancia estaba privado de jurisdicción para considerarlo. Lo procedente, entonces, es que este Tribunal, habiendo asumido 'jurisdicción' una vez se presentó la solicitud de certificación, declarara prematuro el recurso de autos. Por lo demás, la decisión de la Comisión ya ha advenido final y firme y es inapelable. Esto es así, ya que los últimos electores que fueron notificados el 29 de octubre de 2016, tenían hasta el 3 de noviembre de 2016 para acudir en revisión judicial.[65] El término otorgado a las partes venció ese día y, en vista de que ninguna parte afectada interpuso un recurso de revisión judicial durante el término para acudir al tribunal, procedería dar por final y firme la determinación emitida por la Comisión.

Por último, debo explicar mi preocupación con el acápite dispositivo de la opinión mayoritaria. Conforme a cualquiera de los fundamentos en derecho que he explicado, resulta que no existe jurisdicción para atender el recurso de revisión judicial. Por ello, en correcta aplicación del derecho apelativo, corresponde confirmar el dictamen recurrido. No obstante, la mayoría de este Tribunal opta por

---

[65] Esto, a razón de que en el cómputo de los términos expresados en el Art. 4.001 de la *Ley electoral*, aplican las Reglas de Procedimiento Civil. 16 LPRA sec. 4004. En vista de que las partes afectadas fueron notificadas por correo, éstas tenían tres (3) días adicionales a las veinticuatro (24) horas dispuestas en el Art. 4.001 para instar su recurso de revisión judicial. 32 LPRA Ap. V. sec. 68.3. Además, como el plazo concedido es menor de siete (7) días, se excluye del cómputo el domingo, 30 de octubre de 2016. 32 LPRA Ap. V. sec. 68.1. Por lo tanto, el término expiraba ayer jueves, 3 de noviembre de 2016.

un curso de acción distinto; a saber, decide aprobar las solicitudes de voto adelantado en el Colegio de Fácil Acceso en el Domicilio.

Al así proceder, para mi sorpresa, nuevamente salen a relucir los síntomas del trastorno de identidad *disociativo* (multiple personality disorder) que aqueja la postura mayoritaria en este caso desde el 28 de octubre de 2016. Véase *Resolución* de 28 de octubre de 2016, *Voto Particular Disidente Juez Asociada señora Rodríguez Rodríguez,* nota 1. Me explico. La opinión dispone que "validaría **todas las peticiones** de voto adelantado q*ue estuvieron ante la consideración de la CEE* en el caso de epígrafe" (énfasis suplido). *Opinión*, pág. 16. No obstante, inmediatamente después, se expresa que "[c]onforme a todo lo anterior, validaría **todas las solicitudes** de voto adelantado **que están ante la consideración de este Tribunal**" (énfasis suplido). *Id*. "Ahora imagine que", los Comisionados Electorales como los electores afectados reciben este dictamen. ¿Qué procede entonces? Sin duda, se asentaría una duda legítima sobre cuáles solicitudes, en efecto, deberán aprobarse. Por tanto, el dictamen mayoritario, tras implícitamente concluir que no tenía jurisdicción para atenderse el recurso de revisión judicial, debía confirmar el dictamen de la Comisión. Así de simple.

Conforme a los fundamentos antes esbozados, me parece impertinente entrar en los méritos de la controversia. No obstante, con tal de esclarecer la norma sustantiva que debe

ser aplicable, considero suficiente anejar a esta Opinión Disidente, de forma íntegra, el *Informe de la Comisionada Especial* de 1 de noviembre de 2016.

Cierro con un corazón pesado. Insisto que al desviarnos del trayecto que defiende y postula que "[l]os Jueces y Magistrados, en ese itinerario fatigoso y difícil que es garantía de su elevación moral y de su estimación cívica, deben mantenerse en la línea del apoliticismo más radical", laceramos nuestra imagen, la del Tribunal y al final, la confianza en las instituciones del País. Francisco Soto Nieto, *Compromiso de justicia* 114 (1977). Debemos aspirar a que, desde donde se nos observe, trasluzca siempre nuestro señorío e imparcialidad de arbitraje.


                                    Anabelle Rodríguez Rodríguez
                                            Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

**INFORME DE LA COMISIONADA ESPECIAL AL HONORABLE TRIBUNAL SUPREMO:**

GUILLERMO SAN ANTONIO ACHA, en su capacidad oficial como Comisionado Electoral del Partido Popular Democrático

Parte Recurrente

v.

LIZA GARCÍA VÉLEZ, en su capacidad oficial como Presidenta de la Comisión Estatal de Elecciones; ANÍBAL VEGA BORGES, en su capacidad oficial como Comisionado Electoral del Partido Nuevo Progresista, ROBERTO I. APONTE BERRÍOS, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño y JOSÉ F. CÓRDOVA ITURREGUI, en su capacidad oficial como Comisionado Electoral del Partido Pueblo Trabajador

Parte Recurrida

CIVIL NÚM.: SJ2016CV00289

CT-2016-15

---

ANIBAL VEGA BORGES, en su capacidad oficial como Comisionado Electoral del Partido Nuevo Progresista

Parte Recurrente

v.

LIZA GARCÍA VÉLEZ, en su capacidad oficial como Presidenta de la Comisión Estatal de Elecciones; GUILLERMO SAN ANTONIO ACHA, en su capacidad oficial como Comisionado Electoral del Partido Popular Democrático, ROBERTO I. APONTE BERRÍOS, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño y JOSÉ F. CÓRDOVA ITURREGUI, en su capacidad oficial como Comisionado Electoral del Partido Pueblo Trabajador

Parte Recurrida

**CONSOLIDADO CON:**

CIVIL NÚM.: SJ2016CV00290

SOBRE:

REVISIÓN JUDICIAL AL AMPARO DEL ARTÍCULO 4.001 DE LA LEY ELECTORAL

Comparece la Comisionada Especial designada en los casos consolidados de epígrafe y respetuosamente somete su Informe de conformidad con la *Resolución* de 28 de octubre de

2016, en la que se ordenó celebrar una vista evidenciaria el sábado, 29 de octubre y, de ser necesario, el domingo, y a rendir un informe con sus determinaciones de hecho y conclusiones de derecho.

A tenor con lo ordenado, la vista se celebró durante los días designados para ello. Las partes presentaron prueba testifical y documental, según se detallará adelante. En el transcurso de la vista todas las partes comparecientes llegaron a unos acuerdos parciales que pusieron fin a las controversias sobre el precinto 027 de Arecibo y el precinto 049 de Sabana Grande. Además, el Comisionado Electoral del Partido Nuevo Progresista, Aníbal Vega Borges (Comisionado del PNP) desistió de sus reclamaciones en cuanto a las solicitudes de la Sra. María Reyes Reyes y el Sr. David Helfeld Hoffman, ambos electores del Municipio de Jayuya.[66]

Sometida la prueba, se concedió hasta el lunes 31 de octubre de 2016 a las 10:30 a.m. para presentar memorandos de derecho, luego de lo cual, el asunto quedaría sometido.

En cumplimiento con nuestra encomienda, informamos.

## I.

Los casos consolidados de epígrafe[67] tienen su origen en la presentación de dos recursos de revisión de la *Resolución Enmendada CEE-RS-16-83* (*Resolución Enmendada*) emitida el 26 de octubre de 2016, por la Presidenta de la Comisión Estatal de Elecciones, Liza García Vélez, (Presidenta de la CEE). Mediante dicha *Resolución Enmendada*, se consolidaron y se dispuso de 19 apelaciones relativas al derecho que asiste a 788 electores que al amparo del Artículo 9.039(m) de la Ley Electoral, 16 LPRA sec. 4179, según emendado, solicitaron ejercer el voto adelantado a domicilio por razón de problemas de movilidad. Las apelaciones estuvieron sometidas para resolución desde el 21 de septiembre

---

[66] Específicamente, el Comisionado del PNP solicitó la revisión de las denegaciones de las solicitudes de los electores de los siguientes: Precinto 089 de las Piedras; Precinto 090 de las Piedras; Precinto 057 de Jayuya; Precinto 056 de Jayuya, Precinto 015 de Dorado y Precinto 054 de Utuado. Por su parte, el Comisionado del PPD cuestionó la aprobación de solicitudes presentadas en los municipios de Orocovis Precinto 066, Aibonito Precinto 069 y Añasco Precinto 040. Cabe señalar, que en virtud de la Orden, emitida por el Tribunal Supremo de Puerto Rico en los casos de epígrafe, actualmente los votos objeto de controversia se están emitiendo a tenor con lo dispuesto en el Manual, sin embargo se están segregando en un sobre y se están tratando como votos objetados.

[67] El 28 de octubre de 2016, el Comisionado del PPD presentó una *Moción [de] Consolidación* en el caso *Guillermo San Antonio Acha v. Hon. Liza García Vélez y otros*, SJ2016CV00289, que fue, sin objeción de parte, declarada Ha Lugar.

y los días  3, 4 y 5 de octubre de 2016.[68]  El 26 de octubre de 2016, a la 1:10 p.m. la

Presidenta de la CEE dictó la *Resolución CEE-RS-16-83*.[69] Posteriormente, a las 9:07 p.m.,

la Presidenta de la CEE emitió la *Resolución Enmendada*, en la que se acogieron ciertas

apelaciones y se revocaron un sinnúmero de determinaciones sobre solicitudes de voto por

adelantado de las Comisiones Locales, organismo encargado de verificar y emitir una

determinación sobre las mencionadas solicitudes.

El primer recurso de *Revisión Judicial* fue presentado el 27 de octubre de 2016, a las

11:51 a.m., por el Comisionado del Partido Popular Democrático, Guillermo San Antonio

Acha (Comisionado del PPD). En este, el Comisionado del PPD solicitó la revisión parcial

de la *Resolución Enmendada* emitida por la Presidenta de la CEE. En específico, solicitó la

revisión de: (1) la aprobación de 103 solicitudes de voto para personas con problemas de

movilidad del **Precinto 066 de Orocovis** por razón de que la CEE "no encontr[ó] razones

que ameriten denegar las solicitudes sometidas"[70] y (2) la aprobación de 49 solicitudes de

voto para personas con problemas de movilidad del **Precinto 069 de Aibonito** por razón de

que la CEE concluyó que "no hay razón que impid[iese] aprobar las solicitudes en estos

casos"[71].

En cuanto a las solicitudes del Precinto 066 de Orocovis, el Comisionado del PPD

impugnó la determinación de la CEE por entender que habían solicitudes que no cumplían

con los requisitos de forma, que alegadamente los médicos no visitaron a los electores y

que el procedimiento fue irregular, entre otras. Arguyó que las certificaciones de los

médicos Ana María Fagot, Jorge A. Colón y Dalmarys Moreno Montesino, debían mirarse

con sospecha por haberse certificado en un corto término considerando la cantidad de

electores visitados. Además, arguyó que en 3 de las solicitudes en las que una persona

autorizada firmó en sustitución del solicitante no se hizo constar la razón por la cual los

solicitantes no pudieron firmar en violación al Inciso B del Manual de Procedimientos para el

---

[68] El 21 de septiembre de 2016, quedó sometida 1 apelación. El 3 de octubre de 2016, quedaron sometidas 11 apelaciones correspondientes a 626 electores. El 4 de octubre de 2016, quedaron sometidas 5 apelaciones correspondientes a 59 electores. El 5 de octubre de 2016, quedó sometida 1 apelación correspondiente a 103 electores.

[69] Véase: *Guillermo San Antonio Acha v. Hon. Liza García Vélez y otros,* Civil Núm. SJ2016CV00283, Sentencia de 26 de octubre de 2016.

[70] *Resolución Enmendada*, pág. 71.

[71] En su recurso de *Revisión Judicial* presentado el 27 de octubre de 2016, el Comisionado del PPD además solicitó la revisión de la denegación de 98 solicitudes de voto para personas con problemas de movilidad del Precinto 049 de Sabana Grande por razón de que "no existe prueba que demuestre que el Dr. Edrick Ramírez era médico de cabecera o tratamiento de los electores". No obstante, dicha reclamación se dio por desistida en virtud de un acuerdo entre las partes.

Voto Adelantado en el Colegio de Fácil Acceso en el Domicilio para las Elecciones Generales 2016, 11 de agosto de 2016, (Manual). También, cuestionó varias solicitudes por entender que las razones dadas en cuanto al impedimento que no les permitió a los solicitantes firmar sus solicitudes fueron insuficientes. Por último, indicó que impugnaba las solicitudes de varios electores porque alegadamente éstos no tenían conocimiento de que se presentó una solicitud de voto encamado a su nombre.

En cuanto a las solicitudes del **Precinto 069 de Aibonito**, el Comisionado del PPD impugnó su concesión puesto que la cantidad de solicitudes certificadas por el médico Francisco Fontánez Rivera en el término dentro del cual se certificaron las mismas era un término muy corto *vis a vis* la cantidad de electores, por lo que levantaba sospecha. Añadió, que en el caso de la Sra. Carmen Ana Borelli Aponte no se hizo constar el impedimento por el cual la solicitante no pudo firmar en violación al Inciso B del Manual de Procedimientos para el Voto Adelantado en el Colegio de Fácil Acceso en el Domicilio para las Elecciones Generales 2016, 11 de agosto de 2016, (Manual). Por último, alegó que algunos de los solicitantes no tenían un problema de movilidad física de tal naturaleza que les impidiera desplazarse al centro de votación. Conforme a lo anterior, solicitaron al Tribunal que revocase la *Resolución Enmendada* de la Presidenta de la CEE en lo referente a los Precintos 049 de Sabana Grande, 066 de Orocovis y 061 de Aibonito.

El segundo *Urgente Recurso de Revisión Electoral* se presentó en el salón 904 de este Centro Judicial presidido por el Hon. Ángel Pagán Ocasio el 27 de octubre de 2016, a las 12:57 p.m., por el Comisionado PNP. En éste, el Comisionado del PNP indicó, en primer lugar, que la determinación de la Presidenta de la CEE versó sobre varias apelaciones de las Comisiones Locales que no fueron notificadas a los solicitantes y, en consecuencia, se violentó el debido proceso de ley de estos electores. Además, impugnó la autoridad de la CEE para cuestionar diferentes aspectos relacionados a la certificación médica contenida en las solicitudes de voto adelantado para personas con problemas de movilidad. Estos son, si la CEE tenía facultad para cuestionar qué es un médico de cabecera o de tratamiento; si los médicos certificantes contaban con los requisitos legales para ejercer la profesión al momento de emitir la certificación médica (*good standing* y licencia vigente); la cantidad de certificados que un médico podía emitir diariamente y el juicio del médico en

cuanto a que el solicitante tenía un problema de movilidad física que era de tal naturaleza que le impedía desplazarse a su centro de votación[72].

Mediante comparecencia escrita, la Presidenta de la CEE sostuvo que procedía la confirmación de la *Resolución Enmendada*. Arguyó, que la CEE tenía autoridad en ley para hacer un análisis ponderado del texto de la Ley Electoral del Estado Libre Asociado de Puerto Rico, según enmendada, 16 LPRA secs. 4001, *et seq*., (Ley Electoral) y determinar que un médico que visita brevemente a un elector a los únicos fines de certificar sus problemas de movilidad, no es un médico de cabecera o tratamiento y, en consecuencia, denegar una solicitud de voto por adelantado por incumplimiento con dicho requisito.

Evaluados los escritos de las partes, alegaciones, prueba admitida, el testimonio recibido, así como la credibilidad que éste nos mereció, procedemos a cumplir con lo ordenado.

## II.

## DETERMINACIONES DE HECHOS

1. La CEE aprobó un formulario intitulado "Solicitud para votar en el colegio de fácil acceso en el domicilio por impedimento de movilidad (encamados)" para las elecciones generales de 2016.

2. En el formulario se hace constar el número electoral de la persona solicitante, el precinto y la unidad correspondiente. La primera parte contiene la información personal del elector, en la cual se hace constar la firma del solicitante o la firma del testigo, en caso de que el solicitante no pueda firmar. Además incluye un espacio en el cual se requiere que se indique la razón por la cual no firma el solicitante. La segunda parte del formulario es la Certificación Médica. En esta, se hace constar el nombre y licencia del médico que certifica que el elector **"presenta un problema de movilidad de tal naturaleza que le impide acudir a su centro de votación"**. Dicha certificación requiere la firma del médico y fecha. La tercera parte, es para uso de la Comisión Local, en la cual se establece la determinación de esta o su Presidente.

3. El Sr. Walter Vélez Martínez es el Secretario de la CEE. El propósito de su testimonio era para autenticar y certificar copia del expediente administrativo

---

[72] Véase: Escolio 7.

correspondiente a las apelaciones objeto de la *Resolución* de la cual se recurre en este caso.  Al ser confrontado con la copia, el Secretario de la CEE no pudo certificar que la copia mostrada fuese copia fiel y exacta del expediente administrativo, por lo cual no fue admitida.

4.  A preguntas de la representación legal del Comisionado del PNP sobre su conocimiento de si las apelaciones a nivel administrativo fueron notificadas a los electores, indicó "desconozco". Añadió que el que presenta la apelación es el que tiene el deber de hacer la notificación, y no la CEE.

5.  El doctor Carlos Heredia es médico generalista con licencia número 014360 y oficina privada en Morovis.  Testificó que como parte de los procedimientos en este caso, a petición de funcionarios del  Partido Nuevo Progresista de la Comisión Local del pueblo de Añasco, visitó electores con el propósito de cumplimentar la certificación médica que requiere la "Solicitud para votar en el colegio de fácil acceso en el domicilio por impedimento de movilidad (Encamados)" correspondiente a las elecciones generales de 2016.  Indicó que en algunos casos visitó los hogares en más de una ocasión, porque en la primera visita la persona solicitante no se encontraba en el hogar. Desconoce la razón para ello.

6.  Los servicios del Dr. Heredia para estos fines, fueron gratuitos.

7.  El Dr. Heredia testificó que no conocía a los electores que iba a visitar con anterioridad a ello y que se personó a sus hogares con una lista facilitada por los funcionarios del PNP de Añasco.

8.  El Dr. Heredia certificó 83 solicitudes que comprenden el Apéndice III estipulado, el cual consta de 83 folios.  Dichas solicitudes corresponden al Precinto 040 de Añasco.

9.  El Dr. Heredia testificó que el procedimiento consistió en una visita al hogar del elector, acompañado de una enfermera, a la cual no pudo identificar por su nombre en el testimonio, pues no le conocía previamente. Indicó que la enfermera era del pueblo, provista por los funcionarios que le acompañaron a las visitas. Declaró que examinó a los pacientes y determinó que no podían por sus propios medios llegar hasta él o tenían problemas de movilidad. Admitió que no

todos estaban encamados. Algunos estaban en silla de ruedas o necesitaban de ayuda para caminar. En esos casos, cumplimentó la parte de la solicitud correspondiente a la "Certificación Médica". Testificó además, que hubo electores que visitó que se negaron a que se les certificara. En dichos casos, no se llenó el formulario.

10.   Admitió que no tiene una relación médico-paciente con todos los electores a los cuales les cumplimentó el formulario.

11.   De sus visitas, indicó que no todos podían interactuar con él. En el contrainterrogatorio admitió que recordó pacientes con Alzheimer.

12.   Del Apéndice III, estipulado, se desprende lo siguiente:

a. Folio 2, correspondiente al elector Luis Méndez González, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, Haydeé Méndez, sin embargo en el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

b. Folio 3, correspondiente al elector Wilfredo Mercado Montalvo, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

c. Folio 4, correspondiente al elector Humberto Esteves Rodríguez, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, Rosa Román. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

d. Folio 5, correspondiente al elector Hilario Feliciano Cruz, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, en la que el nombre no se puede identificar, de apellido Quintana. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

e. Folio 11, correspondiente a la electora Rosa García Rodríguez, certificado por el Dr. Heredia, no tiene la firma de la electora. Contiene la firma de un testigo, ininteligible. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

f. Folio 13, correspondiente al elector Claudio Rivera Orsini, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, Sara Rivera González. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

g. Folio 17, correspondiente al elector Rosaura Rosado Gutiérrez, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, María Fred Rosado. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

h. Folio 18, correspondiente al elector Wilson Rivera Ruiz, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

i. Folio 20, correspondiente al elector Giovanna Rosario Soto, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

j. Folio 21, correspondiente al elector Mercedes Santana Serrano, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

k. Folio 22, correspondiente al elector Christian Morales Almodóvar, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

l. Folio 25, correspondiente al elector Mildred Muñiz Rodríguez, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

m. Folio 26, correspondiente al elector Ana Vélez Rivera, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo,

Leonardo Orsini.   En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

n.  Folio 27, correspondiente al elector Carmen Rivera García, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible.  En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

o.  Folio 28, correspondiente al elector Leonor Salerna Cabán, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible.  En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

p.  Folio 29, correspondiente al elector Juan Soto Ruiz, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, Gladys Soto.  En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

q.  Folio 31, correspondiente al elector María González González, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, Francisco Vega.   En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

r.  Folio 32, correspondiente al elector Heidi González Sánchez, certificado por el Dr. Heredia, no tiene la firma del elector.  Contiene la firma de un testigo, ininteligible.  En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

s.  Folio 33, correspondiente al elector José Santiago Almodóvar, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible.  En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

t.  Folio 36, correspondiente al elector Monserrate Portugue Echevarría, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible.  En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

u. Folio 41, correspondiente al elector Adriano García Ramírez, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, Yamil García Santiago.  En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

v. Folio 42, correspondiente al elector Luis Figueroa Vázquez, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, Nilda Feliciano Rodríguez.  En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

w. Folio 43, correspondiente al elector Gladys Calderón Quiñonez, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, Gladys Rosario Quiñonez.  En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

x. Folio 44, correspondiente al elector Amelia Rosario Soto, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

y. Folio 45, correspondiente al elector Rafael Vélez Vélez, certificado por el Dr. Heredia, no tiene la firma del elector, pero está marcada una "X". Contiene la firma de un testigo, Olga Vélez Carrero.  En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

z. Folio 46, correspondiente al elector José López De Jesús, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

aa. Folio 52, correspondiente al elector María Reyes Concepción, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

bb. Folio 53, correspondiente al elector Demencia Crespo Rodríguez, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo,

R. Rosado Crespo. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

cc. Folio 57, correspondiente al elector Sotero Morales Vélez, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, Elizabeth Morales. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

dd. Folio 60, correspondiente al elector María Carrero Valentín, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, Víctor M. Vega. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

ee. Folio 70, correspondiente al elector Eladia Colón Balaguer, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, de apellidos Perea Colón. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

ff. Folio 72, correspondiente al elector Iluminada Sánchez Ramos, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, Carlos Colón Sánchez. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

gg. Folio 81, correspondiente al elector Ana Santiago Rivera, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, Paula Rivera. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

hh. Folio 83, correspondiente al elector Esmeralda Echevarría Echevarría, certificado por el Dr. Heredia, no tiene la firma del elector. Contiene la firma de un testigo, ininteligible. En el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

13. De las certificaciones autorizadas por el Dr. Heredia, 34 de ellas adolecen de defectos de forma, ya que no fueron firmadas por el elector y no se especificó las razones para ello.

14. El doctor Dennis Rivera González es médico generalista con licencia número 12404. Fue el médico que certificó 78 electores del Precinto 54 de Utuado. Tiene

práctica médica en Utuado y reside en dicho municipio. Testificó que al momento de suscribir las certificaciones médicas de dicho precinto estaba autorizado a ejercer la medicina en Puerto Rico.

15. El 8 de septiembre de 2016, la Junta de Licenciamiento y Disciplina Médica de Puerto Rico emitió una certificación en la cual se consigna que el Dr. Dennis Rivera González ("Dr. Rivera González"), le fue otorgado el número de licencia 12404 expedida el 26 de septiembre de 1996 y que al 8 de septiembre de 2016 la licencia "…no está vigente porque el/la profesional no ha participado en el Registro de Profesionales de la Salud y de la Educación Continua de Médicos requerido por ley cada tres años para renovar su licencia. Una vez el doctor(a) DENNIS REVIERA GONZ[Á]LEZ someta la evidencia que demuestra que cumple con los requisitos, su licencia estará en [*Good Standing*].[73]

16. El 21 de septiembre de 2016, la Junta de Licenciamiento y Disciplina Médica de Puerto Rico expidió una *Verificación de Licencia "Good Standing"* en la que certificó "que [el Dr. Rivera González] cumplió con el requisito establecido por la Ley Núm. 11 de[] 23 de junio de 1976[,] según emendada. Fecha de expedición es 26 de septiembre de 1996 y la fecha de expiración es 27 de febrero de 2019.[74]

17. El 21 de septiembre de 2016, la Junta de Licenciamiento y Disciplina Médica de Puerto Rico expidió una *Certificación de Registro y Educación Médica* y certificó "que [el Dr. Rivera González] cumplió con los requisitos de registro de licencia y educación médica continua para el trienio 2016-2019, a tenor con lo dispuesto en la Ley Núm. 139 de 1 de agosto de 2008, y núm. 11 de 23 de junio de 1976, según enmendadas. **Esta certificación es válida hasta [el] 27 de febrero de 2019**". (Énfasis en el original).[75]

18. El Dr. Rivera González explicó que todos los 27 de febrero de cada año, por ser la fecha de su cumpleaños, tiene que completar los créditos de educación continua. Explicó que en un momento dado tuvo inconvenientes para completar dichos créditos, pero que nunca ha sido suspendido o se le ha revocado su licencia.

---

[73] Apéndice I, estipulado.
[74] Apéndice II A, estipulado.
[75] Apéndice III - B, estipulado.

19. En el contrainterrogatorio, admitió que no todas las personas que certificó habían sido sus pacientes previo a la certificación, pero que algunas de éstas sí.

20. A preguntas del representante legal del Comisionado del Partido Independentista Puertorriqueño expresó que, para él, un médico de cabecera es cualquier médico que visita a un paciente y que no tiene que existir una relación previa médico-paciente.

21. No obra en evidencia las solicitudes de voto encamado, certificadas por el Dr. Rivera González.

22. La Sra. Michelle Coira Burgos es Comisionada Local del Partido Popular Democrático en Orocovis. Funge como tal, desde agosto de 2016. Entre sus funciones está evaluar las solicitudes de voto encamado. En relación al caso de autos, testificó que realizó una investigación sobre las solicitudes de los votos de encamados del PNP. En relación a ello, expresó que visitó varias residencias, entre ellas la de la Sra. Blanca Ortíz Ortíz. Allí observó que la persona no estaba encamada y advino en conocimiento que no le habían visitado. Indicó que conoce previamente a la Sra. Ortíz Ortíz porque es participante del programa de Asistencia Social Familiar en el cual la testigo trabaja. Se reafirmó que la Sra. Ortíz Ortíz puede caminar sin dificultad.

23. Del Apéndice IV, estipulado se desprende las 68 solicitudes de voto encamado para el municipio de Orocovis, precinto 066. De esas, 42 solicitudes fueron certificadas por el Dr. Jorge Colón Morales. Las restantes 26 fueron certificadas por la Dra. Dalmarys Moreno Montesino.

24. El Dr. Colón Morales es médico de profesión y trabaja en la Corporación del Fondo del Seguro del Estado (CFSE) en Bayamón. Además trabaja parcialmente en oficina privada.

25. Colón Morales testificó que el 17 de septiembre de 2016 visitó pacientes que estaban solicitando el voto encamado, con el propósito de cumplimentar la Certificación Médica que exige la solicitud. Narró que a solicitud de funcionarios de la Comisión Local del PNP, se dirigió al pueblo de Corozal y allí se encontró con la doctora Ana María Faget y Dra. Moreno. Una vez se encontraron con los

funcionarios del PNP, siguieron la "ruta" designada por éstos para visitar pacientes en tres pueblos: Comerío, Barranquitas y Orocovis.

26. Declaró que su visita a Orocovis duró entre dos a tres horas y examinó alrededor de 50 pacientes. Indicó que le tomó de 2-3 minutos verificar la condición de cada paciente y certificar la solicitud de voto encamado. Testificó que esa gestión no conlleva mucho tiempo porque el médico tiene un "ojo clínico" que de observar al paciente puede hacer dicha determinación. Declaró además que el tiempo que demoró en movilizarse entre paciente y paciente fue de 5 a 7 minutos.

27. Al preguntársele si conocía a la Sra. Blanca Ortíz Ortíz, respondió en la negativa.

28. Admitió que los electores que visitó en Orocovis, para efectos de cumplimentar la solicitud de voto encamado, fueron visitas de un solo contacto. Además indicó que su propósito era certificar el formulario de solicitud. Finalmente admitió que no era médico de cabecera, ni tratamiento de dichos electores.

29. La doctora Ana María Faget es médico de profesión y trabaja para la Corporación del Fondo del Seguro del Estado hace 7 años en Bayamón. Trabajó como médico primario privado, anteriormente. Expresó que en la actualidad también practica la medicina privadamente, en visitas al hogar, familiares y personas que conoce. Algunas de éstas, gratuitamente y otras recibe remuneración. En las ocasiones que recibe remuneración, la recibe en efectivo. No acepta planes médicos. La práctica privada la ejerce fuera de sus horas laborables. Su horario de trabajo en la CFSE de 8:00-4:30p.m., de lunes a viernes.

30. La Dra. Faget expuso que ha participado de clínicas gratuitas como servicio a la comunidad, pero solo recuerda una ocasión en el pueblo de Vega Baja.

31. Confrontada con la Orden Administrativa 16-03 de la CFSE, admitió que de ese documento surge que todo empleado profesional que requiere de una licencia para el ejercicio de la profesión y que desee practicar dicha profesión privadamente, requiere de una dispensa de la CFSE. Sin embargo, se reafirmó en que ella no requería dispensa para practicar la medicina privadamente; sino de una notificación. Se le cuestionó si había hecho alguna notificación para el año 2016, y respondió en la afirmativa. En cuanto al 2015, indicó que no recordaba.

32. En relación a las solicitudes de voto encamado para el municipio de Orocovis, testificó que la Asociación de Servidores Públicos del Partido Nuevo Progresista le solicitó sus servicios gratuitos para certificar las solicitudes de votos de encamados.

33. Narró que el 17 de septiembre de 2016, visitó el pueblo de Orocovis y que en otras ocasiones había certificado a pacientes de Corozal y Naranjito. Indicó que dichas gestiones las hizo junto a la Dra. Dalmaris Moreno y el Dr. Colón Morales. Testificó que salió de su hogar en el área metropolitana y se encontró con los doctores Moreno y Colón Morales en el dispensario de Corozal. Allí se encontraron con un funcionario del PNP, al cual siguieron en su carro. Llegaron a una residencia y fueron todos a ver un paciente, al cual evaluaron. Luego, se desplazaron al Comité del Alcalde de Orocovis y se reunieron con otros funcionarios del PNP, quienes tenían una lista de electores a visitar y cada médico siguió una ruta, guiada por los funcionarios del PNP.

34. En su caso, testificó, que llegaba al hogar del elector y mediante la observación lo evaluaba. Expresó que la mayoría de los pacientes, con una observación, es suficiente para determinar si tienen un problema de movilidad. Por ejemplo, indicó que si la persona está en una silla de ruedas, si tiene falta de masa muscular en sus extremidades o si utiliza un andador es indicio de que la persona tiene problemas de movilidad.

35. En relación al formulario, no supo decir quién había cumplimentado la parte superior del mismo que corresponde al nombre y firma del elector.

36. La Dra. Faget fue confrontada con el Apéndice 6, estipulado, folio 27, en cuanto a la solicitud del elector Héctor Ortíz Díaz. Se le preguntó si conocía la razón por la cual indicaba que no podía firmar por estar "encamado (daño cerebral)". La Dra. Faget respondió que a ella no le correspondía cumplimentar dicha parte, que sólo se limitaba a la parte de Certificación Médica, sobre problemas de movilidad. Indicó además, que esa parte la llena el elector o la persona que firma como testigo. Añadió que en ocasiones, las personas que llenan la solicitud no tienen conocimientos médicos.

37. La Dra. Faget no es médico de tratamiento de los electores a los cuales le certificó la solicitud de voto encamado. No pudo precisar si alguno de éstos había sido su paciente con anterioridad a esa fecha, y negó que los hubiese visto después.

38. A pesar de que la Dra. Faget testificó que solo fue el 17 de septiembre de 2016 a Orocovis a certificar electores, del Apéndice VI, estipulado, surge que certificó los siguientes electores el 18 de septiembre de 2016: Esmérida Rivera Rivas (Ap. Estipulado VI, folio 4), Juana Rodríguez Alvarado (Ap. VI, folio 5), José de Jesús Avilés (Ap. VI, folio 30), Pablo Rojas Rivera (Ap. VI, folio 31), Margarita Avilés López (Ap. VI, folio 32), José Hernández Rojas (Ap. VI, folio 3) y Orlando Velázquez Domínguez (Ap. VI, folio 33).

39. Las certificaciones expedidas por la Dra. Faget para el precinto 066 de Orocovis, surgen del Apéndice VI, estipulado, 35 folios, correspondiente a 35 solicitudes. Del mismo surge lo siguiente:

   a. Folio 4, correspondiente al elector Esmérida Rivera Rivas, no tiene la firma del elector, ni marca. Tiene la firma de un testigo, ininteligible. Sin embargo, en el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

   b. Folio 5, correspondiente al elector Juana Rodríguez Alvarado. No tiene firma de elector, ni marca. Aunque tiene firma de un testigo, Felícita Torres Colón. En el espacio para indicar "Razón para no firmar el solicitante", surge: "no puede escribir".

   c. Folio 6, correspondiente a la electora María López Rodríguez. No tiene firma de elector, ni marca. Aunque tiene firma de un testigo, Lilliam, ininteligible. En el espacio para indicar "Razón para no firmar el solicitante", surge: "no puede escribir".

   d. Folio 8, correspondiente a la electora Nixolina Santiago Santiago. No tiene firma de elector, ni marca. Aunque tiene firma de un testigo, M. Cullg. En el espacio para indicar "Razón para no firmar el solicitante", surge: "no puede escribir".

   e. Folio 13, correspondiente a la electora Petronila Alvarado Ortiz. No tiene firma de elector, ni marca. Aunque tiene firma de un testigo, Elsa M. Rodríguez

Ortiz.  En el espacio para indicar "Razón para no firmar el solicitante", surge: "no puede escribir".

f.  Folio 16, correspondiente a la electora Arcadia Meléndez Ortiz. No tiene firma de elector, ni marca.  Aunque tiene firma de un testigo, ininteligible Cruz.  En el espacio para indicar "Razón para no firmar el solicitante", surge: (CVA).

g.  Folio 19, correspondiente a la electora Casilda López Miranda. No tiene firma de elector, ni marca.  Aunque tiene firma de un testigo, Olga Figueroa López. En el espacio para indicar "Razón para no firmar el solicitante", surge: "edad" (vejez) casi no ve.

h.  Folio 21, correspondiente a la electora Francisca Hernández Díaz. No tiene firma de elector, ni marca.  Aunque tiene firma de un testigo, Teresita Colón. En el espacio para indicar "Razón para no firmar el solicitante", surge: "no puede escribir".

i.  Folio 22, correspondiente a la electora Ada Colón Meléndez. No tiene firma de elector, ni marca.  Aunque tiene firma de un testigo, Ada L. Ortiz Colón.  En el espacio para indicar "Razón para no firmar el solicitante", surge: "no puede escribir".

j.  Folio 23, correspondiente a la electora Gloria Torres Ramírez. No tiene firma de elector.  Aunque tiene firma de un testigo, firma ininteligible.  La misma se encuentra en el espacio de la firma del solicitante. En el espacio para indicar "Razón para no firmar el solicitante", surge: "incapacitada para firmar".

k.  Folio 26, correspondiente al elector Benito Ortolaza Collazo. No tiene firma de elector, ni marca.  Aunque tiene firma de un testigo, Iris J. Arriaga.  En el espacio para indicar "Razón para no firmar el solicitante", surge: "no puede escribir".

l.  Folio 27, correspondiente al elector Héctor Ortiz Díaz. No tiene firma de elector, ni marca.  Aunque tiene firma de un testigo, Aida Rodríguez Rivas. En el espacio para indicar "Razón para no firmar el solicitante", surge: "encamado" (daño cerebral).

40. En cuanto a las certificaciones de Orocovis, se certificaron 103 solicitudes por tres médicos el 17 de septiembre de 2016. Tanto la Dra. Faget como el Dr. Colón, testificaron que el recorrido duró aproximadamente dos horas.

41. La Sra. Elba Rivera Torres es residente de Aibonito y funge como Comisionada del Partido Popular Democrático de la Comisión Local de Aibonito. Como parte de sus funciones evalúa transacciones electorales. Entre éstas, la solicitud de voto encamado. El 19 de septiembre de 2016, fecha de cierre del registro electoral, estuvo en la Junta de Inscripción Permanente (JIP) en una reunión de los Comisionados Locales. En esa ocasión, objetó 50 solicitudes de voto a domicilio en las cuales se había certificado la condición de inmovilidad por el Dr. Francisco Fontánez Rivera. Hizo constar la objeción en el Acta de Incidencias y fue citada para audiencia ante la CEE.

42. Declaró que objetó el voto a domicilio de Carmen Ana Borelli, Ana Colón Borelli y Carlos Vegilla Colón. Expresó que su objeción consistía en que conocía que dichos electores se movilizaron a votar en las primarias el 5 de junio de 2016 a la Escuela Francisco Degetau, unidad 8, la cual ubica al lado de la residencia de éstos.

43. Expresó que Carlos Vegilla está en silla de ruedas, pero lo movilizan. Reiteró que le consta que no está encamado. Testificó además que la Sra. Carmen Ana Borelli tiene una condición neurológica y, aunque reconoció que camina con dificultad, puede desplazarse.

44. Las certificaciones expedidas por el Dr. Francisco Fontánez Rivera para el precinto 069 de Aibonito, surgen del Apéndice V, estipulado, 49 folios, correspondiente a 49 solicitudes. Del Apéndice surge lo siguiente:

    a. Folio 7, correspondiente a la electora Carmen Ana Borelli Aponte, no tiene la firma del elector, ni marca. Tiene la firma de un testigo, ininteligible. Sin embargo, en el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

    b. Folio 34, correspondiente a la electora Rosa Cartagena Rodríguez, en la parte que firma el elector hay una marca de "X". Tiene la firma de un

testigo, Nilda L. Santiago.  Sin embargo, en el espacio para indicar "Razón para no firmar el solicitante" está en blanco.

45. Las partes estipularon que la Sra. Elba I. Rivera Torres, como Comisionada del PPD del Precinto 069, durante reunión de la Comisión Local el 19 de septiembre de 2016, objetó 50 solicitudes de voto encamado suscritas por el Dr. Francisco Fontánez Rivera.

46. No se presentó <u>prueba alguna</u> de la ejecutoria Dr. Fontánez Rivera.

47. En cuanto al Precinto 057 de Jayuya, se admitió el Apéndice I del Comisionado del PNP, a los fines de identificar los electores afectados.  No se presentó prueba adicional.

48. En cuanto al Precinto 089 de Las Piedras, se admitió el Apéndice II del Comisionado del PNP, a los fines de identificar los electores afectados.  No se presentó prueba adicional.

49. En cuanto al Precinto 015 de Dorado, se admitió el Apéndice III del Comisionado del PNP, a los fines de identificar los electores afectados.  No se presentó prueba adicional.

50. En cuanto al Precinto 090 de Las Piedras, se admitió el Apéndice IV del Comisionado del PNP, a los fines de identificar los electores afectados.  No se presentó prueba adicional.[76]

## III.

## DERECHO APLICABLE

**A. REVISIÓN JUDICIAL**

El Artículo 4.001 de la Ley Electoral, según enmendada, *supra*, dispone que cualquier parte adversamente afectada por una resolución, determinación y orden de la Comisión podrá recurrir de la misma mediante la presentación de un escrito de revisión ante el Tribunal de Primera Instancia. En estos casos, el Tribunal deberá celebrar una vista en su fondo, en la cual recibirá evidencia y formulará las determinaciones de hecho y conclusiones de derecho que correspondan. Íd; *P.A.C. v. P.I.P.,* 169 DPR 775, 792 (2006). Así pues, el foro primario deberá celebrar un juicio de *novo*. Dicho procedimiento consistirá

---

[76] En relación a los Apéndices I-IV del Comisionado del PNP,  la Comisionada que suscribe está limitada a realizar determinaciones hechos adicionales,  ya que la parte interesada solicitó la admisibilidad limitada a la identidad de los electores.  Ello ante la objeción a la admisibilidad total de las demás partes.

de un enjuiciamiento amplio de las controversias del caso. *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 64-65 (2009). Por consiguiente, podrá presentarse nueva prueba, ya sea documental o testifical, toda vez que los planteamientos de la parte demandante "estarán abiertos a la consideración del tribunal revisor como si se plantearan por primera vez". Íd., *supra*, pág. 65; *Granados Navedo V. Rodríguez Estrada I*, 124 DPR 1, 20 (1989). (Subrayado nuestro). Incluso, el tribunal podrá evaluar la prueba según su propio criterio, sin **necesidad** de conferirle deferencia a la decisión de la CEE. *P.A.C. V. P.I.P.,* supra, pág. 792.

Como primer paso en el análisis, este Tribunal debe guardar la usual deferencia a la CEE en aquellos casos en que la determinación dependa principal o exclusivamente de una cuestión de derecho electoral especializado. Granados v. Rodríguez Estrada I, 124 D.P.R. 1, 20 (1989). Ahora bien, cabe señalar que las decisiones que toma la CEE merecen deferencia judicial. *Mundo v. CEE*, 187 DPR 200, 207 (2012); *P.A.C. v. P.I.P*, supra, pág. 792. Ello se debe a que dicha entidad es el organismo administrativo especializado que tiene el conocimiento y experiencia en el manejo y aplicación de las normas que rigen el proceso electoral. Íd. Es norma reiterada por el Tribunal Supremo que a las decisiones de los organismos administrativos se le debe conceder deferencia por razón de su experiencia y pericia respecto a los poderes que se les ha delegado. Íd. Por lo tanto, las decisiones de una agencia administrativa tienen una presunción de legalidad y corrección que la Rama Judicial debe respetar hasta tanto la parte que las impugna no produzca suficiente evidencia para derrotarlas. *Batista, Nobbe v. JTA. Directores*, 185 DPR 206, 215 (2012).

En cuanto al criterio para revisar las decisiones de la CEE, el escrutinio es más riguroso que el utilizado usualmente para revisar las decisiones de las agencias administrativas. *Granados v. Rodríguez Estrada I*, supra, págs. 19-20. Sin embargo, ese escrutinio se justifica, dado que las decisiones de la CEE están sujetas a las presiones e intereses partidistas. Íd*.* "Tanto la dinámica organizacional de la Comisión Estatal controlada por los partidos políticos como la forma particular en que se toman allí las decisiones exigen la aplicación del criterio de revisión más riguroso." Íd. La revisión debe de tener presente la naturaleza inminentemente política que este tipo de revisiones presenta y la protección del derecho constitucional al sufragio universal. Íd.

**B. EL DERECHO AL VOTO**

La Constitución del Estado Libre Asociado de Puerto Rico dispone que el Estado tiene un deber constitucional de garantizarle el acceso a todo elector para ejercer el derecho fundamental al voto de forma universal, igual, directa privada e independiente protegiéndolos contra toda coacción. Artículo II de la Sec. 2 de la Constitución del Estado Libre Asociado de Puerto Rico, 1 LPRA Art. II, sec. 2. El derecho al voto es un derecho fundamental que pertenece al pueblo y está expresamente garantizado en nuestra Constitución. *Guadalupe v. C.E.E.*, 165 DPR 106 (2005); *P.P.D. v. Administrador Gen. de Elecciones*, 111 DPR 199, 221 (1981). El voto es la expresión por excelencia de la voluntad del pueblo y debe ejercerse a través del sufragio universal, igual, directo, secreto, y libre de toda coacción, y todas las leyes deberán garantizarlo. Íd.

La Ley Electoral, según enmendada, *supra,* se promulgó para salvaguardar el derecho al voto y reglamentar el sistema electoral de Puerto Rico. Según su Artículo 2.002, según enmendada, 16 LPRA sec. 4002, <u>nuestro ordenamiento electoral descansa en unas garantías de pureza procesal capaces de contar cada voto en la forma y manera en que sea emitido</u>. En cumplimiento con el claro mandato constitucional, la citada disposición garantiza al elector el "derecho al voto, igual, libre, directo y secreto*,*" y más aún, reconoce la legitimación activa estatutaria a los electores para iniciar o promover acciones legales predicadas en las disposiciones del Artículo 6.001 de la Ley Electoral, según enmendada, 16 LPRA sec. 4061, conocido como "La Carta de Derechos del Elector" que reconoce los derechos y prerrogativas de los Electores.

Estas garantías provistas por la Constitución y por el Artículo 6.001 de la Ley Electoral, según enmendada, 16 LPRA sec. 4062*,* conllevan el deber y la obligación del Estado de viabilizar el ejercicio del elector de su derecho al voto. Así, el Art. 6.002 de la Ley Electoral dispone que el elector es "toda persona calificada que haya cumplido con los requisitos de inscripción en el Registro General de Electores". El Artículo 6.006 de la Ley Electoral, según enmendado, 16 LPRA sec. 4066,  reitera el mandato constitucional de que la CEE tiene que garantizar el derecho al voto a todo elector requiriendo que "**no se podrá** rechazar, cancelar, invalidar o anular el registro o inscripción legal de un elector o **privar a un elector calificado de su derecho al voto mediante reglamento, orden, resolución, interpretación** o cualquier otra forma que impida lo anterior". (Énfasis nuestro).

## C. COLEGIO DE FÁCIL ACCESO Y EL COLEGIO DE FÁCIL ACCESO EN EL DOMICILIO

La *Ley electoral de Puerto Rico* en el Artículo 9.016, 16 LPRA § 4155, reconoce el derecho de los electores con impedimentos, al establecer estatutariamente la obligación de que en cada precinto o Unidad Electoral, o centro de votación, **"se establecerá un colegio de fácil acceso** para facilitar el proceso de votación a los electores con impedimentos". Es decir, que a todo elector que requiera un <u>centro de votación de fácil acceso</u> por condición de impedimento físico, se le garantiza por este medio el acceso a ejercer su derecho fundamental al voto.

Estos colegios se instituyen <u>el día de las elecciones generales</u> en cada una de las unidades electorales alrededor de la isla. En otras palabras, el colegio de fácil acceso se ofrece para personas que tengan algún impedimento que no sea de tal naturaleza que les **impida** llegar al centro de votación, por una condición de movilidad.

Por otro lado, el derecho de voto adelantado **en el domicilio** o el llamado voto **encamado** está regulado por el inciso "m" del Artículo 9.039 de la *Ley electoral de Puerto Rico*.

## D. DESARROLLO DEL VOTO POR ADELANTADO PARA ELECTORES CON PROBLEMA DE MOVILIDAD

El 20 de octubre de 2004, mediante *Resolución de la Comisión CEE-RS-04-67*, se estableció una categoría de voto adelantado para electores con impedimentos de movilidad o encamados. Este proceso de votación fue renovado en cada elección por la CEE hasta que finalmente se incorporó en el *Código Electoral para el Siglo XXI*, Ley 78 de 2011 mediante una enmienda legislativa al incluirse el inciso (m) al Artículo 9.039, Ley 135 de 3 de julio de 2012.

El pasado Presidente de la CEE, Héctor Conty Pérez, al poner en vigor dicho estatuto interpretó por *Resolución* CEE-RS-12-103 de 31 de agosto de 2012, que el mismo sería administrado como si fuera voto ausente por la Junta Administrativa de Voto Ausente ("JAVA"). El procedimiento se realizó, por tanto, como se conduce el voto ausente: es decir los formularios se enviaban por correo a los electores que presumiblemente que cualificaban para votar encamado. De esta forma personas **con y sin impedimentos** cualificaban como electores de fácil acceso en el domicilio y votaban mediante este

procedimiento[77]. Las controversias públicas con esta situación fue diversa y dramática; ya que electores que no cualificaban para votar mediante este mecanismo se beneficiaron sin tener una condición médica que le impidiera acudir a su centro de votación.

Surge, de la 17[ma] Asamblea Legislativa celebrada en la 4[ta] Sesión Ordinaria, que la Comisión de Gobierno, Eficacia Gubernamental e Innovación Económica presentó, el 10 de noviembre de 2014, un *Informe recomendando la aprobación del P. del S. 1254 con enmiendas* al Senado de Puerto Rico. En la misma, expresó lo siguiente sobre el voto adelantado de las personas con impedimentos de movilidad, descrita como un cambio sustantivo propuesto al Código Electoral:

**[…] Las personas con impedimentos de movilidad (encamados)- Voto adelantado**

Durante los pasados comicios electorales surgieron controversias vinculadas a la enmienda al Artículo 9.039 del Código Electoral de Puerto Rico para el Siglo XXI, que se realizó a través de la Ley 135-2012 y que entre otros, añadió el inciso (m) sobre electores encamados a la lista de electores que pueden realizar el voto por adelantado. Además de añadir el voto del elector encamado a esta lista, dicha enmienda otorgó la responsabilidad de trabajar la votación de este elector y la adjudicación de los votos a la Junta Administrativa del Voto Ausente (JAVA). Asimismo la Comisión Estatal de Elecciones emitió la Resolución Núm. CEE-RS-12-103. Mediante esta Resolución se determinó que los votos de los electores con impedimentos de movilidad (encamados) se tramitarían de acuerdo al reglamento aplicable al voto ausente, o sea, las papeletas serían enviadas a éstas personas por correo.

En las pasadas elecciones, por primera vez, los votos de las personas encamadas fueron procesados como un voto ausente. Esto implicó que aproximadamente 17,000 papeletas fueran enviadas por correo postal a los encamados, en lugar de que una junta de la CEE fuese a su casa con la urna a buscar las papeletas como se hacía en elecciones anteriores. El problema que plantó este voto por correo fue que no se le garantizó que los ciudadanos encamados fueron los que realmente votaran por adelantado, o aun si lo hicieran, de que podrán emitir un sufragio libre y secreto.

Durante elecciones anteriores las Juntas de Colegio, compuestas por dos funcionarios de distintos partidos políticos asistían personalmente a los hogares de los electores que habían solicitado el voto a domicilio y que se le había aprobado. Lo fundamental de este proceso era que estos funcionarios eran considerados como entes fiscalizadores del procedimiento de votación, y a su vez, al elector ejercer su derecho al voto, lo recogían para entregarlo a la Comisión Estatal de Elecciones.

**Mediante la presente medida se establece la restitución o establecimiento de controles y medidas de seguridad que garanticen el voto independiente y secreto de todos los electores en las diferentes clasificaciones de voto adelantado o ausente, en especial, sobre la atención de los grupos de electores más vulnerables, como son los encamados, los hospitalizados y aquellas personas con discapacidades.**

---

[77] Dicha Resolución fue confirmada en Revisión Judicial por la Sentencia del Tribunal de Primera Instancia en San Juan, Caso Civil KPE 2012-3104 emitida por el Juez Isidro Pesquera García.

Una papeleta enviada por correo, sin tener garantías de quien la recibe y quién vota en la misma, es una invitación al fraude. Sin embargo, **el establecer que la Junta Administrativa del Voto Ausente trabaje la votación como voto adelantado garantiza, a través de la Junta de Balance Electoral, la fiscalización entre todos los partidos políticos en gran parte de la operación electoral y administrativa. Asimismo, la Junta de Balance Electoral garantiza la identidad del elector, que las papeletas las reciba en blanco y que el elector ejerce el voto de forma independiente y secreta; de conformidad con lo dispuesto en esta Ley y en el Reglamento de Voto Adelantado.**

Los cambios introducidos en las enmiendas mediante la Ley Núm. 230-2011 y las interpretaciones que adoptó el Presidente de la CEE en aquel entonces, sobre tales enmiendas, provocaron que este innovador sistema de votar se viera empañado por denuncias de malos manejos de papeletas enviadas a electores que nunca pidieron votar bajo ese sistema. **Estos asuntos son corregidos de manera que se devuelva la confianza pública en nuestro sistema electoral.** (Énfasis nuestro).

Tomando lo anterior en consideracion, la Exposición de Motivos de la Ley Núm. 239-2014 expresó que la enmienda fue decretada, entre otros propósitos:

[…] Para garantizar que estos derechos universales no estén subordinados al dominio de unos pocos, y que estén revestidos de todas las garantías contra la opresión y la manipulación, es esencial reforzar nuestro sistema electoral mediante legislación que delinee unos procesos electorales transparentes y confiables, dirigidos a garantizar que la voluntad del individuo y de la mayoría del pueblo sea perfeccionada gracias al voto.

Por todo lo anterior, es esencial proveer la mayor garantía, transparencia y pureza legal en los procesos electorales para que quienes participen de los mismos, y sobre todo la ciudadanía, ya que deposita su confianza en nuestra democracia, tenga la certeza de que la voluntad del elector expresada en las urnas, será respetada y adjudicada.

[…]

Las disposiciones propuestas en este proyecto claramente establecen el consenso para instituir un sistema de escrutinio electrónico, incluyendo las fuentes para su financiamiento, la restitución o establecimiento de controles y medidas de seguridad que garanticen el voto independiente y secreto de todos los electores en las diferentes clasificaciones de voto adelantado o ausente, en especial, sobre la atención de los grupos de electores más vulnerables, como son los encamados, los hospitalizados y aquellas personas con discapacidades.

[…]

Es imperativo defender el derecho de los electores frágiles, estableciendo legalmente la manera en que será administrado dicho voto por juntas de balance político, protegiéndoles de que su voluntad no sea vulnerada por terceros, y consagrando su acceso a la participación en el proceso electoral. Véase P. del S. 1254.

Cónsono con lo anterior, en medio del proceso de aprobación de las enmiendas a la Ley Núm. 135, sobre el proceso de validación de los electores encamados, el representante Ramón L. Cruz Burgos expuso que "esta legislación viene a hacer más riguroso en cuanto

al voto de encamados, que es una preocupación que han planteado los compañeros de la

Minoría[…]".[78] Del mismo modo, el representante Javier A. Aponte Dalmau recalcó:

> […] tenemos un tema muy sensitivo en los procesos electorales, que es el voto de los encamados, y en el proceso electoral, la intención de ese elector encamado, que no vaya a ser utilizado por algún tercero para inutilizar su intención electoral. Y tenemos que tener mucho cuidado con ello, porque obviamente en procesos electorales cerrados este tipo de voto puede ser decisivo, principalmente en aquellos escrutinios que tienen que ver con distritos representativos o alcaldes, en legisladores municipales este tipo de cantidad de voto puede ser esencial en determinar un candidato u otro. Por lo que el Estado tiene que ser sumamente celoso en medir esa intención electoral de cada uno de los procesos, más allá cuando por fin nos podemos enfrentar a la tecnología electoral, y no electorera, de poder armonizar y establecer la infraestructura para hacer de este proceso electoral en Puerto Rico uno dinámico y que por fin sea electrónico.[79]

En consecuencia, la Ley Núm. 239 de 22 de diciembre de 2014 enmendó la Sec. (m)

del Art. 9.039 en su parte pertinente como sigue:

> Artículo 9.039.-**Electores con Derecho al Voto Adelantado**.
>
> […] (m) las personas <u>con impedimentos de movilidad (encamados)</u> que cualifiquen como electores de Fácil Acceso en el Domicilio. La Comisión Local será responsable de verificar, evaluar y aprobar la solicitud, conforme al Reglamento aplicable. Los miembros de las Juntas de Inscripción Permanente deberán grabar la solicitud como una transacción de fácil acceso. La Junta Administrativa del Voto Ausente (JAVA) será responsable de trabajar la votación como voto adelantado y la adjudicación de estos votos.
>
> Para los casos que soliciten el voto adelantado por la causal de algún tipo de condición médica que le impida asistir a su colegio de votación, la Comisión proveerá un formulario **para que el médico de cabecera o de tratamiento <u>del</u> elector certifique: que el elector presenta un problema de movilidad física que sea de tal naturaleza que le impida acudir a su centro de votación.**
>
> La Comisión será responsable de reglamentar la manera en que se establecerá el procedimiento a seguir para garantizar el voto de las personas con impedimento de movilidad (encamados).
>
> […]
>
> Este proceso de voto adelantado será administrado por una Junta de Balance Electoral, la cual garantiza la identidad del elector, que las papeletas las reciba en blanco y que el elector ejerce el voto de forma independiente y secreta de conformidad con lo dispuesto en esta Ley y en el Reglamento de Voto Adelantado.
>
> La Junta de Colegio tendrá la responsabilidad afirmativa de garantizar que el elector tiene la capacidad para consentir y que ejerce el voto en forma secreta. La capacidad para consentir es una mediante la cual el elector debe poder de forma individual y voluntaria comunicarse mediante cualesquiera de los siguientes mecanismos: la expresión oral, escrita y señales o gestos corporales afirmativos iguales o parecidos a los que utilizan las personas con problemas del habla, audición y visión.  También implicará que el elector libremente y sin coacción es quien ejerce el voto de forma independiente y secreta. […]. (Énfasis nuestro). Ley Núm. 239-2014, art. 9.039(m). (P. del S. 1254).

---

[78] Diario de Sesiones de la Cámara de Representantes, 13 de noviembre de 2014.
[79] Diario de Sesiones de la Cámara de Representantes, 13 de noviembre de 2014.

Por su parte, el 25 de mayo de 2016 se aprobó el *Reglamento de Voto Ausente y Voto Adelantado de Primarias 2016 y Elecciones Generales 2016*, que reiteró las disposiciones referentes al voto adelantado para personas con impedimentos de movilidad consagrados en la Ley 135-2012. Además, el 11 de agosto de 2016, se aprobó el *Manual de Procedimientos para el Voto Adelantado en el Colegio de Fácil Acceso en el Domicilio para las Elecciones Generales 2016* ("Manual") que en su Inciso B dispone que:

> El elector, <u>a través de una persona de su confianza</u>, gestionará en la Junta de Inscripción Permanente (JIP) o en la página electrónica de la Comisión la solicitud para votar en el Colegio de Fácil Acceso en el Domicilio. Dicha solicitud será certificada por **su** médico de cabecera o médico de tratamiento y se someterá en la JIP. La solicitud tendrá que **ser firmada por el elector, salvo que tenga impedimentos que no le permitan firmar o que no sepa leer o escribir. En este caso podrá hacer una marca y alguna persona autorizada por él certificará este hecho con su firma como testigo en el espacio que a estos fines provee la solicitud.** (Énfasis nuestro).

De esta forma la CEE detalló el procedimiento para que los electores con impedimento de movilidad, es decir encamados, tengan acceso al voto adelantado, luego que **su** médico de cabecera o de tratamiento así lo certifique en la solicitud que provee el propio Manual. En el caso de que la solicitud sea denegada, el Inciso G del Manual dispone que entonces se le dará la oportunidad para que el elector que tenga alguna dificultad pueda utilizar el colegio de fácil acceso en el centro de votación donde le corresponda votar. Así, se salvaguarda el derecho al voto de todos los electores y se garantiza que el voto adelantado solo se ofrezca para quienes cumplan con los requisitos dispuestos para ello por la Ley Electoral, *supra.*

Es decir, la enmienda que garantiza estatutariamente el derecho del voto adelantado a domicilio a una persona encamada era precisamente garantizar a esa persona que no se puede mover el poder ejercer su derecho al voto. Pues aquél que tenga algún impedimento, siempre tendrá derecho al colegio de fácil acceso el día del evento electoral, según dispone el Art. 9.016 de la Ley Electoral.

Debemos mencionar que en la vista evidenciaria, se equiparó el concepto de colegio de fácil acceso con el colegio de fácil acceso en el domicilio. No obstante, la diferencia entre ambos colegios es que el de fácil acceso no es una solicitud de voto adelantado como el colegio de fácil acceso en el domicilio. La controversia planteada en el caso de epígrafe es sobre el colegio de fácil acceso en el domicilio, o sea, el voto adelantado de las personas

encamadas.

## E. LEGISLACIÓN COMO FUENTE PRIMARIA CUANDO EL TEXTO ES CLARO

Es norma reiterada que si "la ley es clara libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu, máxime cuando el espíritu o intención del estatuto y su letra son la misma cosa." Artículo 14 del Código Civil, 31 LPRA sec. 14. Ello pues el claro texto de una ley "es la mejor expresión de la intención legislativa". *Shell Chemical Yabucoa, Inc. v. Santos Rosado*, 187 DPR 109 (2012); *Soc. Asist. Leg. v. Ciencias Forenses*, 179 DPR 849 (2010).

En el caso de *Cordero et al. v. ARPE et al.*, 187 DPR 445 (2012), el Tribunal Supremo señaló que el primer paso al interpretar un estatuto es remitirse al propio texto de la ley. Cuando la Asamblea Legislativa se ha expresado en un lenguaje **claro** e **inequívoco**, ese texto es la expresión por excelencia de ésta. Es decir, en aquellos casos en los cuales el lenguaje de la ley no cree dudas, no es necesario ir más allá para hallar la voluntad del legislador/a, sino que se debe descubrir y dar efecto a la intención, según expresada en la propia letra del estatuto. Por otro lado, es menester tomar en consideración que:

> Los artículos 15 y 16 del Código Civil establecen unas guías en el caso de estatutos que tratan de materias generales y de materias técnicas. **El artículo 15 ordena al juzgador que dé a las palabras su significado "más corriente y usual" y** el artículo 16 le advierte que "los términos técnicos y las frases usadas en las artes y en las ciencias se interpretarán según el significado y acepción que tengan admitidos por los peritos o maestros en la ciencia, arte o profesión a la cual se refieran. (Énfasis nuestro). L.M. Argüelles y M. Fraticelli, La Investigación Jurídica en el Derecho Puertorriqueño, Ed. Temis, 4ta ed., 2006, pág. 289.

## F. DEFINICIÓN DE MÉDICO DE CABECERA Y MÉDICO DE TRATAMIENTO

Según el Diccionario de la Real Academia Española, un "médico de cabecera" es un médico "que asiste **habitualmente** a una persona o a una familia".[80] (Énfasis nuestro). Por su parte, el Diccionario Esencial de la Real Academia de la Lengua Española define el término como "[e]l que asiste especialmente y de **continuo** al enfermo". (Énfasis nuestro). En cuanto a la definición del "médico de tratamiento" del elector, nos remitimos a la definición de la palabra "tratamiento" esbozada en el Diccionario de la Real Academia Española como el "conjunto de medios que se emplean para curar o aliviar una

---

[80] Consultado el 1 de noviembre de 2016, en http://dle.rae.es/?id=Ol43qKz.

enfermedad".[81]

# IV.

## CONCLUSIONES DE DERECHO

Como parte de la naturaleza de los recursos de revisión judicial presentados, la Comisionada Especial celebró dos vistas en las que recibió prueba testifical, documental y escuchó los diferentes argumentos de las partes a los fines de determinar si procedía revocar la determinación de la CEE en cuanto a la denegación o concesión del derecho a voto adelantado de cientos de electores que presuntamente así lo solicitaron. Los argumentos para solicitar la revocación parcial de la determinación incluyeron controversias sobre el debido proceso de ley, el cumplimiento con las disposiciones de la Ley Electoral, según enmendada, *supra,* la autoridad de la CEE en el desempeño de sus funciones, la definición de médico de cabecera o tratamiento, entre otras.

Antes de discutir los pormenores de lo ocurrido en las vistas evidenciaras celebradas, es necesario hacer constar que las revisiones parciales presentadas por los Comisionados del PNP y del PPD se circunscribieron a cuestionar solo algunos aspectos de la *Resolución Enmendada* emitida por la Presidenta de la CEE el 26 de octubre de 2016. En otras palabras, la *Resolución Enmendada* contiene conclusiones que se sostienen, algunas, como cuestión de derecho por no haber sido impugnadas y, otras, por no haberse aportado la prueba necesaria para revocar las mismas.

Ante esta Comisionada se presentó, en primer lugar, el asunto sobre el significado o alcance de los términos "médico de cabecera" o "médico de tratamiento" que surgen del texto de la Ley Electoral, *supra*, así como sus distintas acepciones. Como tal, el ejercicio de determinar el significado de dichos términos no requiere un ejercicio de interpretación mayor.[82] Del lenguaje del Artículo 9.039(m) de la Ley Electoral, según enmendada, *supra*, la Comisionada Especial concluye que la misma es clara y específica. A pesar de que la Ley Electoral, *supra,* no provee una definición para "médico de cabecera" o para "médico de tratamiento", la Comisionada Especial concluye que la definición de dichos términos debe ser consistente con la letra clara del Artículo 9.039(m) de la Ley Electoral, *supra,* y sus propósitos. Esta conclusión resulta forzosa, pues de lo contrario, nos abrogaríamos de un

---

[81] Consultado el 1 de noviembre de 2016, en http://dle.rae.es/?id=aWzrvDX.
[82] Por lo que no es necesario realizar una interpretación *in pari materia* para auscultar la intención legislativa.

poder que no nos compete al entrometernos en las funciones legislativas y modificar la letra plasmada de la Ley Electoral, *supra*. Consistente con lo anterior, no cabe recurrir a cánones interpretativos cuando la ley es clara. Lo que debemos hacer es indagar cuál es el uso común de lo que significa la palabra.

De entrada, cabe destacar que el referido artículo requirió de manera **expresa**, que "se proveerá un formulario para que el médico de <u>cabecera o de tratamiento</u> **del** elector" certificara la condición o problema de movilidad a los fines de completar la solicitud de voto adelantado encamado. (Énfasis nuestro). Artículo 9.039(m) de la Ley Electoral, *supra*. Lo primero que salta a la vista es, ¿cuál fue el fundamento para que la Asamblea Legislativa dispusiera de la terminología "médico de cabecera o tratamiento"; en vez de un "médico debidamente licenciado" o "médico generalista" o "médico primario"?

Según lo antes señalado, otras disposiciones legales[83] que exigen una certificación médica disponen de manera general que la misma podrá ser expedida por un médico admitido a la práctica de la medicina en Puerto Rico y no requieren que este sea **específicamente** un médico de cabecera o de tratamiento el que así lo certifique.

En este caso, el Artículo 9.039(m) de la Ley Electoral, según enmendada, *supra*, expresa que "la Comisión proveerá un formulario para que **el médico de cabecera o de tratamiento <u>del</u> elector** certifique [...]". (Énfasis nuestro). En su acepción más sencilla, "médico de cabecera o de familia" según lo define el Diccionario de la Real Academia Española y según el uso y costumbre, significa un médico que presta atención primaria y que asiste **habitualmente** a una persona o a una familia. Es decir, es el médico más cercano al paciente; quien con mayor probabilidad conoce su historial médico y está en mejor posición de emitir una certificación de inmovilidad, brindando mayor garantía y transparencia al proceso.

Nótese que el estatuto además indica que será el médico "**del elector**" que apunta al

---

[83] Este Tribunal hace constar que el legislador ha sido enfático al realizar manifestaciones expresas en otras leyes en cuanto al tipo de médico autorizante. Véase Art. 3.09 de la Ley Núm. 22 de 7 de enero de 2000, conocida como la *Ley de Vehículos y Tránsito de Puerto Rico*, que dispone que la certificacion de la expedicion de una licencia de aprendizaje debe ser "expedida por un médico debidamente autorizado a ejercer la medicina en Puerto Rico", de manera general. Por otro lado, la Ley Núm. 184 de 3 de agosto de 2004, conocida como la *Ley para la Administración de los Recursos Humanos en el Servicio Público* dispone en términos expresos sobre el tipo de médico para distintos escenarios contemplados en dicha Ley, usando frases como: "examen médico" (de manera general); tratamiento médico bajo el Fondo del Seguro del Estado (conforme la *Ley de Compensaciones por Accidentes del Trabajo*); certificado médico (para licencias de enfermedad descrito de manera general pero señalando que "del certificado médico se podrá corroborar la inhabilidad del empleado para asistir al trabajo por razones de enfermedad, por cualquier otro medio apropiado."; certificación del médico que la atiende durante el aborto (de manera específica para la licencia en casos de aborto).

interés particular o el escogido de dicho elector. Entiéndase, que el médico que certifique el impedimento o problema de movilidad del elector haya sido escogido por éste último y que, según la definición del término, provea atención médica con, como mínimo, algún tipo de habitualidad. No es posible concluir, y el testimonio de los médicos no lo probó, que un médico pueda ser considerado *de cabecera* por el simple hecho de intervenir con un paciente en una única ocasión para un único fin.

En cuanto a esta definición, determinamos que el uso por la CEE de la disposición del Artículo 7 (50) del Reglamento para implantar las Disposiciones de la Ley Núm. 194 de 25 de agosto de 2000, según enmendada, Carta de Derechos y Responsabilidades del Paciente de Puerto Rico, Núm. 7617, no resultó en una enmienda a la Ley Electoral, según enmendada, *supra.* Dicha definición no contraviene la definición regular de lo que es un médico primario o de cabecera, como un doctor en medicina, autorizado legalmente a practicar la medicina en el Estado Libre Asociado de Puerto Rico. ("Es quien inicialmente evalúa y provee servicios de cuidado de salud y/o tratamiento a pacientes. El médico primario es responsable de identificar y coordinar los servicios requeridos por los pacientes beneficiarios, proveerles continuidad de cuidado y referirlos a servicios especializados de ser medicamente necesarios"). Por lo que no encontramos que su determinación en cuanto a este aspecto haya sido irrazonable.

Por otra parte, en esta ocasión, la directriz clara de la Asamblea Legislativa es cónsone con los intereses que persigue la Exposición de Motivos de la Ley Electoral, según enmendada, *supra.* Conforme al historial legislativo y la exposición de motivos anteriormente relatados, el establecimiento de controles y medidas de seguridad, en particular de las personas encamadas fue un procedimiento que se tomó en consideración para garantizar su derecho al voto independiente y secreto.

La prueba en autos es suficiente para concluir que los médicos que testificaron en este caso, no son médicos de cabecera o tratamiento de los electores que solicitaron el voto encamado en los precintos: 040 de Añasco y 066 de Orocovis. A tenor con las Determinaciones de Hechos, en el caso de Añasco el Dr. Carlos Heredia admitió que no conocía previamente a los electores y que no era su médico de tratamiento. Testificó que los electores no le contactaron, sino que llegó a ofrecer sus servicios gratuitos a petición de funcionarios de la Comisión Local de Añasco. En relación al procedimiento de las visitas, el

doctor no conocía el destino al cual se dirigía, pues admitió que fue llevado por estos funcionarios quienes tenían una lista, ni las solicitudes a cumplimentar. En este caso también le acompañaba una enfermera, a quien no pudo identificar. Indicó que en una sola visita pudo completar 83 solicitudes.

El caso del precinto 066 de Orocovis es también bien similar. Los doctores Colón Morales y Faget admitieron que los electores no le habían contactado. Fueron contactados por la Asociación de Empleados Públicos del PNP, a su vez contactados por los funcionarios de la JIP. Así se dirigieron los doctores Morales y Faget, junto a Moreno a visitar electores por la "ruta" trazada. Morales admitió que no era médico de tratamiento ni de cabecera de los electores que visitó, 42 en total. Faget admitió que no era médico de tratamiento de éstos y que no recordaba si tuvo alguno como paciente. Sin embargo, quedó establecido que el contacto de ésta con dichos electores fue solamente para esa ocasión.

Por otra parte, llama la atención en el corto tiempo que los médicos pudieron evaluar decenas de pacientes en una zona que no conocían. Su testimonio no mereció la credibilidad de este Tribunal en torno a la cantidad de electores que visitaron en dos horas para poder entrar al hogar, observar, preguntar, evaluar y emitir una certificación; sobre todo cuando no tenían el historial previo de estos pacientes y ni les conocían.

Por tanto, en el caso de Orocovis, se recomienda se revoque la Resolución de la CEE, toda vez que no eran los médicos de tratamiento o cabecera conforme a la ley. Por otra parte, surge de las determinaciones de hechos que en cuanto a Orocovis existen varias solicitudes que adolecen de forma; por lo cual sería otra justificación en derecho para en esos casos se revoque la Resolución.

En relación al Precinto 054 de Utuado, durante la vista celebrada se presentó prueba en cuanto a varias certificaciones emitidas por la Junta de Licenciamiento y Disciplina Médica de Puerto Rico en cuanto a la licencia del Dr. Rivera González. La última certificación, de 21 de septiembre de 2016 disponía que el Dr. Rivera González cumplió con los requisitos de registro de licencia y educación médica continua para el trienio 2016-2019, a tenor con lo dispuesto en la Ley núm. 139-2008 y la Ley núm. 11 de 23 de junio de 1976, según enmendadas. Además, expresamente indicó que dicha certificación era válida hasta el 27 de febrero de 2019. Conforme al término del trienio 2016-2019, dicha certificación

comenzaba del 27 de febrero de 2016 y su duración se extendía al 27 de febrero de 2019. No surge de la prueba presentada que al Dr. Rivera González se le haya suspendido o revocado su licencia. Conforme el Art. 7 de la Ley Núm. 139-2008, la Junta de Licenciamiento y Disciplina Médica de Puerto Rico puede tomar las siguientes acciones en torno a las licencias: denegar, suspender, cancelar o revocar cualquier licencia y para emitir una orden fijando a un médico un período de prueba por un tiempo determinado.

En vista de lo anterior, se concluye que a prueba presentada para establecer que el Dr. Dennis González no estaba autorizado a ejercer la medicina no fue clara; por lo que se recomienda revocar la determinación de la CEE en cuanto a ese precinto.

En relación al Precinto 069 de Aibonito para el que la CEE aprobó 49 solicitudes, el PPD solicitó la revisión judicial. Sin embargo, solo presentó prueba de tres casos en particular: Ana Isabel Colón Borelli, Carlos Veguilla Colón y Carmen Ana Borelli Aponte. En cuanto a éstos, hubo prueba directa de que no están encamados; por lo que procede la revocación. No hubo prueba alguna que impugnara las certificaciones del Dr. Francisco Fontánez.

El otro asunto ante nuestra consideración versa sobre el formulario sobre solicitud de voto por adelantado por problemas de movilidad aprobado por la CEE. En primer lugar, resaltamos que el mismo no fue objetado por ninguna de las partes en cuanto a su contenido y la información que a través del mismo se solicita. Como tampoco fue objeto de controversia lo que el dispone el Manual en su inciso B sobre las instrucciones y requisitos para su aprobación. El formulario o solicitud de voto por adelantado provee, en lo pertinente: (a) un espacio para la firma del elector solicitante, (b) un espacio para la firma de la personas autorizada (de no poder firmar el elector) y (c) un espacio para que se indique el impedimento que no le permitió al elector solicitante firmar o el hecho que éste no sabe leer o escribir. Los espacios provistos en la solicitud corresponden a los requisitos dispuestos en el Manual para que proceda la aprobación del mismo. Véase que el formulario o solicitud es el documento mediante el cual la CEE exige el cumplimiento de los requisitos de la Ley Electoral, según enmendada, *supra,* y, a su vez, hace cumplir la intención legislativa. Por lo tanto, su cumplimentación es una cuestión de estricto derecho ya que de no llenar adecuadamente los espacios provistos con la información requerida se incumple con la Ley Electoral, según enmendada, *supra,* y el elector no es aquel que

identificó el legislador como elegible para el voto por adelantado.

De la página 26 de la *Resolución Enmendada* surge que la CEE aprobó solicitudes que, según la prueba presentada en las vistas celebradas, no cumplieron **estrictamente** con los requisitos reglamentarios de forma para su concesión – entiéndase, porque: (1) no consta la firma del elector ni el impedimento que no le permitió firmar o el hecho que no sabe leer o escribir; (2) no consta la firma del elector, sólo tienen una marca presuntamente hecha por éste y no consta la firma de la persona autorizada por él que certifique el impedimento que no le permitió firmar o el hecho que no sabe leer o escribir, (3) no consta la firma del elector ni de la persona autorizada por él y (4) no consta la firma del elector, sólo tienen una marca presuntamente hecha por éste y no consta el impedimento que no le permitió firmar o el hecho que no sabe leer o escribir. El Comisionado del PNP no aportó prueba sobre el particular y no refutó la prueba presentada por el Comisionado del PPD. Por ende, en cuanto a éstas, según lo dispuesto en el inciso B Manual, la Comisionada Especial recomienda la revocación de esta determinación de la CEE. Esto, por las solicitudes **no** estar cumplimentadas según lo dispone el manual, y en consecuencia, no proceder su aprobación.

En virtud de lo expuesto, se emite la siguiente recomendación, apoyada en las determinaciones hechos y derecho aplicable.

## V.

## RECOMENDACIONES

El Comisionado del PNP solicitó la revisión de las **denegaciones** de las solicitudes de los electores de los siguientes: Precinto 089 de las Piedras; Precinto 090 de las Piedras; Precinto 057 de Jayuya; Precinto 056 de Jayuya, Precinto 015 de Dorado y Precinto 054 de Utuado.

Sobre los precintos **089 y 090 de Las Piedras**, no se presentó prueba alguna  por la cual se deba revocar la determinación de la CEE, por tanto se recomienda se confirme y se deniegue el recurso de revisión en cuanto a esa alegación. (90 electores).

Sobre la determinación de la CEE de denegar la aprobación de las solicitudes del **Precinto 057 de Jayuya**, no se presentó prueba alguna por la cual se deba revocar la determinación de la CEE, por tanto se recomienda se confirme la Resolución y se deniegue el recurso de revisión en cuanto a esa alegación. (57 electores)

En cuanto al **Precinto 015 de Dorado** no se no se presentó prueba alguna por la cual se deba revocar la determinación de la CEE, por tanto se recomienda se confirme y se deniegue el recurso de revisión en cuanto a esa alegación.

En cuanto al **Precinto 054 de Utuado**, se recomienda se acoja el recurso de revisión y se revoque la determinación de la CEE. La prueba presentada para establecer que el Dr. Dennis González no estaba autorizado a ejercer la medicina no estuvo clara.  Surge del Apéndice II, estipulado, que el doctor pudo establecer que tenía su licencia vigente para el trienio 2016-2019, los cuales vencen en febrero. Tampoco se presentó una certificación de revocación de licencia o suspensión, por lo cual entendemos que le protege la presunción.

Por su parte, el Comisionado del PPD cuestionó la aprobación de solicitudes presentadas en los municipios de Orocovis Precinto 066 y Aibonito Precinto 069.

A tenor con la prueba, se recomienda revocar la Resolución en cuanto al Precinto 066 de Orocovis, por no ser los médicos certificantes, médicos de cabecera o tratamiento. En relación al Precinto 069, de Aibonito se recomienda se revoque sólo en cuanto a los electores que surgen de las determinaciones de hechos 42 y 44.

En cuanto los planteamientos sobre falta de notificación del procedimiento administrativo ante la CEE y violación del debido proceso de ley,  durante el procedimiento administrativo que llevó a la Presidenta de la CEE a emitir su *Resolución Enmendada,* no se presentó prueba sobre el particular.  Aunque se intentó, por medio de la declaración del Sr. Walter Vélez Martínez, Secretario de la Comisión, éste no pudo afirmar ni negar el hecho de la notificación a los electores; ya que de su declaración, ello no corresponde a la CEE, sino a la Comisión Local.

Por último, en virtud de que todos los comparecientes llegaron a unos acuerdos parciales mediante los cuales desistieron de sus reclamaciones en cuanto a los precintos 027 de Arecibo y 049 de Sabana Grande, se recomienda que se dicte Sentencia de conformidad.

**VI.**

**PRUEBA DOCUMENTAL**

**PRESENTADA EL 29 DE OCTUBRE DE 2016**

**A.  ESTIPULADOS:**

APENDICE I

Certificación – Emitida por la Junta de Licenciamiento y Disciplina Médica de Puerto Rico el 8 de septiembre de 2016

APENDICE II – A

Verificación de Licencia "Good Standing" emitida por la Junta de Licenciamiento y Disciplina Médica de Puerto Rico el 21 de septiembre de 2016

APENDICE II – B

Certificación de Registro y Educación Médica emitida por la Junta de Licenciamiento y Disciplina Médica de Puerto Rico el 21 de septiembre de 2016

APENDICE III – EN BLOQUE DEL 1 AL 83

Solicitud para Votar en el Colegio de Fácil Acceso en el Domicilio por Impedimento de Movilidad (Encamados) del Precinto 040 de Añasco - Elecciones Generales 2016

APENDICE IV – EN BLOQUE DEL 1 AL 68

Solicitud para Votar en el Colegio de Fácil Acceso en el Domicilio por Impedimento de Movilidad (Encamados) del Precinto 066 de Orocovis

**EVIDENCIA ESTIPULADA Y PRESENTADA EL 30 DE OCTUBRE DE 2016**

APENDICE V – EN BLOQUE DEL 1 AL 49

Solicitud para Votar en el Colegio de Fácil Acceso en el Domicilio por Impedimento de Movilidad (Encamados) del Precinto 069 de Aibonito  - Elecciones Generales 2016

APENDICE VI – EN BLOQUE DEL 1 AL 35

Solicitud para Votar en el Colegio de Fácil Acceso en el Domicilio por Impedimento de Movilidad (Encamados) del Precinto 066 de Orocovis  - Elecciones Generales 2016

**EVIDENCIA PRESENTADA 30 OCTUBRE 2016**

**B.  COMISIONADO DEL PARTIDO NUEVO PROGRESISTA**

APENDICE I – EN BLOQUE 78 FOLIOS

Datos del del Precinto 057 de Jayuya que incluye Solicitud para Votar en el Colegio de Fácil Acceso en el Domicilio por Impedimento de Movilidad (Encamados) - Elecciones Generales 2016

APENDICE II –  EN BLOQUE 59 FOLIOS

Datos del Precinto 089 de Las Piedras que incluye la Solicitud para Votar en el Colegio de Fácil Acceso en el Domicilio por Impedimento de Movilidad (Encamados) Elecciones Generales 2016

APENDICE III –  EN BLOQUE  135 FOLIOS

Datos del Precinto 015 de Dorado que incluye la Solicitud para Votar en el Colegio de Fácil Acceso en el Domicilio por Impedimento de Movilidad (Encamados) - Elecciones Generales 2016

APENDICE IV  EN BLOQUE  8 FOLIOS

Datos del Precinto 090 de Las Piedras que incluye la Solicitud para Votar en el Colegio de Fácil Acceso en el Domicilio por Impedimento de Movilidad (Encamados)   Elecciones Generales 2016

**C.    COMISIONADO DEL PARTIDO POPULAR**

APENDICE I - Información del Elector y Solicitud para votar en el Colegio de Fácil Acceso en el Domicilio por Impedimento de Movilidad (Encamados)  Elecciones Generales 2016

- Identificación 1 – Solicitud de Dispensa de Empleado para ejercer la Medicina (Dra. Ana María Faget) del 20 de octubre de 2016

**D. COMISION ESTATAL DE ELECIONES**

APENDICE I – EN BLOQUE 345 FOLIOS

Transcripción de Audiencias en la Comisión Estatal de Elecciones del 11 de octubre de 2016

**EN VIRTUD DE TODO LO CUAL,** la Comisionada Especial somete el Informe requerido y solicita respetuosamente que se tenga por cumplida la orden de este Tribunal Supremo de Puerto Rico. Una vez se presente en el Tribunal Supremo, se procederá a la notificación a las partes por el sistema de SUMAC, según se nos ha instruido.

**RESPETUOSAMENTE SOMETIDO.**

En San Juan, Puerto Rico, 1ro de noviembre de 2016.

**AILEEN NAVAS AUGER**
**COMISIONADA ESPECIAL**
T.P.I. Sala Superior de San Juan
PO Box 190887
San Juan, Puerto Rico, 00919-0887
Aileen.Navas@ramajudicial.pr
Tel. (787) 641-6193

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Aníbal Vega Borges, en su capacidad oficial como Comisionado Electoral del Partido Nuevo Progresista<br><br>Peticionario<br><br>v.<br><br>Liza García Vélez, en su capacidad oficial como Presidenta de la Comisión Estatal de Elecciones; Guillermo San Antonio Acha, en su capacidad oficial como Comisionado Electoral del Partido Popular Democrático; Partido Independentista Puertorriqueño (PIP), por conducto de su Comisionado Electoral Sr. Roberto I. Aponte Berríos; Partido del Pueblo Trabajador (PPT), por conducto de su Comisionado Electoral Dr. José F. Córdova Iturregui<br><br>Recurridos | CT-2016-015 | Certificación Intrajurisdiccional |
| --- | --- | --- |

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 4 de noviembre de 2016.

> "*Aunque pusieran silencio a las lenguas, no lo pudieran poner a las plumas; ellas en libertad dan a entender lo que en el alma está encerrado*".
>
> Miguel de Cervantes

Hoy, al resolver que cientos de electores deben ser tratados como personas con impedimentos de movilidad

(encamados), a pesar de que éstos no acreditaron adecuadamente tal hecho ante la Comisión Estatal Elecciones (en adelante, "C.E.E."), una mayoría de este Tribunal -- **desvirtuando las controversias ante nuestra consideración** -- le imprime, innecesariamente, la primera mancha al proceso electoral que se avecina. Al así hacerlo, con su actuación, derrotan las garantías de pureza procesal en las que, hasta el día de hoy -- en dicho tema --, descansaba nuestro ordenamiento electoral.

En un episodio lamentable y vergonzoso en la historia de este Alto Foro Judicial, y con el único propósito de alcanzar el resultado deseado, cinco (5) jueces de este Tribunal figuran hechos donde no los hay, evalúan prueba que no existe e ignoran las verdaderas controversias ante su consideración.

Por no estar de acuerdo con este atentado a la democracia puertorriqueña, que desde ya tiene el efecto de que un partido político manipule los resultados del evento electoral a celebrarse el próximo martes, 8 de noviembre de 2016, nos vemos en la obligación de disentir. Veamos.

I.

Como es sabido, es norma arraigada en nuestro ordenamiento jurídico que "*el derecho al voto es la más preciada de las prerrogativas del pueblo, porque es a través del voto que el pueblo ejerce su poder soberano y*

*expresa su voluntad". P.P.D. v. Adm. Gen. de Elecciones*, 111 DPR 199, 207 (1981).

En nuestra jurisdicción, el derecho al voto se deriva de varias fuentes, a saber: el derecho natural de todos los seres humanos a elegir sus gobiernos; la Constitución de Estados Unidos de América; la Constitución del Estado Libre Asociado de Puerto Rico, que consagra el derecho al sufragio universal, **igual**, secreto, directo y libre, a través del cual cada ciudadano puede emitir el voto con arreglos a los dictados de su conciencia, y los estatutos que imparten utilidad a las disposiciones constitucionales. *Véase* Art. 2.002 Ley Electoral de Puerto Rico, 16 LPRA sec. 4002.

De conformidad con lo anterior, el ente encargado de conducir los procesos electorales que se llevan a cabo en el País lo es la Comisión Estatal de Elecciones ("C.E.E.") *Véase* Art. 3.001, Ley Electoral de Puerto Rico, 16 LPRA sec. 4011. La C.E.E es la responsable de planificar, organizar, estructurar, dirigir y supervisar el organismo electoral, así como todos los procedimientos de naturaleza electoral que, conforme a la Ley Electoral de Puerto Rico, y sus reglamentos, rigen cualquier elección a celebrarse en Puerto Rico. *Íd*. En el desempeño de tal función la C.E.E. tiene, entre otros, los siguientes deberes:

> (1) Aprobar y adoptar las reglas y reglamentos que fueren necesarios para implantar las disposiciones de este subtítulo bajo su jurisdicción, los cuales tendrán vigencia, previa notificación al Gobernador y a la Asamblea Legislativa de Puerto Rico mediante

publicación al efecto en dos (2) periódicos de circulación general, dos (2) veces en un período de dos (2) semanas, sin que sea necesario el cumplimiento de las disposiciones de las secs. 2101 *et seq.* del Título 3; denominadas "Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico" […];

(m) **Desarrollar un plan de acción afirmativo y aprobar los reglamentos para facilitar el ejercicio del derecho al voto de las personas con impedimento.** (Énfasis nuestro). Art. 3.002 Ley Electoral de Puerto Rico, 16 LPRA, secs. 4012 (l) y (m).

Cónsono con lo anterior, y en aras de facilitar el ejercicio del derecho al voto de las personas con impedimentos, el Art. 9.039(m) de la Ley Electoral de Puerto Rico, 16 LPRA sec. 4179, establece que tendrán derecho a votar voluntariamente, mediante el proceso de voto adelantado, los electores debidamente calificados que se encuentren en Puerto Rico en cualquiera de las categorías que se mencionan a continuación:

[…]

(m) **Las personas con impedimentos de movilidad (encamados) que cualifiquen como electores de fácil acceso en el domicilio.** La Comisión Local será responsable de verificar, evaluar y aprobar la solicitud, conforme al reglamento aplicable. Los miembros de las Juntas de Inscripción Permanente deberán grabar la solicitud como una transacción de fácil acceso. La Junta Administrativa del Voto Ausente (JAVA) será responsable de trabajar la votación como voto adelantado y la adjudicación de estos votos.

**Para los casos que soliciten el voto adelantado por la causal de algún tipo de condición médica que le impida asistir a su colegio de votación,**

**la Comisión proveerá un formulario para que el <u>médico de cabecera o de tratamiento del elector</u> certifique: que el elector presenta un problema**

**de movilidad física que sea de tal naturaleza que le impida acudir a su centro de votación.**

**La Comisión será responsable de reglamentar la manera en que se establecerá el procedimiento a seguir para garantizar el voto de las personas con impedimento de movilidad (encamados).** En este procedimiento se trabajará la votación como voto adelantado bajo la supervisión de la Junta Administrativa del Voto Ausente (JAVA) y coordinado por la Junta de Inscripción Permanente (JIP). Dicho proceso de voto adelantado comenzará diez (10) días previos a las elecciones generales y terminará por lo menos un día antes de la fecha de las elecciones generales para lo que se crearán subjuntas [sic.] bajo la supervisión de la Junta de Inscripción Permanente.

Este proceso de voto adelantado será administrado por una Junta de Balance Electoral, la cual garantiza la identidad del elector, que las papeletas las reciba en blanco y que el elector ejerce el voto de forma independiente y secreta de conformidad con lo dispuesto en este subtítulo y en el *Reglamento* de Voto Adelantado.

La Junta de Colegio tendrá la responsabilidad afirmativa de garantizar que el elector tiene la capacidad para consentir y que ejerce el voto en forma secreta. La capacidad para consentir es una mediante la cual el elector debe poder de forma individual y voluntaria comunicarse mediante cualesquiera de los siguientes mecanismos: la expresión oral, escrita y señales o gestos corporales afirmativos iguales o parecidos a los que utilizan las personas con problemas del habla, audición y visión. También implicará que el elector libremente y sin coacción es quien ejerce el voto de forma independiente y secreta. (Énfasis nuestro).

Al respecto, y en lo referente a la solicitud de voto adelantado, el Art. 9.040 de la Ley Electoral de Puerto Rico, 16 LPRA sec. 4180, añade que:

**[e]l voto adelantado tendrá que solicitarse para cada elección mediante formulario y evidencia acreditativa, según la Comisión disponga por**

**reglamento.** El término para solicitar el voto por adelantado será a la fecha del cierre del Registro General de Electores para la elección correspondiente. No obstante esto, las personas que se encuentren en una de las categorías de los incisos (f), (k) y (l) de la sec. 4179 de este título podrán solicitar el voto adelantado mediante formulario y evidencia acreditativa hasta no más tarde de quince (15) días previo al evento electoral. (Énfasis suplido).

Así las cosas, y a tenor con la facultad otorgada por la Ley Electoral de Puerto Rico, *supra*, la C.E.E. aprobó el *"Reglamento de Voto Ausente y Voto Adelantado de Primarias 2016 y Elecciones Generales 2016"* (en adelante, *"Reglamento"*) de 25 de mayo de 2016. En esencia, y en cuanto al tema de las personas con impedimentos de movilidad (encamados), en la Sección 6.6 (a) del mencionado *Reglamento* se reproduce *in extenso* lo dispuesto en el Art. 9.039 (m), de la Ley Electoral de Puerto Rico, *supra*.

De otra parte, en virtud de las disposiciones legales antes señaladas, también se promulgó el *"Manual de Procedimientos para el Voto Adelantado en el Colegio de Fácil Acceso en el Domicilio para las Elecciones Generales"* de 11 de agosto de 2016 (en adelante, *"Manual"*), el cual recoge los requisitos y criterios para que un elector se pueda acoger a este tipo o modalidad de voto. A su vez, el *Manual* establece los deberes y funciones de las Comisiones Locales de Elecciones, los Oficiales de Inscripción y la Junta Administrativa de Voto Ausente y Voto Adelantado (JAVA, por sus siglas). Según se

desprende de su *Introducción*, los procedimientos allí establecidos tienen como propósito:

> [g]arantizar a los electores del Colegio de Fácil Acceso en el Domicilio su derecho al voto libre y secreto. Además, establecen los mecanismos necesarios para que el proceso de votación sea uno transparente y justo para todos los partidos políticos y candidatos a puestos electivos en las Elecciones Generales de 2016". *Manual,* pág. 2.

De particular importancia para la correcta disposición de las controversias ante nos, resultan ser los incisos A, B, G y H del referido *Manual*, pues en éstos claramente se establece el procedimiento a seguir desde que un elector solicita votar en el *Colegio de Fácil Acceso en el Domicilio*, hasta que dicha solicitud se aprueba o se deniega. Dichos incisos disponen de la siguiente forma:

> A. <u>Requisitos para solicitar votar en el Colegio de Fácil Acceso en el Domicilio</u>
>
> Podrán solicitar votar en el Colegio de Fácil Acceso en el Domicilio, aquellos electores con impedimentos de movilidad para acudir a su colegio de votación el martes, 8 de noviembre de 2016. Conforme a la Ley Electoral y el Reglamento de Voto Ausente y Adelantado deberá ser un elector activo y aparecer en el registro general de electores para las elecciones del 2016. La JAVA distribuirá el documento con la solicitud y certificación médica donde indique que el elector presenta problemas de movilidad. Dicha solicitud estará disponible en las JIP y en la página web de la Comisión
>
> B. <u>Solicitud del Colegio de Fácil Acceso en el Domicilio</u>
>
> El elector, a través de una persona de su confianza, gestionará en la Junta de Inscripción Permanente (JIP) o en la página electrónica de la Comisión la solicitud para [v]otar en el Colegio de Fácil Acceso en el [d]omicilio. Dicha

solicitud será certificada por **su** médico de cabecera o médico de tratamiento y se someterá en la JIP. **La solicitud tendrá que ser firmada por el elector, salvo que tenga impedimentos que no le permitan firmar o que no sepa leer o escribir. En este caso podrá hacer una marca y alguna persona autorizada por él certificará este hecho con su firma como testigo en el espacio que a estos fines provee la solicitud.**

G. <u>Rechazo de Solicitud</u>

En caso de que la solicitud de voto a domicilio no sea aprobada, la Comisión Local autorizará a dicho elector a votar en el colegio de fácil acceso en el centro de votación. La JIP procederá a grabar dicha solicitud conforme fue aprobada por la Comisión Local. No obstante, para grabar la solicitud, la JIP deberá esperar a que transcurra y sea final el proceso de apelación que se dispone en el Inciso (H) de este *Manual*. De la JIP no poder realizar la grabación que corresponda, por haber pasado la fecha límite para esto, deberán remitir el caso al Secretario de la Comisión para que se realice la Certificación de inclusión o exclusión que corresponda.

H. <u>Proceso de Apelación</u>

En caso de rechazo de su solicitud, cualquier elector afectado tendrá cinco (5) días laborables a partir de la fecha del recibo de la notificación negativa para apelar la decisión. La apelación deberá hacerse por escrito y dirigida al Secretario, quien la presentará a la Comisión a la mayor brevedad posible. La Comisión notificará al elector y a la Comisión Local la decisión. De resultar adversa al elector, éste tendrá el derecho de apelar ante el Tribunal de Primera Instancia conforme al Artículo 5.005 de la Ley Electoral. (Énfasis suplido). *Íd.* a las págs. 3-6.

Es decir, a la luz de la normativa constitucional, legal y reglamentaria antes expuesta, en palabras sencillas, podemos colegir que, para poder votar en el *Colegio de Fácil Acceso en el Domicilio*, 1) el elector debe solicitarlo; 2) **<u>su médico de cabecera o de</u>**

**tratamiento debe visitar y certificar que el elector o electora cualifica para el voto a domicilio debido a su condición de salud**; 3) la información debe ser verificada y aprobada por la C.E.E. o sus organismos, y 4) una junta, con representación de todos los partidos políticos debidamente inscritos, debe visitar al elector para tomarle el voto.

En cuanto al asunto medular en controversia, la definiciones adoptadas por la C.E.E. para el término médico de cabecera -- *"profesional de la salud que tiene una relación de continuidad con el paciente al que le atiende alguna condición médica […]"*[84] -- o médico de tratamiento -- *"profesional de la salud (médico) que atiende la condición médica que impide al paciente acudir a su centro de votación"*[85] -- responden al desarrollo que ha tenido dicho concepto en la jurisdicción federal en un contexto particularmente similar al de autos. Asimismo, dichas definiciones responden a concepciones aceptadas en la academia. Nos explicamos.

El término *"médico de cabecera"* ha sido definido como *"[e]l que asiste especialmente y **de continuo** al enfermo"*. (Énfasis nuestro). *Diccionario Terminológico de Ciencias Medicinas*, 12ma ed. 1984, Salvat Editores, S.A., Barcelona, España, pág. 682. *Véase además*, *Enciclopedia de*

---

[84] *Véase*, *Resolución Enmendada de la Comisión Estatal de Elecciones*, CEE-RS-16-83, pág. 24.

[85] *Íd.*, pág. 25.

*Medicina y Enfermería Mosby*, Ed. 1992, Vol. 2, Ediciones Océano S.A., España.

Por su parte, el *Reglamento para Implantar las Disposiciones de la Ley Número 194 de 25 de agosto de 2000 (Carta de Derechos del Paciente), según enmendado, Reglamento Número 7617 del Departamento de Estado*, establece en su artículo séptimo, que el *"médico primario"*, también conocido como *"médico de cabecera"*, tiene la responsabilidad de, entre otras, proveer continuidad de cuidado al paciente. *Véase* Art. 7 (50) del *Reglamento Núm. 7617 del Departamento de Estado*.

En la misma línea, el *"médico de tratamiento"* es quien provee tratamiento o evaluación médica como parte de la relación médico-paciente. Así, de forma análoga, ha sido definido en el ámbito federal por el *Code of Federal Regulations*, en el contexto de los procesos ante la Administración del Seguro Social[86]:

> *Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation **and who has, or has had, an ongoing treatment relationship with you.** Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you*

---

[86] Dicha definición determina el peso que un juez administrativo (Administrative Law Judge) otorgará a una opinión médica al momento de adjudicar una reclamación de beneficios por discapacidad de un trabajador o trabajadora.

*only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).* **We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability.** *In such a case, we will consider the acceptable medical source to be a non treating source.* (Énfasis nuestro). 20 C.F.R. § 404.1502.

Como vemos, ambos conceptos -- médico de cabecera y médico de tratamiento -- necesariamente implican la existencia de una relación **previa** médico-paciente. En este sentido, hacemos referencia al desarrollo que ha tenido dicho concepto en la jurisdicción federal, a saber: *Murphy v. Astrue*, 2011 WL 334316, a la pág. *3 (D. Colo. 2011) (un periodo de tratamiento médico durante un mes es considerado uno breve que no cualifica al médico como uno de tratamiento); *Hunter v. Barmhart*, 210 Fed. Appx. 753 (10mo Cir. 2006) (un médico que examina a un paciente una sola vez y sólo provee información médica relacionada a un periodo de tiempo objeto de una controversia, no cualifica como médico de tratamiento); *Doyal v. Barnhart*, 331 F.3d 758, 762 (10mo Cir. 2003) (la opinión de un médico de tratamiento merece un peso particular basado en **una relación de duración y frecuencia**); *Guyton v. Apfel*, 20 F.Supp 2d 156, nota núm. 11 (D.C. Mass. 1998) (citando con aprobación la definición del término *"treating source"*, según codificada por la Administración del Seguro Social, 20 C.F.R. sec. 404.1502, a saber "[the patient's] *own*

*physician or psychologist who has provided [him or her] with medical treatment or evaluation and **who has or has had an ongoing relationship with [her or him]"*)* (Énfasis suplido). *Weiler v. Shalala*, 922 F.Supp. 689, 696 (D. C. Mass. 1996) (citando con aprobación la definición del término *"treating physician"*, según codificada por la Administración del Seguro Social, *supra); Murray v. Heckler,* 722 F.2d 499, 501-02 (9no Cir. 1983) (resolviendo que un médico de tratamiento tiene una mejor oportunidad de observar al paciente [*vis à vis* un médico que no es de tratamiento]). *Véase* además, *Knight v. Astrue*, 32 F. Supp. 3d 210 (N.D. N.Y. 2012).

A lo anterior, debemos añadir que el lenguaje de la Ley Electoral de Puerto Rico, *supra*, requiere que el médico que certifique sea **del elector**. Definitivamente, esto demuestra que el médico que se encargue de certificar la solicitud de voto adelantado a domicilio no puede ser cualquier persona. La relación previa o posterior con el paciente es necesaria y obligatoria.

Es, precisamente, a la luz de este marco jurídico que debemos disponer de las controversias ante nuestra consideración. En ese sentido, no tenemos duda de que, en el caso de autos, el proceso llevado a cabo para determinar quiénes podían votar en el *Colegio de Fácil Acceso en el Domicilio* fue cuidadosamente resguardado y seguido al pie de la letra por la C.E.E. y confirmado prácticamente en su totalidad por la Comisionada Especial.

**No existe razón en derecho que nos mueva a alejarnos de sus recomendaciones**. Nos explicamos.

II.

En el presente caso, el pasado 28 de octubre de 2016, el Comisionado Electoral del P.N.P, licenciado Aníbal Vega Borges, (en adelante, Comisionado Electoral del P.N.P), nos solicitó que, desde este estrado apelativo de última instancia, expidiéramos un recurso de certificación intrajurisdiccional y pasáramos juicio sobre -- y autorizáramos -- cientos de solicitudes de voto adelantado a domicilio de personas con impedimentos de movilidad (encamados) que, según lo determinó originalmente la C.E.E. tras recibir prueba testifical y documental, no acreditaron adecuadamente que debían ser tratadas como tal, a saber, como personas encamadas. Ello, a tenor con lo dispuesto en el Art. 9.039(m) de la Ley Electoral de Puerto Rico, *supra*, el *Reglamento* y el *Manual*.

Entre las alegaciones que consignó la C.E.E. al evaluar las referidas solicitudes llaman la atención, entre otras, las siguientes: 1) médicos que certificaron las solicitudes no son de cabecera o tratamiento del elector o electora; 2) solicitudes certificadas por un médico que no está en "*good standing*"; 3) médico que certifica las solicitudes no visitó a los electores y para ello designó a una persona que no es médico; 4) médicos que certifican solicitudes no habían tenido ningún

contacto con los electores a los que le certificaron su solicitud; 5) médicos que efectuaron las certificaciones fueron contratados por un partido político fuera del municipio de residencia del elector; 6) solicitudes certificadas por médicos que tenían un conflicto de interés insalvable pues aspiraban a puestos electivos en los municipios donde certificaban la solicitud; 7) certificación del médico no está cumplimentada en su totalidad; 8) electores que afirman que el médico que certificó su solicitud nunca los visitó; 9) solicitudes no firmadas por el elector y sin justificación para no hacerlo, y 10) administradora de un hogar de ancianos certificó por carta que el médico que firmó las solicitudes de un grupo de electores que están bajo su cuidado no visitó los mismos y ella tampoco los conoce[87].

Los Municipios (Precintos Electorales) afectados por esta determinación fueron: Utuado: Precinto 054; Arecibo: Precinto 027; Añasco: Precinto 040; Las Piedras: Precinto 089 y 090; Jayuya: Precinto 056 y 057; Dorado: Precinto 015; San Lorenzo: Precinto 086; Juana Díaz: Precinto 063; Sabana Grande: Precinto 049; Patillas: Precinto 091; Orocovis: Precinto 066; Aibonito: Precinto 069, y Ponce: Precinto 061.

En lo pertinente al caso ante nos, el Comisionado Electoral del P.N.P., además de una alegada falta de

---

[87] *Véase, Resolución Enmendada de la C.E.E.* en el asunto que nos ocupa, CEE-RS-16-83.

notificación de la apelación a los electores, sólo cuestionó ante el Tribunal de Primera Instancia aquellas determinaciones de la C.E.E. relacionadas con: la definición al término *"médico de cabecera o tratamiento"*, el *"good standing"* de los médicos que certifican solicitudes, los médicos contratados que certificaron una gran cantidad de solicitudes, y aquellas que disponen que el problema de movilidad física debe ser de tal naturaleza que impida al elector acudir a su centro de votación. A juicio de éste, las determinaciones emitidas por la C.E.E. en cada una de las instancias antes mencionadas fueron livianas y contrarias a los hechos y el derecho, así como dirigidas a despojar a los electores con impedimentos de movilidad (encamados) de su derecho constitucional al voto. El Comisionado Electoral del P.P.D., en un pleito independiente, hizo iguales señalamientos en escenarios más limitados. Ambos casos fueron consolidados por el Tribunal de Primera Instancia.

Así las cosas, y a solicitud del Comisionado Electoral del P.N.P., este Tribunal -- sin jurisdicción para ello[88]-- emitió una certificación intrajurisdiccional

---

[88] El pasado 31 de octubre de 2016, al momento de certificar la *Resolución* de este Tribunal donde se atendía todo lo relacionado a las mociones de desestimación por falta de jurisdicción presentadas, por separado, por el Comisionado Electoral del P.P.D. y por el Comisionado Electoral del P.P.T., en el presente caso, expresamos lo siguiente:

Hace tan solo cinco (5) días atrás, el 26 de octubre de 2016, en *Luis A. Rodríguez Aponte (Comisionado Electoral del PPD) y otros v. Comisión Local de Elecciones de las Marías, CC-2016-1017*, un caso con controversias en extremo

en el caso de epígrafe, y designó a la Honorable Jueza Aileen Navas Auger como Comisionada Especial con el propósito de rendir un Informe con determinaciones de hecho, conclusiones de derecho y recomendaciones sobre las controversias planteadas ante nuestra consideración.

Luego de los trámites de rigor, entre los cuales el Comisionado Electoral del P.N.P. y del P.P.D. llegaron a acuerdos que pusieron fin a diversas controversias dentro de este pleito, la Comisionada Especial rindió su Informe respecto a la revisión de las denegaciones de las

---

similares a la que hoy nos ocupan, los nueve (9) jueces que componemos este Tribunal procedimos de forma correcta al desestimar por falta de jurisdicción un recurso de revisión judicial en el cual el Comisionado Electoral del Partido Popular Democrático de las Marías nos solicitaba que revisáramos un gran número de recusaciones por razón de domicilio efectuadas en el referido Municipio. Ello toda vez que el recurso presentado por este no se había notificado a las partes dentro del término de 24 horas que establece la Regla 22 (e) del Reglamento de este Tribunal, 4 L.P.R.A. Ap. XXI-B, análoga a el Art. 4.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A sec. 4031. Hoy, en un caso en el que el Comisionado Electoral del Partido Nuevo Progresista nos solicita que revisemos ciertas determinaciones de la Comisión Estatal de Elecciones relacionadas con el voto adelantado de electores con impedimentos de movilidad (encamados), una mayoría de este Tribunal **-- sin brindar razones válidas en derecho para ello --** se niega a desestimar por falta de jurisdicción un recurso que adolece, en esencia, del mismo defecto. No podemos avalar con nuestro voto ese lamentable y errado proceder. Con el mismo sentido de justicia y de responsabilidad que empleé al disponer del caso *Luis A. Rodríguez Aponte (Comisionado Electoral del PPD) y otros v. Comisión Local de Elecciones de las Marías,* hoy desestimaría por falta de jurisdicción el caso ante nos.

Ahora bien, en vista de que cinco (5) compañeros jueces de este Tribunal optaron por reconocer jurisdicción donde no la había, es nuestro deber y responsabilidad atender este caso en sus méritos.

Sobre este particular, véase además, en la *Resolución* de 31 de octubre de 2016 emitida en el caso de epígrafe, el Voto Particular Disidente del Juez Asociado Feliberti Cintrón al cual se unen la Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Colón Pérez, así como el Voto Particular Disidente de la Juez Asociada señora Rodríguez Rodríguez.

solicitudes de los electores de los Precintos 089 y 090 de las Piedras; Precintos 057 y 056 de Jayuya; Precinto 015 de Dorado y Precinto 054 de Utuado. En lo pertinente, en las páginas 33-34 de su Informe emitió varias recomendaciones.

Sobre los **Precintos 089 y 090 de Las Piedras;** el **Precinto 057 de Jayuya;** y el **Precinto 015 de Dorado,** en las cuales la C.E.E. denegó la aprobación de las solicitudes por haber estado firmadas por médicos que no eran médicos de cabecera ni de tratamiento de los solicitantes, se recomendó confirmar dicha determinación y denegar el recurso de revisión por no haberse presentado prueba alguna por la cual se deba revocar[89].

En cuanto al **Precinto 054 de Utuado,** se nos recomendó revocar la determinación de la C.E.E., como consecuencia de que la prueba presentada para establecer que el médico que firmó dichas solicitudes no estaba autorizado a ejercer la medicina no estuvo clara[90].

Respecto a la impugnación de aprobación de solicitudes presentada por el Comisionado Electoral del P.P.D. en los municipios de **Orocovis: Precinto 066 y Aibonito: Precinto 069,** en base a la prueba desfilada, la Comisionada recomendó revocar la determinación de la C.E.E. En cuanto al **Precinto 066 de Orocovis,** su

---

[89] *Véase Informe de la Comisionada Especial,* en las páginas 33-34.

[90] *Íd.*

recomendación se debió a que los médicos certificantes no eran médicos de cabecera o de tratamiento. En relación al **Precinto 069 de Aibonito**, se nos recomendó revocar únicamente en cuanto a los electores Carmen Ana Borelli Aponte, Ana Colón Borelli, Carlos Vegilla Colón, Rosa Cartagena Rodríguez, por desfilarse prueba directa de que no están encamados.[91]

Recibido el Informe, la C.E.E. presentó su alegato ante este Foro. El Comisionado Electoral del P.N.P. también presentó el suyo. De igual forma, comparecieron los Comisionados Electorales del P.P.D., el Partido Independentista Puertorriqueño ("P.I.P.") y el Partido del Pueblo Trabajador ("P.P.T.") en un escrito en conjunto.

Así pues, evaluado en su totalidad el Informe ante nuestra consideración, así como las recomendaciones que contiene el mismo y los alegatos de referencia, somos de la opinión que, el análisis efectuado por la Comisionada Especial, que confirma gran parte de las determinaciones emitidas por la C.E.E., fue uno correcto en derecho. Dicho análisis estuvo centrado en una evaluación concienzuda de la prueba presentada por las partes y del derecho aplicable.

A nuestro juicio, al emitir sus recomendaciones, la Comisionada Especial tomó en consideración el derecho al voto a domicilio de las personas con impedimentos de

---

[91] *Informe de la Comisionada Especial,* en las páginas 33-34.

movilidad (encamados), así como la forma más adecuada de garantizar que el pueblo de Puerto Rico pudiese ejercer sus derechos democráticos en un ambiente de absoluta pureza e imparcialidad. De esta forma, se pretendió evitar que este proceso se prestase para que un partido político, **de forma ilegal y fraudulenta**, obtuviese una ventaja indebida en las elecciones generales de 2016, al no acreditarse adecuadamente que cientos de personas deberían ser tratadas como unas con impedimentos de movilidad (encamados) conforme a las disposiciones constitucionales, legales y reglamentarias antes expuestas.

Es decir, de la prueba desfilada en este caso se desprende que, salvo contadas excepciones con las que estamos de acuerdo, tanto la Comisionada Especial, como la C.E.E., actuaron correctamente al disponer de las solicitudes para el voto adelantado de las personas con impedimento de movilidad (encamados).

Recordemos que si bien es cierto que *"la Asamblea Legislativa estableció que la revisión de las decisiones de la Comisión sería mediante un juicio de novo"* donde *"el foro primario tiene la obligación de celebrar una vista en su fondo, recibir evidencia y hacer sus propias determinaciones de hechos y conclusiones de derecho al revisar las decisiones de la Comisión"*, *P.A.C. v. P.I.P*, 169 DPR 775, 791-792 (2006), igualmente cierto es que ***"en aquellos casos en que la determinación de la Comisión dependa principal o exclusivamente de una cuestión de***

***derecho electoral especializado"*, debemos guardar la

usual deferencia al mencionado organismo administrativo.

*Mundo Ríos v. C.E.E.*, 187 DPR 200, 207 (2012); *P.A.C. v.

P.I.P*, *supra*, a la pág. 792; *Granados Rodríguez Estrada

I*, 124 DPR 1, 20-21 (1989). Sin duda, las controversias

relacionadas al voto adelantado de personas con

impedimento de movilidad, es un área especializada de

derecho electoral. Es precisamente con este estándar de

revisión en mente que acogemos las recomendaciones

contenidas en el Informe rendido por la Comisionada

Especial, y en consecuencia, procederíamos de

conformidad con lo allí dispuesto.

De otra parte, es menester señalar que el

planteamiento relacionado a la alegada falta de

notificación a los electores del proceso de apelación

que tuvo lugar ante la C.E.E., no nos convence. Ello

puesto que no se presentó prueba sobre este particular

ante el foro administrativo[92] como tampoco se presentó

prueba fehaciente sobre ella ante la C.E.E. A esos

efectos el Informe de la Comisionada señala:

> [e]n cuanto los planteamientos sobre falta de
> notificación del procedimiento administrativo
> ante la C.E.E. y violación del debido proceso de
> ley, durante el procedimiento administrativo que
> llevó a la Presidenta de la C.E.E. a emitir su
> *Resolución Enmendada*, no se presentó prueba
> sobre el particular. Aunque se intentó, por
> medio de la declaración del Sr. Walter Vélez
> Martínez, Secretario de la Comisión, éste no

---

[92] *Véase Informe de la Comisionada Especial*, pág. 34.

pudo afirmar ni negar el hecho de la notificación a los electores; ya que de su declaración, ello no corresponde a la C.E.E., si no a la Comisión Local. Informe de la Comisionada, pág. 321.

Es decir, este asunto <u>nunca</u> se trajo ante la C.E.E. El mismo se intentó probar ante el Tribunal de Primera Instancia con el testimonio de una persona que, en esencia, nada dijo sobre el particular. Además, según se desprende del *Informe de la Comisionada Especial*, la representación legal del Comisionado Electoral del P.N.P. tampoco pudo afirmar que en efecto se hubiese incumplido con las aludidas notificaciones[93].

Por último, contrario a lo erróneamente señalado por una mayoría de este Tribunal, la determinación de la C.E.E. <u>**no**</u> impide que electores y electoras ejerzan su derecho fundamental al voto en el evento electoral que se avecina. Sólo implica que éstos deben acudir al colegio electoral correspondiente a emitir sus respectivos votos el próximo martes, 8 de noviembre de 2016. Así correctamente lo pretendió la Comisionada Especial, y la C.E.E, con su proceder en el presente caso. Así debió garantizarlo al País este Tribunal, pero la mayoría de esta Curia optó por no hacerlo.

III.

Por los fundamentos antes expuestos, y por entender que la determinación de la Comisionada Especial, Hon.

---

[93] *Íd.*, pág. 4.

Aileen Navas Auger, que confirma en gran parte la determinación de la C.E.E., garantizaba la pureza del proceso que debe regir los eventos electorales del próximo 8 de noviembre de 2016, disentimos del lamentable curso de acción seguido por una mayoría de este Tribunal en el día de hoy.


                                        Ángel Colón Pérez
                                          Juez Asociado